```
                                                                        1
1                     UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF VIRGINIA
2                         ALEXANDRIA DIVISION

3   -----------------------------x
                                  :
4   UNITED STATES OF AMERICA,     : Criminal Action No.
                                  :
5              versus             : 1:19-cr-356
                                  :
6   KWASHIE SENAM ZILEVU,         : July 13, 2021
                                  :
7              Defendant.  : KWAKU BLAY TESTIMONY
    -----------------------------x
8
          The above-entitled Jury Trial - Excerpt was heard
9   before the Honorable Rossie D. Alston, Jr., United States
    District Judge.
10
                       A P P E A R A N C E S
11
     FOR THE GOVERNMENT:     RONALD FIORILLO, AUSA
12                           JAMAR WALKER, AUSA
                             United States Attorney's Office
13                           2100 Jamieson Avenue
                             Alexandria, VA 22314
14

15   FOR THE DEFENDANT:      CHRISTOPHER BROWN, ESQ.
                             526 King Street
16                           Suite 207
                             Alexandria, VA 22314
17
                             PLEASANT BRODNAX, ESQ.
18                           Law Office of Pleasant S. Brodnax,
                             III
19                           1701 Pennsylvania Avenue, NW
                             Suite 200
20                           Washington, DC 20006

21

22

23   OFFICIAL U.S. COURT REPORTER:   MS. TONIA M. HARRIS, RPR
                             United States District Court
24                           401 Courthouse Square
                             Fifth Floor
25                           Alexandria, VA 22314
```

2

1                         TABLE OF CONTENTS
                          TRIAL WITNESSES
2

On behalf of the Government:
3

Kwaku Blay
4
            Direct examination by Mr. Fiorillo............ 06
5           Cross-examination by Mr. Brown................ 31
            Redirect examination by Mr. Fioriollo......... 84.
6
                            EXHIBITS
7

On behalf of the Defendant:
8                                                   Admitted

9  Number 3.......................................... 40

10                          MISCELLANY

11 Certificate of Court Reporter...................... 88

12

13

14

15

16

17

18

19

20

21

22

23

24

25

─────United States v. Zilevu─────

3

1    (Excerpt trial proceedings -- Kwaku Blay's testimony.)

2            MR. FIORILLO:  Your Honor, the government calls

3    Kwaku Blay.

4            THE COURT:  Kwaku Blay.

5            (The government's witness, Kwaku Blay, was sworn.)

6            THE WITNESS:  Yes, I do.

7            (Witness seated.)

8            THE COURT:  Sir, before we get started, I need to

9    ask you this question.  You are under no obligation to answer

10   it, but I have to take certain precautions depending on what

11   you say.

12           Have you been fully vaccinated, sir?

13           THE WITNESS:  Not yet.

14           THE COURT:  Okay.  Let's put the screens up.  Let's

15   get him a mask.  Sir, there's a rule that's in place.

16           Marlan, if you can help.

17           Sir, there's a rule that I have to follow pursuant

18   to the CDC and the general orders of the Eastern District of

19   Virginia, that if a person is not vaccinated, I have to take

20   special precautions to protect them and to protect the rest of

21   the people who are participating in the process.

22           So we don't mean to embarrass you by putting these

23   devices up, but it's something that I have to do as part of my

24   obligation to the public.

25           THE WITNESS:  Okay.

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

─────United States v. Zilevu─────

Direct - K. Blay

4

1          THE COURT:  Thank you, sir.

2          MR. FIORILLO:  May I proceed, Your Honor?

3          THE COURT:  Yes.

4                    DIRECT EXAMINATION

5   BY MR. FIORILLO:

6   Q.   Could you please say and spell your name for the record.

7   A.   My name is Kwaku Blay.  K-w-a-k-u, B-l-a-y.

8   Q.   How old are you, Mr. Blay?

9   A.   I'm 38.

10  Q.   And where were you born?

11  A.   I was born in Africa, Ghana.  That's in West Africa.

12  Q.   Did you attend school there as a child?

13  A.   Yes, I did.

14  Q.   Until what grade?

15  A.   So I finished, I think, secondary school.

16  Q.   And what was the name of the school you attended?

17  A.   It was Presbyterian Boys Secondary School.

18  Q.   Where do you live now?

19  A.   I live in Laurel, Maryland.

20  Q.   When did you come to the United States?

21  A.   2003, in August.

22  Q.   Mr. Blay, why would you choose to move to the United

23  States?

24  A.   I came here on a student visa, so I stayed.

25  Q.   Did you study here?

United States v. Zilevu

5

```
 1   A.   Yes.

 2   Q.   What did you study?

 3   A.   Business administration in Brooklyn.

 4   Q.   Did you graduate?

 5   A.   No.

 6   Q.   What's your current immigration status?

 7   A.   I'm in removal proceedings for deportation.

 8   Q.   Could you explain what removal proceedings mean.

 9   A.   Basically -- basically waiting for my travel documents

10   from Ghana Embassy, to send me back to Ghana.

11   Q.   Are you married, Mr. Blay?

12   A.   Yes.

13   Q.   When did you get married?

14   A.   2017.

15   Q.   Have you ever been convicted of a state crime involving

16   larceny?

17   A.   Yes.

18   Q.   What was the crime?

19   A.   It was in Norfolk, Virginia, for credit card larceny and

20   credit card theft.

21   Q.   Can you describe what you did in that case.

22   A.   I found a credit card on the floor and I went on a

23   shopping spree, and I was caught and charged with it.

24   Q.   Did you apply for this credit card?

25   A.   No.
```

EASTERN DISTRICT OF VIRGINIA

United States v. Zilevu

6

1   Q.   Where did you find it exactly?

2   A.   Oh, actually, I cannot remember exactly where I found it,

3   but it was either in the mail or on the floor.

4   Q.   On the floor?

5   A.   Yes, some random place.

6   Q.   Do you remember where you used it?

7   A.   Target.

8   Q.   Mr. Blay, have you ever been convicted of any federal

9   crimes involving fraud?

10   A.   Yes.

11   Q.   What was the specific charge you were convicted of?

12   A.   I was convicted for one conspiracy to commit bank fraud.

13   Two bank fraud charges and one identity theft.

14   Q.   Were you convicted of identity theft?

15   A.   No, I wasn't.

16   Q.   Were there other people involved in that fraud scheme?

17   A.   I had five co-defendants.

18   Q.   Was it determined by the federal judge who presided in

19   that case whether you accepted responsibility for your role?

20   A.   Yes, that's right.

21   Q.   What was your role in that fraud and identity theft

22   scheme?

23   A.   My role, basically, was it was like a mule to open

24   accounts basically so money can be deposited and I'll be the

25   one taking the money out.

United States v. Zilevu

Direct - K. Blay

7

1   Q.   I'm sorry, sir.  Did you say "mule"?

2   A.   Yeah.

3   Q.   What does that mean?

4   A.   Basically, someone that just open accounts for -- for

5   funds to be deposited and you would be the one taking the

6   money out of that account.

7   Q.   And these accounts you're speaking of, were they in your

8   name?

9   A.   No.  One was in my name, the other wasn't.

10   Q.   How did you obtain somebody else's name to use to open

11   the account?

12   A.   One of my co-defendants, the main guy in my case,

13   issued -- gave me the information to open the account with.

14   Q.   You were provided this information by someone else?

15   A.   Yes.

16   Q.   Who provided you this information?

17   A.   Mohammed Nkwenya.  He's in prison now.

18   Q.   Did you do anything else to obtain this information?

19   A.   No.  I just opened one in my own name as well.

20   Q.   Why did you open one in your own name?

21   A.   To have multiple accounts.

22   Q.   After you accepted your responsibilities for your role in

23   that crime, were you sentenced to prison?

24   A.   Yes.

25   Q.   How long did you serve in federal prison?

Direct - K. Blay

United States v. Zilevu

8

```
 1   A.   I was sentenced to 21 months.

 2   Q.   How much time did you have to serve?

 3   A.   I did 17 months, three weeks, and some days.

 4   Q.   Did your sentence also include a term of supervised

 5   release?

 6   A.   Yes.

 7   Q.   What, if any, conditions were imposed as part of your

 8   supervised release term?

 9   A.   Definitely not commit a crime, check in with my probation

10   officer, and, you know, random drug tests, and make sure I'm

11   working full-time and stuff like that.

12   Q.   What could happen if you violated a term of your

13   supervised release?

14   A.   Definitely go back to prison.

15   Q.   A few moments ago, do you remember taking an oath to tell

16   the truth before beginning your testimony today?

17   A.   Yes.

18   Q.   What is your understanding of the consequences if you

19   were to lie during your testimony today?

20   A.   Definitely I'll be committing a crime and going back to

21   prison.

22   Q.   Come again?  I didn't hear that.

23   A.   I will be committing a crime now and I'll be going back

24   to prison.

25   Q.   Has anyone from the government promised you any benefit
```

Tonia M. Harris OCR-USDC/EDVA 703-646-1438

EASTERN DISTRICT OF VIRGINIA

─────────────────────United States v. Zilevu─────────────────────
Direct - K. Blay

9

1   for your testimony today?

2   A.    No.

3   Q.    Mr. Blay, I would like to direct your attention now to

4   the time you mentioned when you were a child growing up and

5   attending school in Ghana.

6         During this time, did you meet someone named Kwashie

7   Senam Zilevu?

8   A.    Yes, I did.

9   Q.    When did you first meet Kwashie Senam Zilevu?

10  A.    Freshmen year in secondary school.

11  Q.    Was he a fellow student?

12  A.    Yes.

13  Q.    What name did you call him by?

14  A.    Senam.

15  Q.    Were you two friends during this time?

16  A.    Yes.

17  Q.    Did you and Senam stay in contact with each other after

18  boarding school?

19  A.    Yes.

20  Q.    Did -- when you came to the United States, did you also

21  know Senam?

22  A.    Yes.

23  Q.    Was Senam present at your wedding?

24  A.    Yes, yes, he was.

25  Q.    And where was your wedding held?

Direct - K. Blay

────United States v. Zilevu────

10

1   A.   Chantilly, Virginia.

2   Q.   What, if any, role did Senam have in your wedding?

3   A.   He was one of my groomsmen.

4   Q.   Did Senam have a college degree?

5   A.   Yes.

6   Q.   Do you know what it's in?

7   A.   I know it had something to do with computers.  I'm not

8   sure exactly what it is.

9   Q.   Do you know what university he attended?

10  A.   Yeah, Virginia Tech.

11  Q.   Over the years you've known Senam, have you had the

12  opportunity to observe what he looks like?

13  A.   Yes.

14  Q.   If you saw him today, would you be able to identify him?

15  A.   Yes.

16  Q.   Is he present in the courtroom?

17  A.   Yes.

18  Q.   Could you describe him by what he's wearing and where

19  he's seated.

20  A.   He's wearing a blue suit and a white long shirt.

21        MR. FIORILLO:  Your Honor, please let the record

22  reflect that the witness has accurately identified the

23  defendant.

24        THE COURT:  It shall.

25  BY MR. FIORILLO:

────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─

EASTERN DISTRICT OF VIRGINIA

Direct - K. Blay        ─United States v. Zilevu─
11

1  Q.   Now, Mr. Blay, I would like to direct your attention to

2  years 2016, 2017, and 2018.

3        What, if any, activity were you and the defendant

4  doing together to obtain personal identity information of real

5  people during those years?

6  A.   We were pretty much applying for loans and credit cards

7  using people's information we bought on the dark web.

8  Q.   Could you explain what the dark web is.

9  A.   The dark web is pretty much websites where they sold

10 people's information, Social Security numbers, name,

11 addresses, and credit reports, and stuff like that.

12 Q.   Why were you and the defendant doing this?

13 A.   So we could use those information to open credit cards

14 and get loans.

15 Q.   Were you and the defendant actually able to obtain the

16 personal identification information of other people?

17 A.   Yes.

18 Q.   What kind of information are we talking about?

19 A.   I'm talking about name, date of birth, Social Security

20 numbers, addresses, mother's maiden names in some cases, and

21 also credit report in some cases.

22 Q.   Now, Mr. Blay, if you could take us step-by-step,

23 beginning with the first name that you and the defendant did

24 to accomplish this.

25        Can you explain how you and he obtained the personal

─────United States v. Zilevu─────

1   identification information of real people?

2   A.   We first -- to get the information from the dark web, we

3   put dollar money into a digital currency, Bitcoins.  So we

4   used the Bitcoins to purchase these information from the dark

5   web.

6   Q.   So let me first ask you, how did you obtain the Bitcoin?

7   A.   We put dollar amounts into -- we go to gas stations,

8   either him or me, we go to gas stations and put dollar --

9   dollar amounts, 50 or 100 dollars, into Bitcoin addresses that

10  is linked to a Bitcoin wallet.  And we put the money in there,

11  and it reflects in Bitcoin.

12  Q.   You mentioned an ATM.

13       Is this like what we commonly know as an ATM

14  machine?

15  A.   Yeah, it's just like an ATM machine, but it basically is

16  for Bitcoin.

17  Q.   Where was this ATM machine?

18  A.   The one I used personally was in a gas station in Laurel.

19  Q.   In where?

20  A.   Laurel, Maryland.

21  Q.   And you testified earlier, is that where you live now?

22  A.   Yeah.

23  Q.   How far is this gas station from your home?

24  A.   Ten minutes. Ten minutes.  It's not far.

25  Q.   Did the defendant tell you to go to the Bitcoin ATM?

─────United States v. Zilevu─────

1    A.   Yeah, we both agreed.  Yeah.  Plus, I live closer to one.

2    Q.   Who provides the money to buy the Bitcoin?

3    A.   The first time I did.  But subsequently, we both did.

4    Q.   What city and state did you live in from 2016 to 2018?

5    A.   I lived in Beltsville for a little bit, but from 2016, I

6    moved to Laurel.

7    Q.   Are both of those --

8    A.   It's pretty close.  It's right next to each other.

9    Q.   Are they both in Maryland?

10   A.   Yes.

11   Q.   I'd like to now direct your attention to what is not yet

12   admitted into evidence, but it's been marked as Government's

13   Exhibit 210.

14         With the assistance of the courtroom security

15   officer, please.  And it's in binder 2.  And that's

16   Government's Exhibit 210.

17   A.   210.

18   Q.   Are you there, sir?

19   A.   Yes.

20   Q.   Do you recognize this document?

21   A.   Come again?

22   Q.   Do you recognize this?

23   A.   Yes.

24   Q.   What is it?

25   A.   It's a Bitcoin address I sent to Senam's e-mail.

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

Direct - K. Blay

────────────United States v. Zilevu────────────

14

1    Q.   What was the date this e-mail was sent?

2    A.   May 16, 2017, 11:31 p.m.

3    Q.   Do you see the "from" line, where it says "Hans Pago,"

4    and then lists the e-mail address Pagohans@yahoo.com?

5    A.   Yeah.

6    Q.   Whose e-mail address is that?

7    A.   That's mine.

8    Q.   Did you send this e-mail?

9    A.   Yes.

10   Q.   Do you see the "to" line, where it says "S. Zilevu," and

11   then lists the e-mail address KZilevu@gmail.com?

12   A.   Yeah.

13   Q.   Whose e-mail address is that?

14   A.   That's Senam's e-mail address.

15   Q.   During the years 2016 and 2017, did you regularly send

16   e-mails to the defendant at this e-mail address?

17   A.   Yes.

18   Q.   Is that how you know this e-mail address belongs to the

19   defendant?

20   A.   Yes.

21   Q.   Did you send this particular e-mail to the defendant on

22   May 16, 2017?

23   A.   Yes.

24   Q.   Excuse me.

25   A.   Yes.

─────United States v. Zilevu─────

1        MR. FIORILLO:  Your Honor, the government moves

2  Government's Exhibit 210 to be admitted into evidence.

3        MR. BROWN:  No objection.

4        THE COURT:  Without objection.

5        MR. FIORILLO:  May I publish to the jury, Your

6  Honor.

7        THE COURT:  You may.

8        MR. FIORILLO:  If Ms. Dashoff could blow up the top

9  of that e-mail, please.

10  BY MR. FIORILLO:

11  Q.   Mr. Blay?

12  A.   Yeah.

13  Q.   Why did you send this e-mail to the defendant?

14  A.   Definitely because we both said whoever is closer to a

15  Bitcoin machine, they put the dollar amount in there.  So

16  definitely it was probably me sending him the Bitcoin address

17  to put money into the Bitcoin account.

18  Q.   Now, was the Bitcoin address used by you and the

19  defendant to buy identity information on the dark web?

20  A.   Yes.

21  Q.   Who went on the dark web to purchase identities of real

22  people?

23  A.   We both did.

24  Q.   Was the personal identification information you and the

25  defendant obtained information that you and he knew belonged

Direct - K. Blay

─────United States v. Zilevu─────

16

1   to real people?

2   A.   Yeah.

3   Q.   Was it important for you and the defendant to obtain the

4   identities of real people?

5   A.   Yeah.

6   Q.   In your experience, would a credit card application be

7   approved if you used names and Social Security numbers that

8   didn't belong to real people?

9   A.   No, no.

10  Q.   Is that why you and the defendant used the names and

11  Social Securities of real people?

12  A.   Yes.

13  Q.   So I'd like you to describe what this identity

14  information actually looked like when you and the defendant

15  received it.

16  A.   So it's the name, as I said earlier.  It's the name, date

17  of birth, address, Social Security numbers, mother's maiden

18  name, and sometimes if -- sometimes it doesn't come with it,

19  but credit report.  If it doesn't come with it, we know how to

20  pull it up.

21  Q.   And is this in a text format?

22  A.   Yes.

23  Q.   Once you and the defendant obtained the personal

24  identification information of real people, what was done next

25  by each of you?

─────────United States v. Zilevu─────────

1   A.   We both -- via TeamViewer, we both, most of the time it

2   was in the evening, we do applications on either for loans or

3   for credit cards online.

4   Q.   You mentioned "TeamViewer."

5            What is that?

6   A.   It's a software Senam introduced me to whereby he

7   could -- we could both see each other's screen from wherever

8   we are at.  So we don't have to be together, but we can still

9   open up each other's screens.

10  Q.   So --

11  A.   Like computer-wise.

12  Q.   Understood.

13           And when you guys carried out these activities, what

14  locations were you in?

15  A.   We would both be at each other's home.  I will be at

16  Laurel.  Senam will be in Woodbridge.

17  Q.   Did you actually see the defendant use the stolen

18  identity information to apply for credit cards?

19  A.   Yes.

20  Q.   How exactly did you observe him apply for credit cards

21  using stolen identity information?

22  A.   Because I was with him.  Once we both did applications

23  together.

24  Q.   When you say "with him," is this in person?

25  A.   No, not in person, via TeamViewer.  And also, we would be

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────
EASTERN DISTRICT OF VIRGINIA

United States v. Zilevu

1   on FaceTime.

2   Q.   So you both would be on TeamViewer and FaceTime?

3   A.   Right.

4   Q.   What kind of identity information did you see the

5   defendant use to fraudulently obtain credit cards?

6   A.   Name, Social Security numbers, date of birth, and

7   addresses, mostly.

8   Q.   Approximately how many different applications did you see

9   the defendant submit using stolen identity information?

10  A.   Over that time period, definitely more than 20.

11  Q.   And, Mr. Blay, you mentioned earlier FaceTime.

12       Could you explain exactly what that is?

13  A.   Telephone FaceTime.  IPhone FaceTime.  So media calls.

14  Q.   Just to unpack that a little bit.

15       Can you describe further when you're on TeamViewer

16  and on FaceTime, how did that work?

17  A.   So we both -- on TeamViewer, we -- and we go to the

18  website, either by credit card at Capital One or USAA, and we

19  both put -- basically based on information we bought, we used

20  that information to complete the application, credit card

21  application, loan applications on the website.

22  Q.   Why did you guys work on this at the same time together?

23  A.   Well, make sure everybody knows what's going on.  Which

24  one gets approved and which one doesn't.

25  Q.   And you said that you saw the defendant earlier.

─────United States v. Zilevu─────

Direct - K. Blay

19

```
 1           You testified that he applied for somewhere around
 2  20 or more credit cards.
 3           Approximately, how many of those were actually
 4  approved?
 5  A.    To my knowledge, definitely more than ten.
 6  Q.    In addition to using the stolen identity information on
 7  credit card applications, what, if any, of the defendant's own
 8  personal information did he include on those applications?
 9  A.    On some of the applications with the mail-in part of the
10  application, sometimes uses address, sometimes his parents'
11  address.
12  Q.    How do you know this?
13  A.    Because I know Senam's address, and I know his parents'
14  address as well.
15  Q.    Did you see Senam on TeamViewer?
16  A.    Yes.
17  Q.    Why did he do this?
18  A.    We did this because we wanted a way of receiving the
19  cards when they get approved.  And we actually tried my P.O.
20  Box as well, but the post office wouldn't deliver to an
21  apartment if the name is not on the lease.  So we're much
22  comfortable for us to get the approved cards to come to his
23  address and his mom's address.
24  Q.    Because you lived in an apartment, you're talking about?
25  A.    Yeah, I lived in an apartment.
```

──────United States v. Zilevu──────

1   Q.    And where did the defendant live?  In an apartment?

2   A.    No, in a house.

3   Q.    In a home.

4         And in your experience, are you testifying today

5   that it's easier to have the credit cards sent to a home?

6   A.    Yes, yes.

7   Q.    What, if anything, would the defendant add to his home

8   address?

9   A.    Just to -- just to be -- to throw people off, we probably

10  add like an annex B, his full address, and probably put an

11  annex B or apartment C or, you know, something to throw people

12  off.

13  Q.    What do you mean, "throw people off"?

14  A.    So it doesn't seem like it's coming straight to his

15  address.  But then he had a little, I don't know what, like a

16  -- like a bungalow behind his house.  So we basically used

17  that as an annex B to receive the mail.

18  Q.    When credit cards were approved, what did you and the

19  defendant do next?

20  A.    We found -- the next step would be try to get the funds

21  off the cards, the received cards, the approved cards.

22  Q.    How would you do that?

23  A.    We had numerous ways.  One through PayPal, and the other

24  one would be through eBay.  And also, Senam had a website --

25  charity website, I believe was rebuildafricanow.org,

─────────United States v. Zilevu─────────
21

1  rebuildafricanow.org, that we basically we had donation spots

2  that we can go there and use approved cards to donate and the

3  money comes into his own PayPal account.

4  Q.   And did the defendant create this website?

5  A.   Yeah.

6  Q.   And you said it was a charity.

7         Was it a legitimate charity?

8  A.   As far as I know, it wasn't legitimate.  It was just

9  basically for us to be able to get the funds off the approved

10 credit cards that came in.

11 Q.   Could you describe, how does that work?

12        How is he -- were you and the defendant able to use

13 the credit cards?

14 A.   So for the website, it's -- it looks legitimate, like a

15 charity-owned website that has donation 1,500, 2,000 or 800.

16 So basically, you go in there and we used the cards that came

17 in the mail that got approved and we donate money.

18        So let's say if you donate 1,500, he controls the

19 website, so he knows, oh, like, he has an account attached to

20 the website whereby if the funds go through in a day or two,

21 it comes into his account.

22 Q.   Did you and the defendant have an understanding in how

23 the money obtained would be shared between you?

24 A.   We never spoke about it or agreed to it 50/50, but we

25 know eventually, because we did everything together.  We just

─────United States v. Zilevu─────

1    agreed it is just going to be 50/50.  We didn't specify.  We

2    didn't write anything down.  We just knew since we did

3    everything together, we put money together, we just going to

4    split the money 50/50 when it comes in.

5    Q.   You testified earlier the use of TeamViewer.

6            Was that also used to, you know, monitor the

7    activities?

8    A.   Yes.  So we know which -- which application got approved

9    and whatnot.

10   Q.   Do you know if the defendant told you every time a

11   fraudulent credit card was approved?

12   A.   At that time, I thought so, because I trusted him.  I

13   believed him.  But later on, I realized it was -- he was not

14   being truthful.

15   Q.   If a fraudulent credit card application was approved,

16   that you didn't know about, would you get your share of the

17   stolen money?

18   A.   Yeah.

19   Q.   If you didn't know about the card?

20   A.   No, there was no way I could get it.

21   Q.   Turning back to your wedding for a moment -- I'm sorry.

22           Where did you say the ceremony was?

23   A.   Come again?

24   Q.   Where did you say your ceremony was?

25   A.   My wedding?

—————United States v. Zilevu—————

1  Q.   Yes.

2  A.   Oh.  Chantilly, Virginia.

3  Q.   Was a person named Clifford Shingleton at your wedding?

4  A.   No.

5  Q.   And separately, have you ever had a business partner

6  named Matthew Brown?

7  A.   No.

8          MR. FIORILLO:  Court's indulgence for a moment.

9          THE COURT:  Yes, sir.

10  BY MR. FIORILLO:

11  Q.   Mr. Blay, you testified earlier that the government has

12  not promised you any benefit for your testimony today.

13          Are you hoping to get any benefit from your

14  testimony today?

15  A.   That would be nice, but I'm not looking forward to it.

16  Q.   Say that last part.

17  A.   That would be nice, but it's not my call.  I was

18  subpoenaed to be here, so...

19          MR. FIORILLO:  All right.  Nothing further, Your

20  Honor.

21          THE COURT:  All right.  Ms. Harris?

22          MR. BROWN:  One moment, Your Honor.  Court's

23  indulgence.

24          THE COURT:  Actually, I'm talking with the court

25  reporter.

─────United States v. Zilevu─────

1              (An off the record discussion.)

2              THE COURT:  Counsel, before you begin your

3    cross-examination, as per tasks that we were taking on prior

4    to the jury coming in, we're going to need a little bit of

5    lead time for Ms. Harris to do her job.

6              And so, what I'd like to do is allow the good people

7    in the jury the opportunity to take their lunch break a little

8    bit earlier and bring them back a little bit earlier.

9              So, ladies and gentlemen, what we're going to do is,

10   we're going to go ahead and take our lunch break now.  I know

11   it's a little bit earlier than what lunch usually is, but

12   we're a good society.  We can adjust.  We'll like to have you

13   back in here no later than a quarter of 1:00.  Quarter of

14   1:00.

15             Please remember the instructions that the Court gave

16   you earlier.  And that is not discuss the case or any aspect

17   of the case with anyone.  Obviously, you're free to leave the

18   courthouse if you need to, but I'd like you to be back inside

19   the building no later than 12:30.  Okay?

20             You may now go with the court security officer.

21             (Jury dismissed.) (Lunch Recess 11:53 a.m.)

22             (Court proceedings resumed at 1:02 p.m.)

23             THE COURT:  Let the record reflect, all counsel are

24   present in the case of the United States of America versus

25   Zilevu.  Mr. Zilevu is also present.

─────────United States v. Zilevu─────────

25

1         Counsel, after listening to the testimony of the

2   last gentleman, this is what we're going to do.  I'm going to

3   allow the videotape of that eight minutes to be played without

4   interruption.

5         Mr. Brown, you'll have a copy of the transcript of

6   that and you'll be able to cross-examine the gentleman on

7   whatever the Court deems appropriate and relevant.  So in

8   other words, they're going to get to see the videotape and

9   then you can use the transcript to cross-examine in the

10  traditional way.

11        MR. BROWN:  Thank you, Your Honor.

12        During my cross-examination of him now?

13        THE COURT:  Excuse me?

14        MR. BROWN:  During my cross of Mr. Blay at this

15  time?

16        THE COURT:  Yes.

17        MR. BROWN:  Okay.  Thank you.

18        MR. FIORILLO:  Your Honor, may we be heard on that

19  briefly?

20        THE COURT:  Sure.

21        MR. FIORILLO:  The government opposes a limiting

22  instruction regarding the Mattew Harris that's remarked on

23  that video recording and that it not be Matthew -- that is --

24        THE COURT:  And I actually thought about it that a

25  bit because it was clear that he was making reference to a

1  person other than Matthew Brown, who is the alleged victim in

2  this case.

3          And what I'll let you do is allow that to be pointed

4  out during your closing argument.  And that was indeed a

5  different individual that was referred to in the, I guess, the

6  interrogation, for lack of a better way of putting it, of that

7  particular gentleman.

8          MR. FIORILLO:  Yes, Your Honor.

9          THE COURT:  We can bring the jury back.

10         MR. BRODNAX:  Your Honor, one housekeeping matter.

11 I don't know what the general order, the new one that was just

12 issued, says, but we don't have a problem if Mr. Blay removes

13 his mask.  I think it's important for the jury to see his

14 demeanor.

15         THE COURT:  What we have done, and, again, I

16 appreciate your representation because it is important for

17 them to see his demeanor, we have put the Plexiglass back up.

18 And now that we have the Plexiglass, the way that I read the

19 general orders is that the Plexiglass can suffice for a mask.

20         But it is my general approach, unless I hear a

21 motion like this, particularly one coming from the defendant,

22 that if a person has not been vaccinated, to make sure that

23 we're all protected, that the person be masked.  The general

24 order sort of suggests masking.  But they also make reference

25 to clear plastic or something or the other.  And so, I think,

─────────United States v. Zilevu─────────
                                                                    27

 1   that with the record that we have here of having the clear

 2   Plexiglass there, and we could probably make a pretty good

 3   record that we've taken appropriate steps to comply with the

 4   requirements of the CDC.

 5          MR. BROWN:  And, Your Honor, I've checked with the

 6   defendant and co-counsel, I have not checked with the court

 7   security officer, but since we are the ones closest to the

 8   witness, we have no problem with the removal of the mask.

 9          THE COURT:  Okay.  All right.  Government's

10   response.

11          MR. FIORILLO:  Your Honor, the government just asks

12   if the Court does decide to allow Mr. Blay to remove his mask,

13   if he do it in the presence of the jury, just given that he

14   initially came in without a mask.  The Court directed him to

15   put on a mask.  We don't want any impression that he's not

16   listening to the Court, or just explain the situation.

17          THE COURT:  That's fine.  Again, we have to sort of

18   take all kinds of steps and precautions to make sure that we

19   are in compliance with Constitutional circumstances and also

20   the CDC and the general orders, and so it's a moving target.

21   It might be moving again tomorrow.

22          MR. FIORILLO:  Thank you, Your Honor.

23          THE COURT:  Thank you.  Bring the jury in,

24   Ms. Tinsley.

25          (A pause in the proceedings.) (Jury present.)

Direct - K. Blay

─────United States v. Zilevu─────

28

1          THE COURT:  Ladies and gentlemen of the jury, have

2   you continued to live up to the Court's instruction not to

3   discuss the case or any aspect of the case with anyone?

4          THE JURORS:  Yes.

5          THE COURT:  Ladies and gentlemen, what we're going

6   to do now is allow Mr. Brown to cross-examine the last witness

7   who testified, Mr. Blay.  Before that actual cross-examination

8   takes place, you're going to see a videotape from a February

9   5, 2019, interview in Maryland.

10          You give that observation of that tape whatever

11   weight you deem appropriate.  All right.

12          MR. BROWN:  May we approach, Your Honor, very

13   briefly?

14          THE COURT:  Yes.

15          (Bench Conference.)

16          MR. BROWN:  One clarification.  You're going to play

17   the video in the presence of Mr. Blay?

18          THE COURT:  Yes.

19          MR. BROWN:  Okay.  Two, can I have the video played

20   for him at the end of my cross-examination?  In other words, I

21   will do 95 percent of my questions, play the video, and I may

22   have --

23          THE COURT:  What I don't want to have happen is it

24   to start to get cumbersome, where he doesn't know what you're

25   talking about because he hasn't seen the videotape and he's

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

─────────United States v. Zilevu─────────
                                                                    29

1    not answering the questions that you're asking, and you're not

2    asking the question that he's trying to answer.  I want it to

3    be simple.

4              MR. BROWN:  That's fine.  Just play the video.

5              (Open court.)

6              THE COURT:  Because of the requirements of the CDC,

7    we take several steps to make sure that we're all protected

8    and that both individuals who are testifying and those who are

9    participating in the process, and more importantly, you are

10   protected as we go through this process.

11             There's an agreement, because we do have the benefit

12   of the Plexiglass in the witness box, for Mr. Blay to remove

13   his mask both during the videotape that you're going to

14   observe and during any questioning that Mr. Brown may go

15   about.

16             Keep in mind that Mr. Blay is listening and adhering

17   to the direction of the Court and all things that he's

18   required to do as far as the requirements of the CDC and the

19   general orders.

20             All right.  You may take off your mask.

21             (Video played.)

22             THE COURT:  Mr. Brown.

23                         CROSS-EXAMINATION

24   BY MR. BROWN:

25   Q.   Good afternoon, Mr. Blay.

─────────────────────────────────────

─────United States v. Zilevu─────

1   A.   Good afternoon.

2   Q.   Do you hear me okay?

3   A.   Yeah.

4   Q.   You had an opportunity to watch the video we just

5   watched?

6   A.   Yeah.

7   Q.   Can you tell -- and, Your Honor, I'm going to be sure the

8   jury can hear him, et cetera, so I'm going to stand in a place

9   where I can confirm that is happening.

10          THE COURT:   That's fine.   Just don't get too close

11   to the jury area.

12   BY MR. BROWN:

13   Q.   Mr. Blay, do you recall the date of that interview?

14   A.   February 5th, I believe, of 2019.

15   Q.   You had just been picked up on the charges in Maryland;

16   is that right?

17   A.   Correct.

18   Q.   Do you know -- do you have any information or know when

19   Mr. Blay [sic] was picked up on the charges he stands on trial

20   for today?

21   A.   Mr. Who?

22   Q.   I'm sorry.  Mr. Zilevu?

23   A.   No.  I was locked up then.

24   Q.   Was he locked up when you took this interview?

25   A.   No.

Cross - K. Blay

United States v. Zilevu

31

1   Q.   And he hadn't been locked up yet?

2   A.   No.

3   Q.   You hadn't heard anything about him the police had talked

4   to him or interviewed him or charged him with anything?

5   A.   No.

6   Q.   To the best of your information, there was nothing

7   happening and no charges against Mr. Zilevu at the time of

8   this interview in February of 2019?

9   A.   Actually, one time he told me that federal agents came to

10  his house to question him.

11  Q.   About what?  What did he say?

12  A.   About some names.

13  Q.   About you?

14  A.   No, not about me, about some names, some cards that came

15  to his house.

16  Q.   There's obviously something that you want to tell me.  I

17  want to be clear.

18       He did not tell you they came to ask him about you?

19  A.   No, not me.

20  Q.   Okay.  So your best information is that he hadn't been

21  charged or anything at the time of this interview?

22  A.   No, not charged.

23  Q.   In February of 2019?

24  A.   Not charged.

25  Q.   Okay.  I want to take -- go back a little bit.

Cross - K. Blay
─────United States v. Zilevu─────
32

1          When you were in Ghana, you went to -- was it

2     elementary school?

3     A.    Yes, you could say that.  It's called secondary school

4     back there.

5     Q.    With Mr. Zilevu, correct?

6     A.    Correct.

7     Q.    And it's my understanding from your testimony that you

8     were not very good friends at that time?

9     A.    We went -- we lived in the same dormitory, so we were

10    pretty much classmates and acquaintances.  We're not close,

11    close friends, but we're classmates.

12          And it is a boarding school, so we lived there

13    together every single day.

14    Q.    But you agree you were not, as you testified in your

15    deposition, you did not consider yourself good friends at that

16    time?

17    A.    We were friends.  I wouldn't say good friends, but we

18    were friends.

19    Q.    Thank you.

20          When you came to the United States, that was in

21    2000-?

22    A.    -3.

23    Q.    When did Mr. Zilevu come to the United States, do you

24    know?

25    A.    Zilevu left right after -- probably like -- I'm not sure.

Cross - K. Blay

───────United States v. Zilevu───────

33

 1  Like, two years before I came.  One year before I came.  I'm

 2  not really sure.

 3  Q.   So around within two years of 2003?

 4  A.   Yes.

 5  Q.   Okay.  When was it when the two of you reconnected

 6  somehow?

 7  A.   All right.  So after I did a year-and-a-half school in

 8  Brooklyn -- in New York, and I transferred to university in

 9  Virginia.  That's how we connected back through Facebook, when

10  I moved to Virginia, yeah.

11  Q.   So one of you saw the other one's Facebook page.  I

12  remember that guy from school in Ghana, and reached out.

13  A.   Yeah.

14  Q.   And this would have been 2000, what?  2008?  2009?

15  A.   I can't tell you exactly what year.

16  Q.   I don't need you to tell me exactly.

17  A.   It was definitely after I moved to Virginia.  So

18  probably, like, probably, like, prior to '05, '06.

19  Q.   Okay.  Did you all start spending time together in the

20  late 2000s?

21  A.   Through phone calls, yeah.  Not physical time, but a few

22  phone calls.

23  Q.   Let me ask you this way.

24       Did there come a time when it's your testimony that

25  you became good friends with Mr. Zilevu?

Cross - K. Blay
──────────United States v. Zilevu──────────
34

1  A.   Correct, yeah.

2  Q.   When was that?

3  A.   When I moved towards this part of the DMV area.  So

4  after -- when I left school in Hampton University, I moved to

5  Silver Spring.  That's when we became actually really close

6  and we started talking almost every day.

7  Q.   Okay.  When was that?

8  A.   I moved here probably, like, 2010, 2011.

9  Q.   2010 or 2011, you become very good friends with Mr.

10  Zilevu and you're talking almost every day?

11  A.   Correct.

12  Q.   Are you guys hanging out together socially as well?

13  A.   Yeah.  Once in a while, we meet downtown D.C. sometimes.

14  He either he come to my house, or I meet him at his work.

15  Q.   Okay.  Now, during this interview that we just watched a

16  little clip of, there are a number of times in the interview

17  you're talking about "these guys," your co-defendants in

18  Maryland, who you played soccer with down here somewhere in

19  Virginia, right?

20  A.   No, in Maryland.

21  Q.   In Maryland.

22       But was that in like -- that was 2015, right?

23  A.   Correct.

24  Q.   Were you playing soccer in 2010?

25  A.   Yes, I was.  I've played soccer all my life.

Cross - K. Blay ──────────United States v. Zilevu───────

35

1   Q.   But Mr. Zilevu wasn't playing soccer with you, was he?

2   A.   No, he doesn't play soccer.

3   Q.   So he had nothing to do with all those people you knew

4   and this whole thing in Maryland and your five co-defendants,

5   correct?

6   A.   Nope, not at all.

7   Q.   But you were talking to him every day?

8   A.   Yes.

9   Q.   And you trusted him?

10   A.   Yeah.

11   Q.   But he had nothing to do with those guys?

12   A.   No.

13   Q.   All right.  In 2015, the -- you have engaged in some

14   behavior and you pled to that behavior in your Maryland case,

15   correct?

16   A.   Correct.

17   Q.   And you were charged with conspiracy to commit bank

18   fraud, bank fraud, wire fraud, and aggravated identity theft;

19   is that correct?

20   A.   Correct.

21   Q.   And you were aware of the potential penalties for those

22   crimes, were you not?

23   A.   Yeah, I was aware.

24        MR. FIORILLO:  Objection, Your Honor.

25        Could we approach.

Cross - K. Blay
──────────United States v. Zilevu──────────
36

1          THE COURT:  Mr. Brown, stay within the confines of

2    what you're allowed to do.

3          MR. BROWN:  Yes, Your Honor.

4    BY MR. BROWN:

5    Q.    In your deposition, that was February, you recall

6    February 18, 2021?

7    A.    No, February 5th, 2019.

8    Q.    The deposition?

9    A.    Oh, yeah, last year.

10   Q.    I want to be clear, you were interviewed February of 2019

11   by the police, and we saw some of that in the interview.

12          Those were police officers in that interview; is

13   that correct?

14   A.    Correct.

15   Q.    You were interviewed in February of 2020 by the gentlemen

16   sitting at this table; am I correct?

17   A.    Correct.

18   Q.    How many times did you meet with the gentlemen at this

19   table to talk about your testimony in this case?

20   A.    Twice.

21   Q.    Did you meet with anybody during the break we just had

22   about the testimony you've given or the testimony you were

23   about to give?

24          Did you discuss that with anyone over the break?

25   A.    No.

──────────Tonia M. Harris OCR-USDC/EDVA 703-646-1438──────────

─────────United States v. Zilevu─────────
                                                                    37

1    Q.   Okay.  When was the last time you met with the gentlemen

2    at this table about the testimony you were going to give here

3    today?

4    A.   The deposition.

5    Q.   Okay.  You're counting that as one of those two times?

6    A.   Correct.

7    Q.   So in February of 2021, right?

8    A.   Right.

9    Q.   Right.

10          When you gave that deposition testimony --

11   A.   Right.

12   Q.   -- you made your representations about "because I read

13   the book."

14          Do you remember that?

15   A.   Once incarcerated, yeah, I read a lot of books.

16   Q.   Do you remember what books you were talking about when

17   you told me, "I read the books"?

18   A.   The guidelines book.

19   Q.   So you became familiar with the sentencing guidelines; is

20   that right?

21   A.   Right.  Almost every inmate -- every federal inmate that

22   I came across --

23          THE COURT:  Stop, stop, stop, sir.  Listen to the

24   questions and only answer those questions.

25          THE WITNESS:  Okay.

─────────────────────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─
                     EASTERN DISTRICT OF VIRGINIA

Cross - K. Blay
─────────────United States v. Zilevu─────────────
38

1   BY MR. BROWN:

2   Q.   When it came time to do your plea agreement, you were

3   able to have a number of the charges dropped that were being

4   brought against you?

5   A.   Right.  That's what my lawyer said, yes.

6   Q.   Is that, in fact, what happened?

7   A.   Yes.  That's what happened.  That's what my lawyer told

8   me, yes.

9            MR. BROWN:  Thank you.

10            At this time, Your Honor, I belive I'm moving in,

11   without objection, Defendant's Exhibit 3, which is the plea

12   agreement, and a supplemental plea agreement that's been

13   unsealed combined into one exhibit.

14            MR. FIORILLO:  No objection, Your Honor.

15            THE COURT:  Without objection.

16            (Defendant's Exhibit No. 3 admitted into evidence.)

17            THE COURT:  You want to hand that up to the -- are

18   you going to use it?

19            MR. BROWN:  I have extra copies, Your Honor.

20            THE COURT:  Okay.  Just make sure we keep the record

21   clean.

22   BY MR. BROWN:

23   Q.   Mr. Blay, I want to make sure I give you the opportunity.

24            Did you also meet with the government on July 8th?

25   A.   Yes.

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────
EASTERN DISTRICT OF VIRGINIA

Cross - K. Blay
─────────United States v. Zilevu─────────
                                                              39

1   Q.   So that's another time?

2   A.   Yeah.

3   Q.   When you met with the police on February 2019, you told

4   them that you were going to tell the truth, right?

5   A.   Yeah.

6   Q.   And when you met with these gentlemen here, for the

7   government in February of 2020, you told them you were going

8   to tell the truth?

9   A.   Yes.

10  Q.   When you met with the government on July 8th, you told

11  them you were going to tell the truth?

12  A.   Yes.

13  Q.   At your deposition in February 2021, you said you were

14  going to tell the truth?

15  A.   Yes.

16  Q.   And here today, you again, under oath, and you've sworn

17  that you were going to tell the truth?

18  A.   Correct.

19  Q.   All right.  In your plea agreement -- let's go to page

20   -- let me find it first.

21          We're going to go to the supplemental plea

22  agreement, the last few pages.

23          THE COURT:  Sir, turn to that page.  And when you

24  find it, look up at Mr. Brown, and let him know that you have

25  found it, sir.

Cross - K. Blay

─────United States v. Zilevu─────

40

 1          THE WITNESS:  Come again?

 2          THE COURT:  When you find that section, look up at

 3   Mr. Brown and let him know that you have found that section.

 4          MR. BROWN:  So we're looking at page 205 of this

 5   document, which is the second set of documents.

 6          THE COURT:  Why don't we do this, Mr. Brown.  Why

 7   don't you take the copy that he has and give him the copy that

 8   you found the section that you're trying to make reference to.

 9          MR. BROWN:  The Bates number in the bottom right

10   corner is 042.

11          THE COURT:  Very good.

12   BY MR. BROWN:

13   Q.   All right.  So under "Obligations of the United States

14   Attorney's Office," do you see that, Mr. Blay?

15   A.   Yeah.

16   Q.   It reads:  "If the defendant fully complies with all of

17   the terms of this agreement and this sealed supplement, then

18   in connection with the defendant's sentencing, this office

19   will inform the probation office and the Court of the nature

20   and the extent of the defendant's cooperation; and two, all

21   other information with respect to the defendant's background,

22   character, and conduct which this office deems relevant to

23   sentencing, including the conduct that is the subject of any

24   counts of the indictment that this office has agreed to

25   dismiss at sentencing."

Cross - K. Blay ──────United States v. Zilevu──────

41

1        Do you see that?

2    A.   Yeah.

3    Q.   Now, was the information you provided to these government

4    attorneys on February 2020, was that provided to the

5    government in your Maryland case and to the Court prior to

6    your sentencing on June of 2020?

7    A.   Can you please repeat that.

8    Q.   You provided certain testimony here today that implicates

9    Mr. Zilevu, correct?

10   A.   Correct.

11   Q.   You did that as well in your deposition in February of

12   2021, correct?

13   A.   Correct.

14   Q.   And you did it when you were interviewed by the

15   government, these government attorneys, in February of 2020,

16   correct?

17   A.   Correct.

18   Q.   And that testimony was, "I was engaged in these criminal

19   activities with Mr. Zelivu that involved all these credit

20   cards and personal information and going to the dark web," et

21   cetera?

22   A.   Correct.

23   Q.   Did you advise the government attorneys in your Maryland

24   case and the judge prior to or during your sentencing in June

25   of 2020 of that testimony?

Cross - K. Blay ───United States v. Zilevu───

42

1   A.    No.

2   Q.    And, in fact, you were given credit in your sentencing

3   having committed to giving testimony in this case, right?

4   A.    No.

5   Q.    You weren't given a two-level reduction in anticipation

6   of your testimony in this case?

7   A.    It was not for this case.  I was told it was not for this

8   case.

9            MR. BROWN:  May I approach the witness, Your Honor.

10           THE COURT:  You may.

11           MR. BROWN:  I'm going to first attempt to refresh

12   your recollection, okay, by showing you this document.

13           THE COURT:  Sir, read the document to yourself.

14   Don't read it aloud.  Read it to yourself.  When you finish

15   reading the document, look up, and Mr. Brown may have a

16   question for you.

17   BY MR. BROWN:

18   Q.    So if you would please read the highlighted section at

19   the bottom.

20           THE COURT:  Read it to yourself.

21           THE WITNESS:  Yes, I'm done.

22           THE COURT:  Mr. Brown.

23           MR. WALKER:  Your Honor, hold on one moment.  I

24   don't believe we have a copy of the document.

25           THE COURT:  What does he have?

Cross - K. Blay
─────────United States v. Zilevu─────────

43

1   BY MR. BROWN:

2   Q.   Does that refresh your recollection?

3   A.   Yes.

4   Q.   Now, for the record, I want to get the question out.

5        Does that refresh your recollection that you were

6   expressly given a benefit by the Court at your sentencing for

7   the testimony it was expected you would give based on

8   interviews to the Court today?

9   A.   No.

10  Q.   No.

11       MR. BROWN:  Your Honor, I'd like to move the exhibit

12  into evidence.  I believe there's no question -- the grounds

13  of the objection is authentic.

14       THE COURT:  Typically, the present recollection

15  refresh, the item does not come into evidence.

16       MR. BROWN:  Yes, but if it's -- depending on the

17  grounds of the objection, if there's no question as to his

18  credibility that's provided to us by the government,

19  there's no -- it's relevant.  It not only further impeaches

20  the defendant -- I mean, the witness.  I'm sorry.  If the --

21  I'm unclear.

22       THE COURT:  If I understand the concept of present

23  recollection refresh, you can refresh someone's recollection

24  with pretty much anything.  You can hand him an apple.  If

25  that refreshes his recollection, fine.  It doesn't mean that

─────────────────────────────────────────

─────────────United States v. Zilevu─────────────
Cross - K. Blay
                                                              44

 1    the apple comes into evidence.

 2              MR. BROWN:  It doesn't.

 3              THE COURT:  And basically, with present recollection

 4    refresh, as I understand it, whatever answer he gives, we're

 5    all stuck with it.

 6              MR. BROWN:  Right.  I'm more getting away from the

 7    fact that I'm not using their refreshing his recollection as a

 8    means to get it in.  I'm using the fact that it's reliable,

 9    upon which nobody disputes, but it's relevant to the

10    testimony.

11              And I don't understand what the basis for the

12    objection would be to its coming into evidence.  It's

13    foundation of authenticity rather than --

14              THE COURT:  I'll hear from the government.

15              MR. FIORILLO:  Your Honor, as has been articulated

16    by the Court, just using this document to refresh Mr. Blay's

17    recollection is the proper use in and of itself, not for

18    admissibility purposes.  Trying to move this into evidence

19    just because it was used in an attempt to refresh Mr. Blay's

20    recollection doesn't suffice to admit into evidence in this

21    case.

22              THE COURT:  I believe that the Court's articulation

23    of the basis of present recollection refresh is an accurate

24    statement of the law, so the item will not come into evidence.

25    Obviously, you can use it for whatever purpose you want to,

─────────────────────────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─
EASTERN DISTRICT OF VIRGINIA

Cross - K. Blay

─────────United States v. Zilevu─────────

45

1  but it doesn't come into evidence.

2          MR. BROWN:  I'm going to approach the witness again,

3  Your Honor.

4          THE COURT:  Yes.

5          MR. BROWN:  And show him what will be marked as

6  Defendant's Exhibit 4 for identification.

7          THE COURT:  Defendant's No. 4 for identification

8  purposes.

9  BY MR. BROWN:

10 Q.  And, Mr. Blay, you were present --

11         MR. FIORILLO:  Objection, Your Honor.  We don't have

12 a copy of this.

13         Can we acknowledge what we're looking at here?  Your

14 Honor, the specific document.

15         THE COURT:  Just turn on the white noise.

16         Tell him what it is, Mr. Brown.

17         (Counsel confers.)

18         MR. BROWN:  We appreciate the Court's indulgence and

19 the jury's.

20 BY MR. BROWN:

21 Q.  Mr. Blay, let me ask you this.

22         You were present at your sentencing, were you not?

23 A.  Yes, I was.

24 Q.  You were present with your attorney at your sentencing?

25 A.  Correct.

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

Cross - K. Blay ─────────United States v. Zilevu─────────

46

1    Q.   You heard the Court speak from the bench during your

2    sentencing?

3    A.   Yes.

4    Q.   You heard the Court stating its reasons for why it was

5    sentencing you in the manner that it did?

6    A.   Yeah.

7    Q.   And at the conclusion of your sentencing, did you go over

8    things with your lawyer and did he share the sentencing

9    documents with you?

10   A.   Yes.

11           MR. FIORILLO:  Objection, Your Honor.  This is

12   potentially calling for privileged information.

13           MR. BRODNAX:  Your Honor, the witness has already

14   answered the question.

15           THE COURT:  Well, again, I need you to speak with

16   one voice.  And so, I appreciate you wanting to get in the

17   game, Mr. Brodnax, but this is Mr. Brown's witness.

18           Mr. Brown, you know the confines of what you're

19   entitled to do under the Fourth Circuit precedent.  So make

20   sure we stay in our lane.

21           MR. BROWN:  And I believe there's a response to

22   that, and I don't want to go any further than that.

23           THE COURT:  Okay.

24   BY MR. BROWN:

25   Q.   Your lawyer shared with you the sentencing documents that

Cross - K. Blay

—————United States v. Zilevu—————

47

1    were issued by the Court?

2    A.    Right.

3    Q.    Was this one of those documents?

4    A.    Yes, I believe so.

5          MR. BROWN:  I move that in as Defendant's No. 4,

6    Your Honor.

7          MR. FIORILLO:  We are going to continue our

8    objection, Your Honor.

9          THE COURT:  Let me take a look at it.  There may be

10   certain information in there that is privileged.

11         MR. BROWN:  I'm approaching.  Thank you, Your Honor.

12         (A pause in the proceeding.)

13         THE COURT:  Mr. Brown, what I'm going to let you

14   have, as far as admissibility, is the judge's signature page.

15   The very first page.

16         MR. BROWN:  Your Honor, what I'm interested, if I

17   may.  The third page, the third-from-the-last page, where it

18   says "Statement of Reasons."  And literally, the very bottom

19   paragraph D.

20         MR. FIORILLO:  Your Honor, this is the same page

21   that defense counsel was trying to move in previously after we

22   refreshed Mr. Blay's recollection with it.

23         MR. BROWN:  That's exactly right.

24         THE COURT:  All right.

25         MR. BROWN:  Now that he's acknowledged seeing the

─────────United States v. Zilevu─────────
                                                                    48

 1   document.

 2                THE COURT:  I'm going to give you page 1.  And you

 3   have the opportunity to cross-examination.  You can't get in

 4   the rest.  Just page 1.

 5                MR. BROWN:  Just page 1?

 6                THE COURT:  Yes, sir.

 7   BY MR. BROWN:

 8   Q.   All right.  Mr. Blay, in 2015, you engaged in some

 9   criminal behavior.  And you have pled for that in this case,

10   in the Maryland case.

11                If I'm not mistaken from your deposition, we learned

12   that you have not -- you had not -- I recall the question was

13   that you had not worked since 2014, and that you had been

14   supporting yourself through your various criminal activities.

15                Do you recall that?

16   A.   That's correct.

17   Q.   When we say, "your various criminal activities," are we

18   talking about the things that you're doing with your soccer

19   friends or are we talking about the things that you're doing,

20   you're just talking every day with Mr. Zilevu or are we

21   talking about both?

22   A.   Both.

23   Q.   Okay.  In 2016 to 2018, is what your testimony was, is

24   that you were engaged in a joint effort with Mr. Zilevu to

25   purchase people's -- person's -- personal identifiable

Cross - K. Blay
─────United States v. Zilevu─────
                                                              49

1   information from the dark web, right?

2   A.    Correct.

3   Q.    And that you would go onto some dark web websites and use

4   a Bitcoin account to purchase the dark web data; am I right?

5   A.    Yeah.

6   Q.    Okay.  And if I understand you correctly, you and

7   Mr. Zilevu would -- had some type of an account that you would

8   use to fund the Bitcoin account, right?

9   A.    Yes.

10  Q.    The money has to come from somewhere, right?

11  A.    We didn't have a specific account set up for making

12  deposits into the Bitcoin address, no.  It is whatever, what

13  do you have, 50, 100, pretty much.

14  Q.    So my point is, you're using money that you or Mr. Zilevu

15  have, this is your testimony, to purchase Bitcoin to buy

16  people's data to get credit cards?

17  A.    Correct.

18  Q.    And the money going into the Bitcoin accounts is coming

19  from somewhere, right?

20  A.    Right.

21  Q.    That money is in your account or Mr. Zilevu's account?

22  A.    Right.

23  Q.    And I asked you in your deposition what made you think

24  the government couldn't trace that stuff.

25            And what was your answer?

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

Cross - K. Blay
─────────────────United States v. Zilevu─────────────────
50

1    A.    I don't recollect.

2    Q.    Okay.  You don't recall telling me, "I never said they

3    couldn't trace it"?

4    A.    I don't remember.  Refresh my memory.

5              MR. BROWN:  Your Honor, at this time it might make

6    it easier if I had moved into evidence Government Exhibit 200

7    and 200A.

8              MR. FIORILLO:  We have to object to that, Your

9    Honor.  He can refresh the witness's recollection with the --

10   his deposition, but not moving the entire thing into the

11   record is not warranted.

12             THE COURT:  You can refresh his recollection

13   assuming that you have the statement that's inconsistent.  So

14   you can try to refresh his recollection.

15             MR. FIORILLO:  Okay.

16             MR. BROWN:  And I certainly understand that rule,

17   but it was in their exhibit book.  No one objected to it.  I

18   thought it was coming in, but I guess it's not.

19             THE COURT:  Okay.

20             MR. BROWN:  I'm not going to hold things up looking

21   for that part.  I'll do that after the short break, if I can

22   get that.

23   BY MR. BROWN:

24   Q.    All right.  Consistent with your testimony today, you

25   said that you submitted more than 20 applications for credit

Cross - K. Blay
─────────United States v. Zilevu─────────
51

```
 1  cards with Mr. Zilevu; is that right?
 2  A.   Yes.
 3  Q.   And I didn't hear the testimony today, but do you recall
 4  that your testimony at the deposition perhaps today was that
 5  more than ten of those credit cards were approved?
 6  A.   Yeah.
 7  Q.   And this is testimony you gave to the government back in
 8  2020, February 2020?
 9  A.   Yes.
10  Q.   Okay.  And you made some statement about "I don't know if
11  every time a credit card was approved that Mr. Zilevu told me
12  that."
13          Do you remember that?
14  A.   Not approved, but when they actually came in the mail.
15  It's a difference.  Because every time we both did an
16  application, we are both on the computers together.  So if an
17  application got approved, I also saw as well.  And we
18  basically put in a notepad, so I know which got approved or
19  not.
20  Q.   So the distinction you're making is "The cards may have
21  actually come and I may not have known about that"?
22  A.   Correct.
23  Q.   Is that what you're saying?
24  A.   Correct.
25  Q.   "And therefore, Mr. Zilevu may have cheated me out of my
```

Cross - K. Blay ─────────United States v. Zilevu─────────

52

1  50/50 split of these funds that I didn't know about"?

2  A.   Or I thought sometimes he made applications on his own.

3  Q.   Okay.  Well, would he be cheating you out of half your

4  split if he did it on his own?

5  A.   I don't think so.

6  Q.   Okay.  So we're not talking about that then, are we?

7        We're talking about the ones you say you got cheated

8  out of half of your split?

9  A.   Right.

10  Q.   And my question is:  In this notebook that you had, did

11  you have that there was a Matthew Brown, Larry Fudger, and

12  Clifford Shingleton -- and Larry Fudger is still here, trying

13  to see the outcome of this case.

14        Did you have those in your notebook?

15  A.   Yeah, we did because we purchased it together.

16  Q.   Okay.  I understand.

17        But you just got done telling the jury you put in

18  your notebook when it got approved, but you don't know about

19  when the cards came in?

20  A.   No, I couldn't tell when the cards come in.

21  Q.   Right.

22        So were those names in your notebook if they were

23  approved, right?

24  A.   I can't --

25        THE COURT:  Let him answer the question.

─────────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────────
EASTERN DISTRICT OF VIRGINIA

Cross - K. Blay
─────United States v. Zilevu─────
53

```
 1    A.   Yes.

 2    Q.   Were they in your notebook?

 3    A.   It's a been a while, so I can't remember exactly what

 4    names are on there.  It's been a couple of years -- three,

 5    four years.

 6    Q.   You've been interviewed by the government, like, once a

 7    year for the past three years?

 8    A.   I understand.

 9    Q.   And you had a -- this notebook, you're talking about a

10    physical thing you handwrote in?

11    A.   No, computer.

12    Q.   You're talking about your MacBook, aren't you?

13    A.   Notepad.

14    Q.   So it was a physical thing you --

15    A.   No, a notepad on the MacBook.

16    Q.   So you're talking about on your MacBook, right?

17    A.   Correct.

18    Q.   And that MacBook was in Mr. Zilevu's house, was it not?

19    A.   I don't know where it ended up, but, yeah.

20    Q.   You don't remember telling me where it ended up in the

21    deposition?

22    A.   That's because eventually he was supposed to purchase the

23    MacBook once I was incarcerated.  So I don't know how it ended

24    up with Senam.

25    Q.   Tell the jury what you do know.
```

————United States v. Zilevu————

1    A.    All I know is Senam had it last and he was supposed to

2    purchase the MacBook from my wife.

3    Q.    Do you know that you told Isaac to get your MacBook?

4    A.    I never told Isaac to get my MacBook.

5    Q.    Did you know that Isaac got your MacBook?

6    A.    I know Isaac spoke to my wife to take the MacBook to

7    Senam and to take --

8    Q.    Do you know -- didn't you tell me that Isaac asked you,

9    "Is it okay if I sell the MacBook to Kwashie Zilevu?"

10    A.    I don't know what happened between Isaac and my wife.

11    But I know eventually my wife didn't want to go all the way to

12    Woodbridge, so Isaac was the one who was to supposed to drop

13    the MacBook off and exchange it for the money.

14    Q.    For what money?

15    A.    For buying -- for buying the MacBook.

16    Q.    Just to be clear, so you knew it was supposed to be

17    delivered to Mr. Zilevu?

18    A.    Correct.

19    Q.    And you knew, as we discussed in your deposition, that

20    your MacBook was seized by the government as a result after

21    Mr. Zilevu's arrest?

22    A.    Correct.

23    Q.    And you knew that a significant amount of information was

24    obtained off of that MacBook, correct?

25    A.    Correct.

Cross - K. Blay
─────────── United States v. Zilevu ───────────
                                                        55

1   Q.   Now, this notepad thing, it had these three names on it;

2   is that what you're telling the jury, Matthew Brown, Larry

3   Fudger, and Clifford Shingleton?

4   A.   Honestly, I can't recollect.

5   Q.   Okay.  Okay.  Do you recall there were a number of credit

6   cards and driver's licenses and account information on that

7   MacBook, Mr. Blay?

8   A.   Yes.

9   Q.   Do you recall that you had a -- we heard the officer talk

10  to you about a driver's license on the little video for Mattew

11  Harris that had your picture on it, right?

12  A.   Right.

13  Q.   And do you recall you had a D.C. driver's license on your

14  MacBook with your picture, with the name Daniel Mangle?

15  A.   Yeah.

16  Q.   Would this be that license?

17  A.   Yeah.

18          MR. FIORILLO:  Objection, Your Honor.  This hasn't

19  been admitted into evidence and defense counsel is publishing

20  it.

21          MR. BROWN:  Well, to the witness.  But I will now

22  move it in as Defendant's 5, Your Honor.

23          MR. FIORILLO:  And the government now objects, Your

24  Honor.

25          THE COURT:  Basis for objection?

─────────────────────────────────────────────

─────United States v. Zilevu─────

1          MR. FIORILLO:  That this, one, there's a lack of

2   foundation, and defense counsel has not laid that the witness

3   has personal knowledge about this.

4          THE COURT:  Let's do it this way.  Why don't you go

5   ahead and lay a proper foundation, and then I'll hear from

6   defense counsel with regard to maybe relevance or hearsay or

7   whatever they want to argue.  Go ahead and then lay a proper

8   foundation.

9          You can approach the witness.

10         MR. BROWN:  Thank you, Your Honor.

11  BY MR. BROWN:

12  Q.   Why don't you take a look at that, Mr. Blay.

13         Do you recognize that?

14  A.   Yes.

15  Q.   Do you recognize that as having been a document that was

16  on your MacBook?

17  A.   Correct.

18  Q.   Do you recognize that -- well, let me see.

19         Where did you get it?

20  A.   I can't recollect, but I know I paid -- I paid somebody

21  to do it for me.  I can't recollect exactly who, but it's been

22  a while.  But I remember I paid money from the fake driver's

23  license.

24  Q.   And you didn't pay for a picture, did you?

25  A.   What do you mean?

Cross - K. Blay

──────United States v. Zilevu──────

57

1   Q.   You did not pay money for a picture of a fake driver's

2   license, did you?

3   A.   What do you mean, I paid a picture?  I paid for the fake

4   driver's license card.

5   Q.   That's my point.

6        You didn't pay just for a picture, right?

7        MR. FIORILLO:  Objection, Your Honor.  At this

8   point, we're eliciting testimony about a document that hasn't

9   been admitted into evidence, and the government also objects

10  on relevance grounds.  This isn't germane to this proceeding.

11       THE COURT:  All right.  Let's go through the steps.

12       The foundation is still a bit lacking, Mr. Brown.

13  But I'm going to assume that you're going to lay a proper

14  foundation for the admissibility of this evidence.

15       So now, let's cross over to the relevance issue.

16       What does this tend to prove or disprove?

17       MR. BROWN:  It tends to disprove his -- Mr. Blay's

18  testimony that he -- for his -- that he's just a mule for his

19  Fairfax charge that he picked up.

20       THE COURT:  Okay.  Let me stop you there.

21       This particular document is tangental to that

22  because there hasn't really been any evidence as to, you know,

23  regarding what you just mentioned.  I don't want to speak too

24  frankly on it.  But you need to somehow hook this piece of

25  evidence to something that tends to prove or disprove

─────United States v. Zilevu─────

Cross - K. Blay

58

1    something relevant to this case.

2         MR. BROWN:  So I'll skip what I felt was a way of

3    asking it.  I'll say this.

4         THE COURT:  Okay.

5    BY MR. BROWN:

6    Q.   You purchased a physical driver's license from some

7    person, right?

8    A.   A fake one.

9    Q.   And you would take pictures of it and it would be on your

10   MacBook, right?

11   A.   Yeah.

12   Q.   And as with all these other credit cards that were on

13   your MacBook?

14   A.   Right.

15   Q.   This was part of --

16        MR. FIORILLO:  Objection, Your Honor.  Again, we're

17   eliciting testimony about documents that aren't relevant to

18   this case and --

19        THE COURT:  I'm going to give him a little bit of

20   latitude.

21        Mr. Brown, you've got to hook it up here quicker.

22   BY MR. BROWN:

23   Q.   These were all a part of this credit card scheme that you

24   were running with your guys, with your soccer team or

25   Mr. Zilevu, right?

Cross - K. Blay
─────United States v. Zilevu─────
59

1  A.   Not the soccer team.

2  Q.   This is all the stuff you did with Mr. Zilevu?

3  A.   And part just me as well.

4        MR. BROWN:  With that, Your Honor, I'd move -- I can

5  go through them one-by-one or I would like to move in all of

6  them.

7        THE COURT:  Let me see what you have and make sure

8  the government has an opportunity to view it in advance.

9        MR. BROWN:  So should we approach so I can discuss

10  it to some extent, Your Honor?

11       THE COURT:  That's fine.

12       MR. BROWN:  Thank you.

13       THE COURT:  Ladies and gentlemen, while we're doing

14  this, you can take a stretch break.

15       (Bench Conference.)

16       THE COURT:  First, let me see what we have.

17       MR. BROWN:  These are four copies of each document.

18  So if you would like assistance, you can have Mr. Walker or

19  Mr. Fiorillo --

20       So these are files provided to us by the government

21  on one of about seven DVDs.  This one labeled 2197-7-6, as

22  items obtained by their forensic person from Item No. 12,

23  which is identified and listed as the MacBook.

24       THE COURT:  So now, as I'm going through these

25  materials, I see various credit cards, various licenses

─────United States v. Zilevu─────

Cross - K. Blay

60

1   identifying individuals:  Kofi Asari (ph).  TD Bank.  Looks

2   like a credit card in the name of Ronald Pittman.  Daniel

3   Mangle.  A credit card issued to Dean Thompson.  Another

4   one --

5           Mr. Brown, help me out here.  Maybe I'm missing

6   something or being dense.  Mr. Blay has admitted on the stand

7   that he's been involved in all kinds of credit card theft,

8   aggravated credit card fraud, all of the things that are

9   dishonest regarding his acceptability of other people's

10  private information and using it to acquire credit cards.

11  He's already admitted to all of that.

12          So what does this help us do?

13          MR. BROWN:  It helps us push back against his

14  assertion that my client is showing him how to do it and my

15  client was the guy.  He was just along for the ride.  When all

16  of this was found on his laptop, nothing is found on my guy's

17  laptop.  If it's all on his laptop and he always wants to make

18  it look like, "Oh, I found a credit card" or "I got pulled in

19  by this guy at my wedding."

20          THE COURT:  Wouldn't we have a different case if

21  this gentleman had testified that he had no involvement with

22  any credit card theft or aggravated credit card fraud or

23  identity fraud at all, and it was all Mr. Zilevu?  If he had

24  testified that that was the case, then, obviously, this would

25  be --

Cross - K. Blay ──────United States v. Zilevu──────

61

 1          MR. BROWN:  I'm impeaching him and -- more

 2   probative.

 3          THE COURT:  Yeah.  You're more probative.  But

 4   putting all of this in, potentially, gets us away from the

 5   issue that we have to resolve.  And that is not this

 6   gentleman's criminal liability for actions that he allegedly

 7   engaged in, as per your client's criminal activity.

 8          And as I hear this gentleman's testimony, what he's

 9   saying is, "Oh, yeah, I was doing a whole lot of bad stuff.  I

10   was a cheater.  I was a stealer.  I was a liar.  I did a lot

11   of things I shouldn't have done, but I wasn't the only person

12   doing it.  Mr. Zilevu was, also."

13          So how does this do anything other than maybe even

14   bolsters the government's case to show whether -- what a

15   manipulative guy he is?

16          MR. BROWN:  What concerns me is he won't go as far

17   as to say -- he knows nothing about these particular victims.

18          THE COURT:  Right.  That's why we don't have the

19   conspiracy.

20          MR. BROWN:  He won't go as far as to say anything

21   about these three victims, and yet he wants to paint himself

22   as almost a victim of these people who are much smarter and

23   more engaged in this dark web.

24          THE COURT:  I think that is really something that

25   you can, you know, ride herd over in closing arguments, and

──────Tonia M. Harris OCR-USDC/EDVA 703-646-1438──

────────United States v. Zilevu────────

1  you're really good at that stuff.

2          And so, what I'm going to do is, I'm going to deny

3  that all of this goes in and make a determination based upon

4  your cross-examination and the information that's elicited

5  from this evidence, that this all becomes extraneous and may

6  detract the jury from what they need to resolve.

7          But again, I'm not going to stop you in any way from

8  being able to say in closing argument that "You really want to

9  believe this guy?"  That's your call.

10          MR. BROWN:  Okay.  Very well, Your Honor.

11          THE COURT:  Yes, sir.

12          (Open court.)

13          MR. BROWN:  All right.  Mr. Blay, thank you for your

14  patience, and the ladies and gentlemen of the jury.

15          THE WITNESS:  That's fine.

16          MR. BROWN:  And thank you for the Court to allow us

17  to have that time to resolve that issue.  We appreciate that.

18  BY MR. BROWN:

19  Q.   Okay.  There came a time when you purchased a BMW 6

20  series, a black BMW 6 series, correct?

21  A.   Yes, I did.

22  Q.   And if I'm not mistaken, there was some situation where

23  Mr. Zilevu, you went to discuss it with him and he cosigned

24  for the vehicle with you?

25  A.   Yes.

─────United States v. Zilevu─────

1  Q.   And when we say that, when we say "he cosigned for the

2  vehicle," you mean for you to buy the vehicle, it was some

3  assistance to you to have him on the loan?

4  A.   Yeah, that's what we agreed on.  Yes.

5  Q.   You knew where Mr. Zilevu worked, didn't you?

6  A.   Yes.

7  Q.   And, in fact, you know his home address, you know his

8  parents' address; is that right?

9  A.   Yeah, I know his home address.  I don't know his parents'

10  address offhand.

11  Q.   You don't recall, when you were being asked questions by

12  the government just earlier today and you saying "I know his

13  parents' address"?

14  A.   Yes, I do.  I know it's in Alexandria, but I don't know

15  exactly where -- what exactly number.

16  Q.   Do you recall saying that earlier this morning?

17  A.   Yeah.

18  Q.   You don't recall saying, "I know where the address is"?

19  A.   Yeah, I was talking about when we're filling out

20  applications.

21  Q.   All right.  And so, where does Mr. Zilevu work?

22  A.   I know he works in the IRS building in Lanham, close to

23  Lanham.  In Maryland, yeah.

24  Q.   And so, his being on the application assisted you in

25  getting this car in some way?

Cross - K. Blay
──────United States v. Zilevu──────
64

1    A.   Yeah, that's what we greed on.  Yeah.

2    Q.   And there came a time when you also purchased, you

3    obtained in some way a white BMW 6 series?

4    A.   That was before the black BMW.

5    Q.   And what year was the black BMW 6 series?

6    A.   It was a 2012.

7    Q.   What year was the white one?

8    A.   It was '06.

9    Q.   Okay.  And was it one of these M635s?

10   A.   No, 650.

11   Q.   It was a 650?

12   A.   Correct.

13   Q.   And what -- you got the white one first; is that right?

14   A.   Yeah, I bought the white one cash.  Yeah.

15   Q.   And what did you do with it?

16   A.   I drove it.

17   Q.   You drove it.

18        And then you got a second one?

19   A.   No.  It had mechanical issues.  So the -- what we agreed

20   on is, I was going to give it to Senam to purchase it because

21   he had troubles with his car as well.  If he helped me get a

22   new car, he could use the white car until he fixes his car.

23   That's what we agreed on.  That's how he cosigned it for me.

24   Q.   I want to be clear.

25        You said he was going to buy it, but then you said

─United States v. Zilevu─

1   you're going to let him use it.

2          Which is it?

3   A.   It was whatever he wanted to do with it, because at that

4   time, I didn't need two cars.

5   Q.   No.  What happened?

6   A.   What happened was we agreed that either he was going to

7   fix it and use it, or either he's going to fix it whenever his

8   old car is ready, he could just give it back to me.

9   Q.   You sold the car to him.

10          Is that what happened?

11   A.   No, he never paid me for it.

12   Q.   You said it was a mechanical problem.

13          Is that what you said?

14   A.   Correct.

15   Q.   Isn't it true that there was something wrong with the

16   title work; you couldn't even get the car titled?

17   A.   No, there was nothing wrong with the title.  What

18   happened was we bought the car at salvage, so we had to go

19   back to the last owner to get the salvage title.

20   Q.   Why did you have to get a salvage title if you had no

21   problem titling the car?

22   A.   We bought the car and they gave us a bill of sale for the

23   car and was told to reach out to the last person who owned the

24   car so we can get a salvage title from the person.  And

25   because the car had a mechanical or electrical problems, we

Cross - K. Blay

66

1    couldn't register the car.

2    Q.    Okay.  I want to be clear.

3            You couldn't title the car, that's why you had to

4    try and do this salvage title; am I right?

5    A.    No, the car was salvage when we bought it -- or when I

6    bought it.

7    Q.    Right.

8            That's why you can't get a title unless you go to

9    the car owner and get some kind of a salvage title?

10   A.    Correct.

11   Q.    So I'm right when I say "you could not title the

12   vehicle"?

13   A.    We could, but we just couldn't -- we didn't get the title

14   yet.

15   Q.    I mean, you could be -- you couldn't title the car, but

16   only because you hadn't done what had to be done to title the

17   car?

18   A.    Correct.

19            MR. FIORILLO:  Objection, Your Honor.  At this

20   point, it's been asked and answered several times.

21            THE COURT:  I think we all understand.

22   BY MR. BROWN:

23   Q.    Okay.  Now, it's your testimony that didn't cause any

24   kind of rift or any problems in your relationship with

25   Mr. Zilevu?

──────United States v. Zilevu────────

67

1  A.  I wouldn't say it never caused problems.  He would

2  probably -- "Hey, did you pay the monthly?"

3          "No, I'm late."

4          We would have never gotten into, whereby we're so

5  mad at each other.  He was in my wedding, for Christ sake,

6  after all of this.

7  Q.  How do you have payments on a car you paid cash for?

8  A.  Come again?

9  Q.  How do you have payments on a car you paid cash for?

10 A.  No, I thought you were talking the black BMW.

11 Q.  Okay.  I'm sorry.

12         I'm not talking about the -- I'm talking about the

13 white BMW that you let Zilevu use that couldn't be titled

14 unless you took some steps --

15 A.  Right.

16 Q.  -- and had some mechanical problems.

17         I'm asking you:  If you had given him a car to use

18 that couldn't be titled without some other steps and had some

19 mechanical problems, caused problems in your relationship and

20 you said, "No, we might talk about payments," that's what you

21 said?

22 A.  No, I thought you were talking about the black BMW.  But

23 it never caused any -- no disagreements, no ham between us,

24 the white BMW.

25 Q.  However, there was problems with the payments on the

────────United States v. Zilevu────────
68

1    black BMW; am I right?

2    A.    Yeah, a couple of times.

3    Q.    And that affected Mr. Zilevu's credit, did it not?

4    A.    And mine as well.

5    Q.    Okay.  Well, was he causing your credit to be affected,

6    or you causing his credit to be affected?

7    A.    I was causing both of our credits to be affected.

8    Q.    Thank you.

9          And you had some conversations with Mr. Zilevu, or

10   he had them with you, saying, "Man, what's the problems with

11   the payments," right?

12   A.    Yes.

13   Q.    Did that cause some stress on your relationship?

14   A.    No.

15   Q.    No?

16   A.    No.

17   Q.    Okay.  What end up happening to the black BMW?

18   A.    It got -- I got hit one time when I was in D.C. and the

19   car got totaled.  And I was fully insured by GEICO, so GEICO

20   paid for it.

21   Q.    Okay.  When -- let's be clear about something with Isaac.

22         When you told Isaac it was okay to sell it to

23   Zilevu, didn't you testify in your deposition that you assumed

24   that Mr. Zilevu would wipe the MacBook for you?

25   A.    Yeah, pretty much.  I thought he was going to do that.

Cross - K. Blay

──────United States v. Zilevu──────

69

1    That's not the first time me selling a MacBook to Senam.

2    Q.   So that Bitcoin app, that e-mail with the Bitcoin address

3    in it.

4    A.   Which one?

5    Q.   The one the government showed you.  The only one we've

6    seen.

7    A.   Yeah.

8    Q.   Right.

9         Do you recognize that Bitcoin account?

10   A.   Yeah.

11   Q.   How many digits does that Bitcoin have?

12   A.   It's a lot.

13   Q.   I know it's a lot.  I want you to tell me how many.

14   A.   More than 16.

15   Q.   Okay.  Do you know how many account -- you don't know how

16   many numbers are in the account?

17   A.   No.

18   Q.   Like, if you had to -- if you lost a piece of paper and

19   had to go to Bitcoin and say, "It's my account," what would

20   you tell them the account number was?

21   A.   I can't tell all of it.

22   Q.   So did you have more than one Bitcoin account?

23   A.   No, just one.

24   Q.   You only had one?

25   A.   One Bitcoin account, yeah.

Cross - K. Blay

────────United States v. Zilevu────────

70

1  Q.   There were no other pictures on your MacBook showing

2  Bitcoin accounts?

3  A.   No.

4  Q.   It's when you go to the machine, the machine -- you can

5  give the machine what address you want on there.  So let's say

6  if a dark web, let's say, dark web has this address on there,

7  it goes to the machine, you could either -- you could either

8  deposit the money straight into your Bitcoin wallet or

9  straight to the website, the dark web.

10           Does that make sense?

11  A.   Yes.

12  Q.   So what does the e-mail tell us happened with that

13  account?

14           Does it tell us anything?

15  A.   It shows -- it shows the Bitcoin address, yeah.

16  Q.   Does it tell us if some payment went directly to the dark

17  web or went to a Bitcoin wallet?

18  A.   The only time I --

19  Q.   Mr. Blay, does it --

20           MR. FIORILLO:  Objection, Your Honor.  Let the --

21  the government would ask the witness has an opportunity to

22  answer.

23           THE COURT:  Sir, listen as best you can to the

24  question that's asked and answer that question and that

25  question alone.

────Tonia M. Harris OCR-USDC/EDVA 703-646-1438────

─────────United States v. Zilevu─────────
                                                          71

 1              THE WITNESS:  Okay.

 2    BY MR. BROWN:

 3    Q.   Does that e-mail, seeing that Bitcoin string of numbers,

 4    does that tell the jury what happened, that some money went

 5    directly to the dark web or directly to a Bitcoin wallet?

 6    A.   Directly to the defendant's Bitcoin.

 7    Q.   So you added that little extra information.

 8              Now, it's just not a Bitcoin wallet, it's

 9    Mr. Zilevu's Bitcoin wallet, correct?

10    A.   Correct.

11    Q.   The point is this:  It does not say that it went directly

12    to some dark web thing, does it?

13              It doesn't suggest that in any way?

14    A.   No.

15    Q.   And people use Bitcoin for very legitimate purposes as

16    well, don't they?

17    A.   Correct.

18    Q.   People trade Bitcoin, do they not?

19    A.   They do.

20    Q.   People trade currency, do they not?

21    A.   They do.

22    Q.   Are you aware that Mr. -- that has anything to do with

23    Mr. Zilevu's business with his service in his basement?

24    A.   I can't tell.

25    Q.   You can tell or you can't tell.

1              What does that mean?

2    A.    I don't know.

3    Q.    Okay.  Then there came a time -- when was it that you

4    bought the Range Rover, the Land Rover?

5    A.    Probably 2018.

6    Q.    2018?

7    A.    Yeah.  Yeah, probably 2018.

8    Q.    This would have been the year before you had the

9    interview with the police that we watched in the video?

10   A.    Correct.

11   Q.    That was January of '19, right?

12   A.    So maybe, yes, 2018.

13   Q.    And you used Mr. Zilevu's address to register that

14   vehicle, correct?

15   A.    Yes.

16   Q.    Did that cause some static or tension in your

17   relationship?

18   A.    No.

19   Q.    You used his address to register your car at his house?

20   A.    Yes.

21   Q.    What do you mean "no"?

22              He didn't say anything to you, like, "What are you

23   doing?"

24   A.    No.  Before I did that, I made sure I had his approval

25   first.

Cross - K. Blay

─────United States v. Zilevu─────

73

```
 1   Q.   How did you do that?

 2   A.   By asking him.

 3   Q.   What did you ask him?

 4   A.   Can I use it?

 5   Q.   And what did he say?

 6   A.   I said, "Yes."  That's only reason why I did it.  And

 7   before that, any paperwork that comes in, if -- if he didn't

 8   allow me to --

 9   Q.   I understand.

10        My point is this:  When you say, "The only reason I

11   would have done this," you wouldn't use somebody's addresses

12   unless you had their authorization, Mr. Blay?

13   A.   Correct.

14   Q.   You didn't have the authorization of Mr. Fudger, did you?

15   A.   No.

16   Q.   Mr. Shingleton?

17   A.   Who?

18   Q.   Mr. Clifford Shingleton, one of the other unfortunate

19   victims in this case.

20   A.   I don't know that name.  I'm sorry.

21   Q.   Or Mr. Matthew Brown?

22   A.   No.

23   Q.   Do you know that name?

24   A.   Yes, it sounds familiar.

25   Q.   How do you know that name?
```

─────────────United States v. Zilevu─────────────
                                                              74

1    A.   It just sounds familiar.

2    Q.   Did you hear the police officer ask you about it in that

3    interview?

4    A.   Mattew Harris?

5    Q.   My question is:  Did you hear the officer say to you --

6              MR. FIORILLO:  Objection, asked and answered.

7              THE COURT:  Refresh his recollection.  If you want,

8    you got the transcript right there, Mr. Brown.

9              MR. BROWN:  Yes, Your Honor.  Thank you.

10             THE COURT:  Last page.

11             MR. BROWN:  Page 8 and --

12             THE COURT:  Yes, you may approach.

13             MR. BROWN:  He has a copy, Your Honor?

14             THE COURT:  I don't think so.

15             Mr. Brown is handing you a transcript of a

16   proceeding in which you were involved.  Handing you page 8.

17             I want you to look at the last seven lines on that

18   page.  Read it to yourself, and then Mr. Brown is going to ask

19   you if that refreshes your recollection about knowing anything

20   about a Matthew Brown.

21             MR. BROWN:  Have you finished reading it?

22             THE WITNESS:  Just one second.  Yeah.

23   BY MR. BROWN:

24   Q.   Okay.  Do you remember the officer asking you about

25   Matthew Brown during that interview?

Cross - K. Blay
─────────United States v. Zilevu─────────
75

1   A.    Yeah.

2   Q.    Now, I understood this volume had to be up a little high

3   so everybody could hear and it can be very difficult for the

4   court reporter to make it out.  And we played in the record.

5   We can play it again.

6              Where the court reporter says "inaudible."

7              THE COURT:  You can refresh his recollection.

8   BY MR. BROWN:

9   Q.    Do you recall the officer said to you, "And all this

10  fraud going on with Matthew Brown on your phone"?

11  A.    I don't remember.  But if it's on file then, yeah.  But I

12  don't remember what he asked me.

13  Q.    You remember just watching it, right?

14  A.    Yeah, I remember.

15  Q.    So that name -- I mean, it's a little bit more than just

16  familiar, right?

17  A.    Right.

18  Q.    I mean, you were actually discussing all the fraud with

19  Matthew Brown in February of 2019, with the police officer,

20  right?

21  A.    Right.

22  Q.    You didn't get charged for anything having to do with

23  Matthew Brown, did you?

24  A.    No.

25  Q.    And you heard the police officer make reference to all

─────────────────────────────────────────────

1  the other stuff that was on your phone, the IDs, the credit

2  cards, the different names, the fake IDs, New Jersey.

3          Do you remember that?

4  A.   Right.

5  Q.   You didn't get charged with that stuff either?

6  A.   No.

7  Q.   The stuff you got charged for had to do with bank

8  accounts and checking accounts in banks; am I right?

9  A.   Correct.

10 Q.   And nothing to do with credit cards, right?

11 A.   Correct.

12 Q.   And when Mr. Zilevu got charged, after you had spoken to

13 investigators in February of 2019, you didn't get charged for

14 any of those crimes, did you?

15 A.   No.

16 Q.   I mean, you're admitting that here today that you did

17 these things, right?

18 A.   Correct.

19 Q.   More than 20 times applications; am I right?

20 A.   Correct.

21 Q.   More than ten of them approved?

22 A.   Correct.

23 Q.   And it's your position you was splitting all of these

24 profits 50/50, right?

25 A.   Yeah, to my knowledge.  Yes.

Cross - K. Blay
─────────United States v. Zilevu─────────
77

1   Q.   How would you do that?

2        How would you split these profits 50/50?

3        Would you pull cash out of ATMs?

4   A.   As I explained earlier, we had ways of getting the money

5   from the parts either through eBay, through PayPal, and

6   through the website he set up.

7   Q.   Okay.  So that would go to your accounts, right?

8   A.   Mostly to Senam's PayPal account and whatever account he

9   had connected to the eBay.

10  Q.   The money wouldn't go to you?

11  A.   No.

12  Q.   How would you get your 50/50 split?

13  A.   He comes to me.  He -- he was it call -- cash -- was it

14  Zelle or Venmo?  He CashApp.  He gives me cash.  He stop by my

15  house.

16  Q.   So CashApp or Venmo would go to your account, right?

17  A.   Right.

18  Q.   So there's a record of that?

19  A.   Right.

20  Q.   You're receiving all these funds?

21  A.   Probably one time.

22  Q.   So the 20 times you applied, the more than ten times they

23  were approved, all this fraud you claim was being committed,

24  you got your 50/50 split one time?

25  A.   No, through that account.  I was in Hawaii on my

Cross - K. Blay

──────United States v. Zilevu──────

78

```
 1  honeymoon, that's when he -- I don't remember if it was Venmo

 2  or CashApp.  He Venmoed me that money.

 3  Q.   That reminds me of something.

 4        What year was your honeymoon, Mr. Blay?

 5  A.   2017, when I got married.

 6  Q.   Hadn't you been the subject to a deportation order in

 7  Virginia since, like, 2010?

 8  A.   Correct.

 9  Q.   How do you fly to Hawaii when you're subject to a

10  deportation?

11  A.   Hawaii is a United States state.  It's just like Virginia

12  or going to Maryland.

13  Q.   Okay.  So you're allowed to fly and you don't have to

14  worry about that?

15  A.   As long as I have my driver's license, yeah.

16  Q.   Okay.  So there was an address where you used to live for

17  about five years, and you recall in your deposition that you

18  couldn't remember that address, you weren't sure?

19  A.   Can you refresh my memory.  I lived in a couple places.

20  Q.   I know.

21        Do you recall me asking you in the deposition, I was

22  curious that you knew Mr. Zilevu's address by heart, but your

23  testimony was you only had been there two or three times?

24  A.   Yeah.

25  Q.   Do you remember that?
```

Cross - K. Blay
─────────── United States v. Zilevu ───────────
79

1   A.   Yeah, I remember that.

2   Q.   But you remember you couldn't remember your own address

3   and you lived there for five years?

4   A.   No, I don't remember.  I don't remember.

5            MR. BROWN:  May I approach the witness, Your Honor.

6            THE COURT:  You may.

7   BY MR. BROWN:

8   Q.   I'm going to try to refresh your recollection.

9            You had your deposition taken on February 21 of

10  2021, correct?

11  A.   Correct.

12  Q.   And at page 34, line 22, you were asked the question:

13       "Question:  You couldn't remember --

14            MR. FIORILLO:  Objection, Your Honor.  This is

15  improper.

16            THE COURT:  Show him the document, Mr. Brown.  See

17  if it refreshes his recollection.

18            When you finish reading that, look up to Mr. Brown

19  and let him know that you've digested what you just read.

20            (A pause in the proceedings.)

21  BY MR. BROWN:

22  Q.   Does that refresh your recollection, Mr. Blay?

23  A.   Yeah.  Not entirely, but, yeah.

24  Q.   Does it refresh your recollection that in your deposition

25  you told me you couldn't remember your own address where you

Cross - K. Blay

──────United States v. Zilevu──────

80

1    lived for five years, but you could remember Mr. Zilevu's

2    address by heart and only been there two or three times?

3    A.    No, that's not what it states on there.

4    Q.    What does it state?

5    A.    22 states -- it doesn't even say I don't recall my own

6    address.

7    Q.    Okay.

8    A.    I don't --

9             THE COURT:  Let me see the document.

10            MR. BROWN:  Line 22 to 25.

11            THE COURT:  Sir, I want you to look at lines 22

12   through 25.  After you read lines 22 through 25, look up, and

13   then Mr. Brown is going to ask you that same question that he

14   asked on lines 22 and 25.

15            And then we want you to provide your answer today.

16            Ask the question, Mr. Brown.

17            MR. BROWN:  Thank you, Your Honor.  I will read it

18   verbatim.

19            "Question:  You couldn't remember your own address

20   you lived at for five years, but you remember Mr. Zilevu's and

21   you've been there less than three times, right."

22   A.    Correct.

23   Q.    "Yes," that's your answer?

24   A.    Yes.

25   Q.    Do you recall in your deposition telling me that you

Cross - K. Blay ──────United States v. Zilevu─────
                                                              81

1  never told me -- you never thought that the Bitcoin wallet

2  information couldn't be traced by the authorities?

3  A.   Yes.

4  Q.   Do you remember telling me that you never said that the

5  fact that Zilevu's address was on the applications for

6  Mr. Fudger and Mr. Brown and his parents was on the Shingleton

7  --

8  A.   Can you please repeat that.

9          THE COURT:  Compound question, Mr. Brown.  Break it

10  up a little bit for him.

11  BY MR. BROWN:

12  Q.   Did you also tell me that it was not your view that

13  using Mr. Zilevu's address on a credit card application

14  couldn't be fixed?

15          It was never your position that it couldn't be

16  fixed?

17  A.   No, I never said that.

18  Q.   You were aware that it could be traced?

19  A.   Yeah.

20  Q.   You also told me that the IP addresses used on the

21  applications for the credit cards were those applications

22  contributed to my client's accounts, the Verizon account.

23          You also testified there's no one -- no thought that

24  that couldn't be traced?

25  A.   No, I never said that.

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────
EASTERN DISTRICT OF VIRGINIA

Cross - K. Blay
─────────────────United States v. Zilevu─────────────────
                                                         82

1              MR. BROWN:  Court's indulgence.

2              THE COURT:  Yes, sir.

3              MR. BROWN:  Your Honor, that's all we have.  Thank

4    you.

5              THE COURT:  How long do you anticipate redirect?

6              MR. FIORILLO:  Ten minutes, Your Honor.

7              THE COURT:  Okay.  Ladies and gentlemen, we're going

8    to go ahead and let the government finish redirect, and then

9    we'll take our afternoon break.

10             MR. FIORILLO:  Thank you, Your Honor.

11                       REDIRECT EXAMINATION

12   BY MR. FIORILLO:

13   Q.  Mr. Blay, you were just asked a couple of questions about

14   the tracing of Mr. Zilevu's address.

15             Do you remember --

16             THE COURT:  Just a second.  Counsel, I have a

17   gentleman that I don't recognize stepped in the courtroom.

18             Make sure he's not a witness.

19             MR. FIORILLO:  No, Your Honor.  At least not for the

20   government.

21   BY MR. FIORILLO:

22   Q.  So, Mr. Blay, the question you were asked about the

23   tracing of the defendant's address and your use and the

24   defendant's use of that address on the credit card

25   applications.

─────United States v. Zilevu─────

1          Do you remember testifying on direct about something

2    you would add to that address?

3    A.    Yeah.

4    Q.    What did you and the defendant add to that address?

5    A.    Like, annex B or apartment B.

6    Q.    And why was that done?

7    A.    So to not -- to, you know, to throw people off to

8    whatever -- being suspicious of that's not the main address,

9    but it's a subaddress in the back or something.

10   Q.    And you also were asked some questions about how you were

11   able to remember Mr. Zilevu's address so readily.

12          You testified that you applied for how many credit

13   card applications?

14   A.    A lot.  Over 20.

15   Q.    Did those credit card applications require you to type in

16   Mr. Zilevu's address?

17   A.    Yeah, it was almost every night.

18   Q.    And you were also asked a bunch of questions about cars.

19   I think one particular about the Land Rover and your use of

20   Mr. Zilevu's address regarding that Land Rover.

21          Why did you do that?

22   A.    My wife at that time --

23          MR. FIORILLO:  Sorry, your hand is covering your

24   mouth.

25   BY MR. FIORILLO:

─────United States v. Zilevu─────

1   A.   I just wanted to hide it from my wife at that time.

2   Q.   Why did you want to hide it from your wife at that time?

3   A.   She know we couldn't afford it.  And also, I just -- I

4   just didn't want her talking in my ear.  So I didn't want her

5   to see the monthly payments on the car.

6   Q.   So you said monthly payments.

7        How did you tell your wife you paid for the car?

8   A.   I told her I paid it cash.

9   Q.   In what?

10  A.   Cash.

11  Q.   And so, the monthly payments, how would you -- how would

12  you receive those bills?

13  A.   The bills were paperless.  But the first couple ones, I

14  think, came through the mail, came through Senam's mail.  But

15  eventually, we turned to paperless and I was paying online.

16  Q.   Did your wife ever see those bills?

17  A.   No.

18  Q.   Oh, and did the defendant give you permission to use his

19  address for that purpose?

20  A.   Yeah.

21  Q.   Did he know that it was because you didn't want your wife

22  to know?

23  A.   Yeah.

24  Q.   And so, did you have the defendant's permission to do so?

25  A.   Yes.

Cross - K. Blay

─────United States v. Zilevu─────

85

1  Q.   And you were asked about a Bitcoin debit coin account and

2  your use of that.

3        Did you and the defendant trade Bitcoin?

4  A.   What do you mean, "trade"?

5  Q.   Defense counsel asked you whether you guys were engaged

6  in the trading of Bitcoin?

7  A.   No.

8  Q.   What were you doing with the Bitcoin in this wallet?

9  A.   Solely to put money in, to buy information on the dark

10 web.

11 Q.   And just backing up one more time about the car and the

12 use of address.

13       Did you ever use the defendant's address without his

14 permission?

15 A.   No.

16 Q.   So there was some discussion of the MacBook and how the

17 defendant ended up with your MacBook and why you felt

18 comfortable with him having this MacBook with incriminating

19 materials on it.

20       Why did you feel comfortable the defendant having

21 something with a bunch of incriminating materials on it?

22 A.   Because I felt like he knows -- he knew exactly

23 everything that was on it.  Even my wife didn't know what was

24 on it.  Senam was the only one who knew exactly what's on the

25 MacBook, so I feel comfortable -- if anybody at all that

─────────────────────────────────────────────────

Cross - K. Blay
─────United States v. Zilevu─────
86

1  should erase it, it should be him.

2  Q.   And we began, at least your cross-examination today, by

3  playing a video of an interview.

4        And do you remember the day of that interview?

5  A.   Yeah.  February 5, 2019.

6  Q.   Was that before you accepted responsibility for the

7  crimes you had committed in Maryland?

8  A.   It was after that, after that interview.

9  Q.   Just to clarify, you accepted responsibility after that

10  interview?

11  A.   Correct.

12        MR. BROWN:  That's all I have.

13        THE COURT:  Is this witness subject to recall?

14        MR. FIORILLO:  No, Your Honor.

15        THE COURT:  Very good.

16        MR. BROWN:  Yes, by the defendant, Your Honor.

17        THE COURT:  Sir, you remain under oath.  Please do

18  not discuss the case or any aspect of the case with anyone

19  while the case is pending.  That is your obligation.

20        Do you have any questions about that, sir?

21        THE WITNESS:  No.

22        THE COURT:  You may step down.

23        THE WITNESS:  Thank you.

24        THE COURT:  You can go ahead and put your mask back

25  on, please, sir.

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────
EASTERN DISTRICT OF VIRGINIA

Cross - K. Blay ———————United States v. Zilevu———

87

1    (Witness excused.) (Conclusion of Kwaku Blay's testimony.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    CERTIFICATE OF REPORTER

2

3          I, Tonia Harris, an Official Court Reporter for

4    the Eastern District of Virginia, do hereby certify that I

5    reported by machine shorthand, in my official capacity, the

6    proceedings had and testimony adduced upon the Jury Trial -

7    Excerpt in the case of the UNITED STATES OF AMERICA versus

8    KWASHIE SENAM ZILEVU, Criminal Action No. 1:19-cr-356, in

9    said court on the 13th day of July, 2021.

10         I further certify that the foregoing 88 pages

11   constitute the official transcript of said proceedings, as

12   taken from my machine shorthand notes, my computer realtime

13   display, together with the backup tape recording of said

14   proceedings to the best of my ability.

15         In witness whereof, I have hereto subscribed my

16   name, this October 15, 2021.

17

18

19

20

21   _____
                            Tonia M. Harris, RPR
22                          Official Court Reporter

23

24

25
```
                                                              88