1

```
1                   UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF VIRGINIA
2                        ALEXANDRIA DIVISION

3    ------------------------------x
                                   :
4    UNITED STATES OF AMERICA,      : Criminal Action No.
                                   :
5              versus              : 1:19-cr-356
                                   :
6    KWASHIE SENAM ZILEVU,          : July 14, 2021
                                   :
7                   Defendant. : FLANNAN SODEN TESTIMONY
     ------------------------------x
8
          The above-entitled Jury Trial - Excerpt was heard
9    before the Honorable Rossie D. Alston, Jr., United States
     District Judge.
10
                         A P P E A R A N C E S
11
      FOR THE GOVERNMENT:    RONALD FIORILLO, AUSA
12                           JAMAR WALKER, AUSA
                             United States Attorney's Office
13                           2100 Jamieson Avenue
                             Alexandria, VA 22314
14

15    FOR THE DEFENDANT:     CHRISTOPHER BROWN, ESQ.
                             526 King Street
16                           Suite 207
                             Alexandria, VA 22314
17
                             PLEASANT BRODNAX, ESQ.
18                           Law Office of Pleasant S. Brodnax,
                             III
19                           1701 Pennsylvania Avenue, NW
                             Suite 200
20                           Washington, DC 20006

21

22

23    OFFICIAL U.S. COURT REPORTER:   MS. TONIA M. HARRIS, RPR
                                      United States District Court
24                                    401 Courthouse Square
                                      Fifth Floor
25                                    Alexandria, VA 22314
```

2

TABLE OF CONTENTS
TRIAL WITNESSES

On behalf of the Government:

Flannan Soden

Direct examination by Mr. Walker.............. 04
Cross-examination by Mr. Brown................ 84

MISCELLANY

Certificate of Court Reporter....................... 103

Direct - F. Soden
────────────United States v. Zilevu────────────

3

```
 1   (Excerpt trial proceedings -- Flannan Soden's testimony.)

 2            MR. WALKER:  Your Honor, the government calls

 3   Flannan Soden.

 4            (Government's witness, Flannan Soden, sworn.)

 5            (Witness seated.)

 6            THE COURT:  Sir, have you been fully vaccinated?

 7            THE WITNESS:  Yes, sir.  Yes, Your Honor.

 8            MR. WALKER:  Your Honor, before we begin, the

 9   government will move into evidence a number of exhibits

10   pursuant to stipulation.  It's a lengthy list, so I'll go

11   slowly, so the courtroom deputy can follow along.

12            THE COURT:  Yes, sir.

13            MR. WALKER:  Government's Exhibit 1, 2A, 2B, as in

14   "boy," 2C, 2D, as in "dog," 2E, 21B, 11C, 11D, 11I, 40, 41,

15   42, 43, 44, 45, 50, 50A, 51, 70, 71, 72, 73, 74, 75, 77, 91,

16   100, 110, 120, 141, 142B, 171, 191, and 303, as we discussed,

17   Your Honor, previously with the signatures by the parties.

18            THE COURT:  Yes, sir.

19            Without objection, Mr. Brown?

20            MR. BROWN:  Without objection, Your Honor.

21            THE COURT:  Without objection.

22                      DIRECT EXAMINATION

23   BY MR. WALKER:

24   Q.   Good morning, sir.

25   A.   Good morning.
```

─Tonia M. Harris OCR-USDC/EDVA 703-646-1438─

EASTERN DISTRICT OF VIRGINIA

─United States v. Zilevu─

1   Q.   Could you please state and spell your name for the

2   record.

3   A.   Yes.  My name is Flannan Soden.  That's F-l-a-n-n-a-n.

4   Last name is S-o-d-e-n.

5   Q.   Where do you work?

6   A.   For the Treasury Inspector General for Tax

7   Administration.

8   Q.   Does the Treasury Inspector General for Tax

9   Administration have an acronym that it commonly goes by?

10   A.   It does.

11   Q.   What is it?

12   A.   TIGTA, T-I-G-T-A.

13   Q.   How long have you worked for TIGTA?

14   A.   Approximately six years.

15   Q.   What's your current title there?

16   A.   Special agent.

17   Q.   Could you describe your duties and responsibilities as a

18   special agent at TIGTA.

19   A.   My duties are to investigate any kind of fraud, waste, or

20   abuse that involves the Internal Revenue Service.

21   Q.   Is it also part of your duties as a special agent at

22   TIGTA to investigate potential criminal activity?

23   A.   Yes.

24   Q.   Could you describe your educational background?

25   A.   My educational background includes a four-year bachelor's

1    degree in criminal justice from Radford University.

2    Q.    What sort of formal training do you have from TIGTA?

3    A.    Formal training, I have, as part of a requirement to

4    become a special agent, I was sent down to the Federal Law

5    Enforcement Training Academy, where I completed the criminal

6    investigator basic training program.

7              In addition to that, I attended a one-month long

8    course for special agent basic training, which is tailored to

9    my position at TIGTA.

10   Q.    Special Agent Soden, are you familiar with the

11   investigation of the defendant, Kwashie Senam Zilevu?

12   A.    Yes.

13   Q.    How are you familiar with that investigation?

14   A.    I conducted the investigation.

15   Q.    How did the investigation first come to the attention of

16   TIGTA?

17   A.    It first came to TIGTA's attention when we had an IRS

18   criminal investigator reach out to my office and he reported

19   that he had made contact with the United States Postal

20   inspector, Jackie Palmer, who reported to him that he believed

21   that there was an IRS employee that was involved in some form

22   of fraud.

23   Q.    Prior to testifying today, were you asked to review and

24   summarize certain financial and transactional records in this

25   case?

─────United States v. Zilevu─────

6

1   A.    I was.

2   Q.    If I could ask you to take a look at what has been marked

3   for identification, but is not yet in evidence, as

4   Government's Exhibits 401, 402, and 403.

5            And, Ms. Tinsley, that's binder 2.

6            Do you have Government's Exhibit 401 in front of

7   you, Special Agent Soden?

8   A.    Yes, I do.

9   Q.    What are we looking at Government Exhibit 401?

10  A.    We are looking at a summary chart for the American

11  Express credit card that was opened using Matthew Brown's

12  identity.

13  Q.    Who prepared this chart?

14  A.    I did.

15  Q.    Could you generally describe what's being summarized in

16  the chart.

17  A.    Yes.  Basically, this describes all of the transactions

18  that occurred using the American Express credit card that was

19  opened using Matthew Brown's identity, to include where these

20  purchases were made as far as businesses or vendors.

21           That also includes the cardholder name, which would

22  be Matthew Brown.  It also illustrates that the card ended in

23  the number 2003.

24           There were also -- it also adds up the total number

25  of transactions of each vendor, and also the date range from

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

 1    the first purchase that was made at each vendor until the last

 2    purchase.  And then, of course, the cumulative total, which

 3    would be the total amount that was spent at each one of these

 4    businesses or vendors.

 5    Q.   And when the same merchant was the source of a

 6    transaction, have you grouped those transactions together for

 7    the members of the jury?

 8    A.   Yes.

 9    Q.   Let's move now to Government's Exhibit 402.

10         What are we looking at in Government's Exhibit 402?

11    A.   Exhibit 402 is another summary chart.  This one is for a

12    U.S. Bank & Trust credit card that was opened using the

13    identity of Larry Fudger.

14    Q.   Who prepared this chart?

15    A.   I did.

16    Q.   Could you generally describe what's being summarized?

17    A.   Same as the last chart.  It's going to show all the

18    transactions that occurred at different businesses and

19    vendors, the cardholder name, the last four digits of the card

20    that was used, total transactions that occurred at each

21    business or vendor, the date range for the transactions, and

22    then also the total amount that was spent at each vendor or

23    business.

24    Q.   Let's move now to Government's Exhibit 403.

25         What is Government's Exhibit 403?

—United States v. Zilevu—

8

1   A.   This is another summary chart.  This one is for the U.S.

2   Bank credit card that was opened using the identity of

3   Clifford Shingleton.

4   Q.   Who prepared this chart?

5   A.   I did.

6   Q.   And in this chart, as similar to the others, have you

7   grouped transactions together when they're made at the same

8   merchant?

9   A.   Yes.

10  Q.   And does this chart also summarize the bank statements

11  associated with the account from U.S. Bank?

12  A.   It does.

13  Q.   Now, are the records that were the sources of

14  Government's Exhibit 401, 402, and 403 voluminous in nature?

15  A.   They were.

16  Q.   Would it be inconvenient to examine all those records

17  here in court today?

18  A.   It would.

19  Q.   Now, at the bottom of these exhibits, have you provided

20  the source of the information contained within these exhibits?

21  A.   Yes.

22  Q.   And do the sources match up with Government Exhibits that

23  had been previously admitted into evidence?

24  A.   Yes.

25  Q.   So if the members of the jury wanted to check your work,

Direct - F. Soden

United States v. Zilevu

9

1  could they review the exhibits that are listed as the sources

2  of these charts?

3  A.   They could.

4          MR. WALKER:  Your Honor, the government moves

5  Government's Exhibits 401, 402, and 403 into evidence.

6          MR. BROWN:  Without creating the appearance that we

7  agree to the accuracy of the records, there's no objection to

8  their admission.

9          THE COURT:  Yes, sir.  Subject to cross-examination.

10          MR. BROWN:  Thank you.

11  BY MR. WALKER:

12  Q.   Special Agent Soden, let's start by talking about the

13  financial chart that you've compiled for the American Express

14  card in the name of Matthew Brown, Government's Exhibit 401.

15          MR. WALKER:  Can we publish that to the jury,

16  please.  I know it's going to be a little bit hard to see.

17  We're going to work through individual sections and enlarge

18  them as we go.  I want to make sure we understand what each of

19  the headings on the chart represents.

20          Ms. Dashoff, if we can highlight all the headings of

21  the columns, please.

22  BY MR. WALKER:

23  Q.   Starting from left to right, the column that says "vendor

24  payee," what's captured in that column?

25  A.   Basically, that describes where the transaction occurred

United States v. Zilevu
10

1   and where the purchase was made, whether that be a business or

2   some other vendor.

3   Q.   What about the second column, "cardholder name"?

4   A.   That's the name of the -- the name that was on the credit

5   card that was used.

6   Q.   And the next column, "payor account"?

7   A.   That just indicates the last four digits on the credit

8   card that was used.

9   Q.   What about the next column that says "transactions"?

10  A.   That is the total of transactions that occurred at that

11  business or vendor.

12  Q.   And in the next-to-last column there, it says "date range

13  of transactions."

14          What's the significance of that column?

15  A.   That illustrates the date that the first purchase was

16  made there and then the -- to the last date of the purchase

17  that would have been made at each business or vendor.

18  Q.   And to be clear, does this mean that a transaction

19  occurred at every day between those date ranges?

20  A.   No.

21  Q.   Now, finally, what's the cumulative total on the far

22  right?

23  A.   That's the total amount that was spent at each one of

24  those businesses or vendors using that credit card.

25  Q.   All right.  Before we go to some specific transactions

────United States v. Zilevu────

1  and talk about how they might have impacted the investigation,

2  I want to first talk about the application associated with

3  this account.

4       Have you reviewed the application associated with

5  Matthew Brown?

6  A.   Yes.

7  Q.   During the course of your investigation, did you have an

8  opportunity to interview the defendant?

9  A.   I did.

10 Q.   When did this interview take place?

11 A.   This occurred on September 19th of 2019.

12 Q.   Who was present for the interview?

13 A.   Kwashie Zilevu, myself, and United States Postal

14 Inspector, Jackie Palmer.

15 Q.   Where did this interview take place?

16 A.   This took place in the New Carrollton federal building

17 located in Lanham, Maryland, which is where my office and both

18 Kwashie Zilevu's office used to be located.

19 Q.   Is that why the interview took place there?

20 A.   That is.

21 Q.   Do you see Mr. Zilevu in the courtroom today?

22 A.   I do.

23 Q.   If you could identify him by where he is sitting and what

24 he is wearing.

25 A.   Mr. Zilevu is sitting to the left of me here.  He's

Direct - F. Soden

United States v. Zilevu

12

1    wearing a blue blazer and a black mask.

2            MR. WALKER:  Your Honor, may the record reflect that

3    the witness has accurately identified the defendant

4    Mr. Zilevu.

5            THE COURT:  It shall.

6    BY MR. WALKER:

7    Q.   What was the defendant's job at the IRS?

8    A.   He was an information technology specialist.

9    Q.   What, if anything, did he tell you during the interview

10   about what that entailed?

11   A.   He indicated that his primary responsibilities included

12   programming and coding for the Electronic Federal Payment

13   Posting System.

14   Q.   On behalf of the IRS?

15   A.   Yes.

16   Q.   Now, prior to asking the defendant any questions, did you

17   advise him of his rights?

18   A.   I did.

19   Q.   Did you inform him that he was under no obligation to

20   talk to you?

21   A.   Yes.

22   Q.   Did you also inform him that if he chose not to talk to

23   you, that no disciplinary action would be taken against him?

24   A.   Yes.

25   Q.   Was he also informed that any statement he may give could

—United States v. Zilevu—

13

 1   be used as evidence in a future criminal, civil, or agency

 2   proceeding?

 3   A.   Yes.

 4   Q.   Was he informed he could consult with a lawyer?

 5   A.   Yes.

 6   Q.   Was he informed he could have a lawyer present?

 7   A.   Yes.

 8   Q.   Was he also informed that he could stop the interview at

 9   any time?

10   A.   He was.

11   Q.   Was he informed that he was free to leave at any time?

12   A.   Yes.

13   Q.   Did he indicate that he understood these warnings and his

14   rights?

15   A.   He did.

16   Q.   Did he nevertheless agree to be interviewed by law

17   enforcement?

18   A.   Yes.

19   Q.   What, if anything, did you ask the defendant about the

20   application for the Matthew Brown card?

21   A.   I asked Mr. Zilevu if he was responsible for submitting

22   that application.

23   Q.   Did you also ask the defendant if he received the card in

24   the name of Matthew Brown?

25   A.   I did.

──────United States v. Zilevu──────

14

1    Q.   What, if anything, did he tell you when you asked if he

2    had applied for and received an American Express card in the

3    name of Matthew Brown?

4    A.   Mr. Zilevu indicated that he did not apply for the credit

5    card in Matthew Brown's name.  However, he did acknowledge

6    that he received the credit card in Matthew Brown's name in

7    the mail and took it out of an envelope.

8    Q.   What did he tell you he did, if anything, after he

9    received the card in the mail?

10   A.   He stated that he used the card to make purchases.

11   Q.   What, if any, explanation did he give you as to why he

12   thought he was permitted to use the card?

13   A.   Mr. Zilevu explained that he had a friend named Kwaku

14   Blay.  He had assisted Mr. Blay in obtaining a $10,000 auto

15   loan, and apparently Mr. Blay had fallen behind on payments.

16   So Zilevu was responsible for making some of those payments

17   since he co-signed on the loan.

18        And as a solution Mr. Blay offered up, his business

19   partner had a credit card and said that, "Here, you can spend

20   $10,000 on this card to make up for the amount that I -- or

21   that you would have owed on that auto loan that you co-signed

22   for."

23   Q.   Who was this purported business partner, according to the

24   defendant?

25   A.   Matthew Brown.

─────────United States v. Zilevu─────────

15

1  Q.   And with that $10,000 number that you mentioned in mind

2  for the loan, I'd like to pull back up Government's Exhibit

3  401 and go to the last page.

4          MR. WALKER:   And, Ms. Dashoff, if we could blow up

5  the totals in the bottom right corner.

6  BY MR. WALKER:

7  Q.   Special Agent Soden, what is the total amount of the

8  transactions that occurred on the Matthew Brown card?

9  A.   $58,209.40.

10  Q.   Is it fair to say that number exceeds 10,000?

11  A.   It is.

12  Q.   During your interview with the defendant, what, if

13  anything, did he say about why he spent so much more than

14  $10,000 on the card?

15  A.   He could not recall why he spent more than $10,000 on the

16  card.

17  Q.   During the course of your review of statements from the

18  Matthew Brown American Express card, did you notice whether

19  payments were made on the card?

20  A.   I did.

21  Q.   What, if anything, did you ask the defendant about the

22  payments that were made on the card?

23  A.   I asked him why he made payments to the card, and he

24  indicated that he made payments in order to make sure that the

25  credit card remained active.

Direct - F. Soden
─────────────United States v. Zilevu─────────────
16

1    Q.   During the course of the investigation, did law

2    enforcement obtain records from some of the various places the

3    Matthew Brown card was used?

4    A.   Yes.

5    Q.   Let's talk about a few of those.

6         MR. WALKER:  Ms. Dashoff, if we could go back to

7    page 1 and highlight the first couple of transactions all the

8    way across, please.

9    BY MR. WALKER:

10   Q.   Special Agent Soden, what's the name of the first vendor

11   or payee that is listed there?

12   A.   PayPal.

13   Q.   What is PayPal?

14   A.   PayPal is an online mobile payment service where you can

15   send payments to businesses and peer-to-peer.

16   Q.   If we could go to the far right there, what was the

17   cumulative total of the PayPal transactions?

18   A.   It would have been $7,950.

19   Q.   Let's take a look at Government's Exhibit 74.

20        Special Agent Soden, what is Government's Exhibit

21   74?

22   A.   This is PayPal records that were obtained for

23   transactions -- for any payments used or for any transactions

24   that occurred using the Matthew Brown credit card ending in

25   2003.

─────────────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────────────
EASTERN DISTRICT OF VIRGINIA

Direct - F. Soden
─────United States v. Zilevu─────
17

1   Q.   Let's go to the second page of these records and first

2   focus on the transaction log section at the top.

3           Do you see the column there that says "name"?

4   A.   I do.

5   Q.   There's a name that's starts with an "M" that is listed

6   three times.

7           What is that name?

8   A.   MacroTele.

9   Q.   Are you familiar with that entity?

10  A.   I am.

11  Q.   How are you familiar with it?

12  A.   During my interview with Kwashie Zilevu, he indicated to

13  me that he owns a business by the name of MacroTele.

14  Q.   Have you reviewed these records before coming to court

15  today?

16  A.   I have.

17  Q.   I want to direct your attention now to the line, line

18  number 4 there, with a date of November 13, 2016.

19          Do you see that?

20  A.   I do.

21  Q.   Now, next to the defendant's business name, it says

22  "type."

23          What is reflected in the "type" section?

24  A.   It says, "Credit card payments sent."

25  Q.   What was the gross or total amount that was paid?

─────United States v. Zilevu─────
18

1    A.    $550.

2    Q.    What credit card was used to pay this $550?

3    A.    The Matthew Brown American Express card ending in 2003.

4    Q.    Looking down at line 8, do you see MacroTele mentioned

5    again?

6    A.    I do.

7    Q.    What is listed as the type of this transaction?

8    A.    Type is "request received."

9    Q.    And the total amount of the request?

10   A.    Paid.

11   Q.    The total amount of the request?

12   A.    $7,400.

13   Q.    And what is the status of the request?

14   A.    Paid.

15   Q.    So let's look at Government's Exhibit 75.  If we could go

16   to page 2, please.

17          Special Agent Soden, looking at the second section

18   there, does this document reflect a $7,400 payment made using

19   the Matthew Brown card ending in 2003?

20   A.    Yes, it does.

21   Q.    And is this the same payment to MacroTele that we were

22   just discussing?

23   A.    Yes.

24          MR. WALKER:  All right.  If we could go back, Ms.

25   Dashoff, to Government Exhibit 74, and focus on the third box

─────United States v. Zilevu─────

1   on page 2 with the e-mail addresses.

2   BY MR. WALKER:

3   Q.   All right.  Special Agent Soden, do you see line 4 on

4   this section?

5   A.   Yes.

6   Q.   What is the "from" e-mail address there?

7   A.   Mbbrown1933@gmail.com.

8   Q.   And what's the "to" e-mail address?

9   A.   Kiddysmall@yahoo.com.

10  Q.   During the course of your interview, what, if anything,

11  did you ask the defendant about this e-mail address

12  kiddysmall@yahoo.com?

13  A.   I asked Mr. Zilevu if that was an e-mail that he used,

14  and he stated that he did.

15  Q.   And the shipping address that's listed for Matthew Brown,

16  what is that purported to be?

17  A.   That is 14520 Gen. Wash. Drive B, Woodbridge, Virginia

18  22193.

19  Q.   Are you familiar with that address?

20  A.   Yes, that's Kwashie Zilevu's or was Kwashie Zilevu's home

21  address.

22  Q.   How do you know that?

23  A.   He advised me that during our interview.

24  Q.   Now, I want to focus for a moment on the "B" that is

25  mentioned in the address there.

──United States v. Zilevu──

20

1    Were you present in court for the testimony of Mr.

2  Blay earlier in trial?

3  A.   I was.

4  Q.   What, if anything, did you hear him say about the use of

5  annex B or apartment B in addresses?

6  A.   Mr. Blay indicated that he would -- they would use "annex

7  B" or apartment such-and-such to try and, you know, make it

8  appear as if the card was not coming directly to Kwashie

9  Zilevu's address, and that it was directed to another

10  apartment or annex there.

11  Q.   Looking below that to line 7, what's the e-mail address

12  listed as the "from" there?

13  A.   Kzilevu@gmail.com.

14  Q.   Did you ask the defendant about this e-mail address?

15  A.   I did.

16  Q.   What did he tell you about it?

17  A.   He stated that that is also an e-mail address that he

18  uses.

19  Q.   Well, if he admitted to you that he used that address and

20  the kiddysmall@yahoo.com, what, if anything, did you ask him

21  about the mbbrown1933@gmail.com address?

22  A.   I asked him if he was responsible for opening that

23  account and if he had used that account.

24  Q.   What did he say?

25  A.   He stated that he has not used that account at all and

United States v. Zilevu

1   was not responsible for opening it.

2   Q.   What, if anything, did he say about connecting that

3   account to the PayPal account?

4   A.   He stated that he was not responsible for doing so.

5   Q.   Special Agent Soden, did you obtain records from Google

6   regarding this mbbrown1933@gmail.com account to determine if

7   the e-mail address was associated with the defendant?

8   A.   Yes.

9   Q.   Let's take a look at Government's Exhibit 70.

10         Special Agent Soden, what are we looking at here?

11  A.   We looking at Google subscriber information for the

12  mbbrown1933@gmail.com account that was opened.

13  Q.   Now, do you see the section that lists a number of IP

14  addresses on this document?

15  A.   I do.

16  Q.   What is an IP address?

17  A.   An IP address is an internet protocol address.  It's much

18  like in real life, you have a physical address where your home

19  or business is located.  This is an address that would tie

20  your physical location to any kind of online activity.

21  Q.   All right.  I want to go down to the IP address

22  information.

23         What's the first IP address that's listed there?

24  A.   100.15.54.9.

25  Q.   Did law enforcement obtain records associated with this

1    IP address?

2    A.    Yes.

3              MR. WALKER:    All right.    If we could pull up

4    Government's Exhibit 2 side by side with Government Exhibit

5    70, Ms. Dashoff.    And if we could enlarge.    Thank you.

6    BY MR. WALKER:

7    Q.    Looking at Government Exhibit 2, do you recognize this as

8    customer's information associated with the IP address you just

9    mentioned?

10   A.    Yes.

11   Q.    Who is the customer associated with this address?

12   A.    Aseye Zilevu.

13   Q.    What is the relationship of Aseye Zilevu to the

14   defendant?

15   A.    That is Kwashie Zilevu's sister.

16   Q.    What is the account address that is listed there?

17   A.    14520 General Washington Drive, Woodbridge, Virginia.

18   Q.    And the phone number that's listed as the evening

19   telephone number, are you familiar with that number?

20   A.    I am.

21   Q.    How are you familiar with that number?

22   A.    That is Kwashie Zilevu's Google Voice telephone number.

23   Q.    And the e-mail address above his Google Voice number,

24   whose e-mail address is that?

25   A.    That's Kwashie Zilevu's e-mail address.

─────United States v. Zilevu─────
23

1   Q.   Did you obtain records from Google associated with

2   Kwashie Zilevu's e-mail address?

3   A.   I did.

4   Q.   Let's go to Government Exhibit 1, please.

5        MR. WALKER:  Enlarge the top portion with the

6   subscriber information, please, Ms. Dashoff.

7   BY MR. WALKER:

8   Q.   Whose name is listed as the subscriber for this e-mail

9   address?

10  A.   Kwashie Zilevu.

11  Q.   And if we could zoom out of that and focus on the bottom

12  half of the subscriber information, please.

13       Special Agent Soden, do you see a recovery e-mail

14  associated with this gmail.com address?

15  A.   I do.

16  Q.   What is the e-mail address listed there?

17  A.   Kwashie.s.zilevu@irs.gov.

18  Q.   Are you familiar with that e-mail address?

19  A.   Yes, that was Kwashie Zilevu's official IRS e-mail

20  address.

21  Q.   And that Google Voice number that you mentioned earlier,

22  ending in 2285, do you see that listed here?

23  A.   I do.

24  Q.   Where is that reflected?

25  A.   Towards the middle, next to where it says "SMS," and then

─────United States v. Zilevu─────

24

1  there's a plus.

2  Q.    There's also a nickname associated with the account.

3          What's the nickname?

4  A.    Kiddy Small.

5  Q.    Let's go back to Government's Exhibit 70.

6          What's the second IP address that is listed there?

7  A.    108.28.0.151.

8  Q.    Did you obtain records associated with this IP address?

9  A.    I did.

10  Q.    Let's go to Government's Exhibit 2B.

11          Are these the records associated with the second IP

12  address that we just mentioned?

13  A.    Yes.

14  Q.    Is this also associated the defendant's e-mail address?

15  A.    Yes.

16  Q.    Do you see the defendant's home address reflected here as

17  well?

18  A.    Yes.

19  Q.    Where is that shown?

20  A.    Towards the middle, directly beside account address.

21  Q.    The Google Voice number that we just discussed, do you

22  see that listed as well?

23  A.    I do.

24  Q.    Where is that reflected?

25  A.    Beside evening telephone number, down towards the bottom.

─────United States v. Zilevu─────

1   Q.   All right.  Let's go back to Government Exhibit 70 and

2   focus on the third IP address.

3             The third IP address appears twice, Special Agent

4   Soden.

5             What is it?

6   A.   96.255.54.88.

7   Q.   Did you obtain information associated with this IP

8   address as well?

9   A.   I did.

10  Q.   If we could pull up Government's Exhibit 2D.

11            Is this the IP address customer information

12  associated with the IP address we just discussed?

13  A.   Yes.

14  Q.   To your knowledge, who is the individual listed as the

15  customer there?

16  A.   The customer is Eva Ahiable.

17  Q.   Do you know who that individual is?

18  A.   That is Kwashie Zilevu's mother.

19  Q.   Do you recognize the account address listed there?

20  A.   Yes.  That is Kwashie Zilevu's parents' address.

21  Q.   How do you recognize that as the defendant's parents'

22  address?

23  A.   Kwashie Zilevu stated that during my interview with him.

24  Q.   Did he also tell you whether or not he had previously

25  lived at that address?

─────────United States v. Zilevu─────────
                                                                    26

 1  A.   Yes, he stated that he had.

 2  Q.   Now, do you recognize the -- I'm sorry.  One second,

 3  please.

 4          You mentioned a moment ago that the address was his

 5  parents' address.

 6  What is the address listed there.

 7  A.   5576 Roundtree Drive, Woodbridge, Virginia 22193.

 8  Q.   All right.  Let's go back to Government's Exhibit 70 once

 9  again.

10          After the defendant's parents' IP address, there's

11  an IP address that begins with 108.56.

12          Do you see that?

13  A.   I do.

14  Q.   What is the full address?

15  A.   108.56.157.38.

16  Q.   Did you obtain records for this IP address?

17  A.   Yes.

18  Q.   If we could pull up Government's Exhibit 2E.

19          Are these the IP address records associated with the

20  address we were just discussing?

21  A.   Yes.

22  Q.   Looking at this document, at what address are these

23  records associated?

24  A.   Kwashie Zilevu's parents' address.

25  Q.   Finally, let's go back to Government Exhibit 70 one more

United States v. Zilevu

Direct - F. Soden

27

1   time.

2          The final IP address associated with the -- with

3   this account appears four consecutive times.

4          Do you see that?

5   A.    I do.

6   Q.    What is that address?

7   A.    72.83.15.13.

8   Q.    And consistent with the other IP addresses we discussed,

9   did you obtain records for this one as well?

10  A.    I did.

11  Q.    Let's look at Government's Exhibit 2C.

12          Looking at Government's Exhibit 2C, do you see the

13  defendant's home address there?

14  A.    I do.

15  Q.    Where is that reflected?

16  A.    Towards the middle of the page, to the right of account

17  address.

18  Q.    Do you also see the defendant's e-mail address and Google

19  Voice number listed?

20  A.    Yes.

21  Q.    Where do those appear?

22  A.    Towards the bottom beside "e-mail address" and "evening

23  telephone number."

24  Q.    What, if any, evidence did you find during your

25  investigation to suggest that this mbbrown1933@gmail.com was

─────United States v. Zilevu─────

1   associated with the real Matthew Brown in any way?

2   A.   None at all.

3   Q.   With that in mind, let's talk about how else that Gmail

4   account was used.

5        Special Agent Soden, are you familiar with what's

6   Google Wallet?

7   A.   I am.

8   Q.   What is your understanding of what Google Wallet is?

9   A.   It's an online payment service.  It could also be mobile.

10  It's like having a digital wallet where you can easily

11  transfer funds to businesses or peer-to-peer.

12  Q.   I'd like you to take a look, with that in mind, at

13  Government's Exhibit 71.

14       If we could go to page 2, Ms. Dashoff.

15       Special Agent Soden, could you read the bolded text

16  at the very top of this exhibit.

17  A.   "You requested $7,750 from mbbrown1933@gmail.com.

18  Q.   And the "to" that is listed there, what is the e-mail

19  address that you see?

20  A.   Kzilevu@gmail.com.

21  Q.   So who is the "you" being referred to there with the "you

22  requested $7,750"?

23  A.   Kzilevu@gmail.com.

24  Q.   On what date was this request sent?

25  A.   May 7, 2016.

─────────── United States v. Zilevu ───────────

1  Q.   Special Agent Soden, from where was this document

2  obtained?

3  A.   This document was obtained through a Google search

4  warrant, which was executed on the e-mail address

5  kzilevu@gmail.com.

6  Q.   So then where specifically was this e-mail communication

7  found?

8  A.   This was located in the inbox.

9  Q.   For what account?

10  A.   For kzilevu@gmail.com.

11  Q.   All right.  I want to shift gears and focus on American

12  Express records for a moment.

13       You testified earlier that the Google Voice number

14  ending in 2285 was the defendant's number.  So with that in

15  mind, I'd like to look at Government's Exhibit 10C.

16       Special Agent Soden, were you in court for the

17  testimony of Investigator Peter Boresky?

18  A.   I was.

19  Q.   Did you hear him say this spreadsheet reflected calls

20  associated with the Matthew Brown American Express account?

21  A.   Yes.

22  Q.   Do you recognize the number at the top of the page?

23  A.   I do.

24  Q.   What number is that?

25  A.   That is Kwashie Zilevu's Google Voice telephone number.

Direct - F. Soden ─────────United States v. Zilevu─────────

30

1   Q.   How many times did that number call into American Express

2   on the Matthew Brown account?

3   A.   Four different times.

4   Q.   Earlier, you testified that Mr. Zilevu admitted that he

5   used kiddysmall@yahoo.com; is that correct?

6   A.   Correct.

7   Q.   Did you obtain customer information for that e-mail

8   address from Yahoo?

9   A.   Yes.

10  Q.   Let's take a look at Government's Exhibit 73.

11          If we could enlarge the first five or six headings

12  there.

13          Do you recognize Government's Exhibit 73?

14  A.   I do.

15  Q.   What is it?

16  A.   This is account subscriber information for the Yahoo

17  e-mail address, kiddysmall@yahoo.com.

18  Q.   Looking down at the line that says "alternate

19  communication channels," can you describe what information is

20  captured there.

21  A.   Yes.  Kwashie Zilevu's kzilevu@gmail.com address, and

22  also Kwashie Zilevu's Google Voice telephone number.

23  Q.   If we could enlarge the name on the account, please.

24          What's the full name listed there?

25  A.   Mr. Senam Zilevu.

Direct - F. Soden
─────────United States v. Zilevu─────────
31

1   Q.   What is the defendant's middle name?

2   A.   Senam.

3   Q.   Now, looking at the "other identities," what's the first

4   other identity listed there?

5   A.   Kiddy Small.

6         MR. WALKER:  If we could go back now to Government

7   Exhibit 401.  And highlight the first few transactions, the

8   first two or three.

9   BY MR. WALKER:

10   Q.   Do you see a vendor listed there named Floor & Décor,

11   Special Agent Soden?

12   A.   Yes.

13   Q.   What is Floor & Décor?

14   A.   Floor & Décor is a store that sells flooring.  Also,

15   interior decorating products.  It would be popular if you're

16   remodeling a home or staging it to sell your own home.

17   Q.   How many transactions were the Matthew Brown card used

18   for at Floor & Décor?

19   A.   Five transactions.

20   Q.   And then what total amount?

21   A.   $3,804.37.

22   Q.   Well, during the course of the investigation, did law

23   enforcement obtain any evidence from Floor & Décor?

24   A.   Yes.  We obtained receipts and also pictures of

25   surveillance footage.

Direct - F. Soden
─────────United States v. Zilevu─────────

32

1   Q.   Let's look now at Government's Exhibit 21.

2            What is Government's Exhibit 21?

3   A.   This is a receipt from Floor & Décor.

4            MR. WALKER:  If we could enlarge the header

5   information at the top, Ms. Dashoff.

6   BY MR. WALKER:

7   Q.   Looking at this portion of the receipt, Special Agent

8   Soden, in what city and state are Floor & Décor located?

9   A.   Woodbridge, Virginia.

10           MR. WALKER:  If we could go now to the bottom of the

11  page and highlight from the -- thank you.

12  BY MR. WALKER:

13  Q.   Do you see the last four digits of the account number

14  listed there?

15  A.   I do.

16  Q.   What are they?

17  A.   2003.

18  Q.   And from what credit card company?

19  A.   From American Express.

20  Q.   And below the word "chip," what is reflected there?

21  A.   "Sign."

22           MR. WALKER:  If we could go back to the top of this

23  exhibit, please, Ms. Dashoff.

24  BY MR. WALKER:

25  Q.   What is the date listed on this receipt?

─────────

Direct - F. Soden

1   A.   January 16, 2017.

2   Q.   And the time?

3   A.   1:58 p.m.

4        MR. WALKER:  All right.  If we could zoom out one

5   more time and go back again to the bottom, the very bottom

6   this time.

7   BY MR. WALKER:

8   Q.   What's the customer name on the receipt?

9   A.   Matt Brown.

10  Q.   And the telephone number, do you recognize that number?

11  A.   I do.

12  Q.   What is it?

13  A.   Kwashie Zilevu's Google Voice telephone number.

14  Q.   Now, the customer name here you said is listed as Matt

15  Brown.

16       Were you present in court for Mr. Brown's testimony?

17  A.   Yes.

18  Q.   Had you seen Mr. Brown before he appeared in court?

19  A.   Yes.

20  Q.   You said a moment ago that the time stamp was January 16,

21  2017 at 1:58 p.m.; is that correct?

22  A.   That's correct.

23  Q.   With that in mind, I'd like to take a look at

24  Government's Exhibit 21A.

25       What is Government's Exhibit 21A?

────────United States v. Zilevu────────
34

1   A.   This is a picture of surveillance footage obtained from

2   Floor & Décor.

3        MR. WALKER:  If we could enlarge the time stamp

4   please, Ms. Dashoff.

5   BY MR. WALKER:

6   Q.   What date and time are reflected in the time stamp?

7   A.   This would have been January 16, 2017, at -- it's in

8   military time -- that converts to 2:01 p.m.

9   Q.   For how soon after the receipt was printed is this image?

10  A.   Three minutes.

11  Q.   Were you in here in court for the testimony of the

12  defendant's sister?

13  A.   I was.

14       MR. WALKER:  If we could enlarge the photograph for

15  a moment, Ms. Dashoff.

16  BY MR. WALKER:

17  Q.   Where, according to the defendant's sister, did he attend

18  college?

19  A.   Virginia Tech.

20  Q.   If we could go back to Government's Exhibit 401, to the

21  very last line of page 1 of the exhibit.

22       Special Agent Soden, what is the last vendor listed

23  there?

24  A.   DSW.

25  Q.   What is DSW?

─────────United States v. Zilevu─────────
                                                                  35

```
 1   A.   Designer Shoe Warehouse.

 2   Q.   How much money was spent at DSW?

 3   A.   $180.10.

 4   Q.   According to the transaction log there, what was the date

 5   of the last transaction that occurred at DSW?

 6   A.   That would have been January 7th of 2017.

 7   Q.   Did law enforcement obtain surveillance evidence from DSW

 8   during the course of the investigation?

 9   A.   We did.

10   Q.   Let's take a look at Government Exhibit 22.

11        What are we looking at in Government's Exhibit 22,

12   Special Agent Soden?

13   A.   This is a picture of surveillance footage that was taken

14   at DSW.

15   Q.   Does this exhibit have a date stamp on it?

16   A.   It does.

17   Q.   What date is that?

18   A.   January 7, 2017.

19        MR. WALKER:   If we could enlarge the photograph, Ms.

20   Dashoff.

21   BY MR. WALKER:

22   Q.   Where you in court for the testimony of Jessica Solomon?

23   A.   I was.

24   Q.   What, if anything, did you hear her say about the

25   defendant's attire when they met at his home?
```

─────United States v. Zilevu─────

1   A.   She stated that he was wearing a trench coat.

2   Q.   Looking at this photo, what does the individual in the

3   photo appear to be wearing?

4   A.   A trench coat.

5   Q.   Special Agent Soden, are you familiar with BJ's

6   Wholesale?

7   A.   I am.

8   Q.   What is it?

9   A.   It's a wholesale store.  They sell big box items, similar

10  to a Costco or a Price Club or Sam's Club.

11  Q.   Based on your investigation, was the Matthew Brown card

12  used at BJ's Wholesale?

13  A.   It was.

14  Q.   Did you obtain evidence related to one of those uses from

15  BJ's?

16  A.   Yes.

17       MR. WALKER:  Let's take a look at Government Exhibit

18  24.

19       If we could highlight the details at the top,

20  please, Ms. Dashoff.

21  BY MR. WALKER:

22  Q.   What is the date reflected on this receipt from BJ's

23  Wholesale?

24  A.   January 8th of 2017.

25  Q.   What is the total amount of the receipt?

————United States v. Zilevu————
37

1   A.    $405.67.

2   Q.    Where was this BJ's Wholesale Club specifically located?

3   A.    Woodbridge, Virginia.

4   Q.    All right.  I want to focus -- zoom out for a minute, and

5   focus on the bottom half of the purchases.

6         Do you see an item number ending in 6092, the second

7   purchase listed there?

8   A.    I do.

9   Q.    What is reflected as being purchased?

10  A.    A body pillow.

11  Q.    All right.  If we could go now to Government's Exhibit

12  24A.

13        Was this photo obtained from the same day as the

14  transaction that occurred at BJ's on January 8, 2017?

15  A.    Yes.

16  Q.    Special Agent Soden, this photo does not appear to have a

17  date and time stamp.

18        How do you know that this surveillance photo was

19  from the same day?

20  A.    We brought Amex statements to the store, and based on the

21  total transaction amount, like the card number that was used

22  and the name, they were able to pull surveillance footage

23  based on those identifiers.

24  Q.    And who is the "they" that you are referring to?

25  A.    Loss prevention.

1    Q.   How much time elapsed between the DSW transaction and

2    this BJ's transaction?

3    A.   From the DSW?  One day.

4    Q.   Now, the large white item on the cart, what does that

5    appear to be?

6    A.   Appears to be a body pillow.

7    Q.   What does the individual carrying the products in this

8    surveillance photo appear to be wearing?

9    A.   A trench coat.

10         MR. WALKER:  If we could go back to Government's

11   Exhibit 401, about 12 lines or so down, Ms. Dashoff.  If we

12   could highlight the section that has Home Depot, Delta, Venmo,

13   and Best Buy.

14   BY MR. WALKER:

15   Q.   Do you see in the enlarged portion, Special Agent Soden,

16   the seventh vendor listed there as Venmo?

17   A.   I do.

18   Q.   What is Venmo?

19   A.   That's another online payment service.  It's actually

20   owned by PayPal, but it's also -- you can send money to and

21   from peers and make purchases at businesses.

22   Q.   How much money from the Matthew Brown American Express

23   card was spent at Venmo?

24   A.   $1,545.

25   Q.   Did you obtain records from Venmo during the course of

United States v. Zilevu

1    the investigation?

2    A.   Yes.

3    Q.   During your interview with the defendant, did you ask him

4    whether he used the mbbrown1933@gmail.com account to open a

5    Venmo account?

6    A.   I did.

7    Q.   What did he say?

8    A.   He said that he did not.

9    Q.   Let's take a look at Government's Exhibit 77.

10            What is Government Exhibit 77, Special Agent Soden?

11   A.   This is a Venmo subscriber information for the Venmo

12   account opened using Matthew Brown's name.

13            MR. WALKER:  If we could enlarge the -- before we go

14   there, Ms. Dashoff, if we can enlarge the registration

15   information, please.

16   BY MR. WALKER:

17   Q.   What's the name listed as the registered information?

18   A.   Matthew Brown.

19   Q.   And below that, do you see where it says "date joined"?

20   A.   I do.

21   Q.   On what date was this account opened?

22   A.   June 30, 2016.

23   Q.   Now, if we could go to the next section that says

24   "identity verified."

25            Now, do you see in the list there where it says

─────United States v. Zilevu─────

40

1    "identity verified" in sort of the second section?

2    A.    Yes, I do.

3    Q.    What two forms of identity were used to verify this

4    account?

5    A.    A Social Security number and a date of birth.

6    Q.    And at the bottom there in the "about" section, do you

7    see a Social Security number and date of birth reflected

8    there?

9    A.    Yes.

10           MR. WALKER:  Let's go now to the second page of this

11   exhibit and enlarge the section that says "cards and bank

12   account."

13           Ms. Dashoff, if we could just enlarge the first two

14   or three columns.  Let's make it a little larger for the

15   members of the jury, please.  Thank you.

16   BY MR. WALKER:

17   Q.    Special Agent Soden, in the section that says "cards,"

18   what is the last four digits of the card that is shown as

19   associated with this Venmo account in Matthew Brown's name?

20   A.    2003.

21   Q.    Are those the same last four digits as the Matthew Brown

22   American Express account?

23   A.    Yes.

24   Q.    Let's focus on the bank account section for a moment.

25           What are the last four digits of the bank account

─────United States v. Zilevu─────
41

1   associated with this Matthew Brown Venmo account?

2   A.    3169.

3   Q.    What's listed as the financial institution there?

4   A.    Wright Patman Congressional FCU.

5   Q.    During your investigation, did you learn whether the

6   defendant maintained any accounts at that bank?

7   A.    I did.

8   Q.    With that in mind, let's take a look at Government

9   Exhibit 120.

10          What are we looking at in Government Exhibit 120?

11  A.    This is a Congressional Federal Credit Union membership

12  application.

13          MR. WALKER:  If we could enlarge the account owner

14  section with the checkmark right above it as well.  Thank you.

15  BY MR. WALKER:

16  Q.    Do you see in the top left corner there where the box is

17  checked that says "I'm already a member"?

18  A.    Yes.

19  Q.    What are the last four digits of the account number

20  associated with that account?

21  A.    3169.

22  Q.    Are those the same last four digits as the bank account

23  used on the Matthew Brown Venmo account?

24  A.    Yes.

25  Q.    What address has the defendant listed here?

─────United States v. Zilevu─────

1  A.    Kwashie Zilevu's parents' address.

2  Q.    And the e-mail address that's reflected there?

3  A.    That is Kwashie Zilevu's official IRS e-mail address.

4  Q.    All right.  Let's shift gears now and talk about hotels.

5        Did you also discover evidence that the Matthew

6  Brown card was used to purchase hotel stays?

7  A.    Yes.

8  Q.    Are you familiar with what's called HotelTonight?

9  A.    I am.

10 Q.    What is HotelTonight?

11 A.    HotelTonight is a booking service that allows you to book

12 higher-end hotels for cheap at the last minute.

13 Q.    If you could please take a look at Government Exhibit 90.

14       Special Agent Soden, what is Government's Exhibit

15 90?

16 A.    This is an e-mail booking confirmation from HotelTonight.

17 Q.    If we could enlarge this section, Ms. Dashoff.

18       What does the bolded information say on this

19 receipt?

20 A.    "HotelTonight booking receipt, November 13, at Trump

21 International Resort."

22 Q.    What e-mail address received this booking confirmation

23 receipt?

24 A.    Kzilevu@gmail.com.

25 Q.    How did you obtain a copy of this booking receipt?

Direct - F. Soden    ─United States v. Zilevu─
                                                                43

1   A.    This was obtained through executing the search warrant on

2   Kwashie Zilevu's or the kzilevu@gmail.com address.

3   Q.    On what date was this e-mail sent?

4   A.    November 13, 2016.

5   Q.    Can you read the sentence that starts with "thanks for

6   booking."

7   A.    "Thanks for booking with HotelTonight.  Here is a receipt

8   for your stay."

9   Q.    Where is the stay reflected in this receipt?

10  A.    It's just below that sentence towards the bottom of the

11  page.

12  Q.    What is the name of the hotel reflected there?

13  A.    Trump International Resort.

14  Q.    And in what location is that resort?

15  A.    In Sunny Isles, Florida.

16  Q.    Is Sunny Isles, Florida, outside the Commonwealth of

17  Virginia?

18  A.    Yes.

19  Q.    If we could scroll down to the "receipt details" section,

20  please.

21        Who is listed as the guest on this stay?

22  A.    Kwashie Zilevu.

23  Q.    What are the check-in and checkout dates?

24  A.    Check-in date is November 13, 2016.  Checkout date is

25  November 14, 2016.

─────────United States v. Zilevu─────────

44

1   Q.   Can you read the sentence that starts with "we charged."

2   A.   "We charged $201 to your American Express card ending

3   2003, under the name HotelTonight."

4   Q.   Is that the same card as the Matthew Brown card that was

5   charged for HotelTonight?

6   A.   Yes.

7   Q.   If we could pull up Government's Exhibit 91.

8        Special Agent Soden, is this another booking

9   confirmation or receipt from HotelTonight?

10  A.   Yes.

11  Q.   How did law enforcement obtain this e-mail receipt?

12  A.   Also a search warrant on the kzilevu@gmail.com address.

13       MR. WALKER:   If we could enlarge the header

14  information, please, Ms. Dashoff.

15  BY MR. WALKER:

16  Q.   On what date was this e-mail sent?

17  A.   This was sent on November 14, 2016.

18  Q.   And on what date was it received?

19  A.   November 14, 2016.

20  Q.   What e-mail address received this booking receipt?

21  A.   Kzilevu@gmail.com.

22  Q.   Special Agent Soden, where was this hotel stay?

23  A.   This would have been the Riviera South Beach in Miami

24  Beach, Florida.

25  Q.   Is Miami Beach, Florida, outside the Commonwealth of

Direct - F. Soden
──────────United States v. Zilevu──────────
45

1   Virginia?

2   A.   Yes.

3   Q.   If we could scroll down to the receipt details.

4          On what date was the defendant checked out of this

5   hotel?

6   A.   Checked out on November 15, 2016.

7   Q.   And what card is reflected as being charged this time?

8   A.   The American Express card ending in 2003.

9   Q.   Now, when, in relation to the stay at the Trump

10  International Resort, was this stay at the Riviera South

11  Beach?

12  A.   The following day.

13  Q.   So if the members of the jury were to look at

14  Government's Exhibit 41, would they see two hotel charges

15  reflected under the name "HotelTonight"?

16  A.   Yes.

17  Q.   Special Agent Soden, you mentioned a moment ago that the

18  checkout date was November 15, 2016; is that correct?

19  A.   That's correct.

20  Q.   Were you also in court for the cross-examination of

21  Matthew Brown?

22  A.   Yes.

23  Q.   Did you hear Mr. Zilevu's lawyers ask him whether someone

24  could just put a person's name on an Uber account?

25  A.   I did.

─────────United States v. Zilevu─────────
                                                        46

```
 1  Q.   With that in mind, let's take a look at Government
 2  Exhibit 80.
 3           Do you recognize this as an Uber receipt you
 4  obtained during the investigation?
 5  A.   Yes.
 6           MR. WALKER:  If we could enlarge first the top right
 7  corner of this exhibit.  The top right.  All the way at the
 8  top.  Thank you.
 9  BY MR. WALKER:
10  Q.   What is the date of this Uber receipt?
11  A.   November 15, 2016.
12  Q.   Is that the same day as the checkout at the Riviera South
13  Beach?
14  A.   Yes.
15  Q.   Now, if we could go to the bottom portion of this receipt
16  and focus on the origin and destination sections, please.
17           What is the origin of this trip listed here?
18  A.   The origin is 5 Aviation Circle, Arlington, Virginia.
19  Q.   Do you know what is located at or near that address?
20  A.   Yes.  That address is at Reagan International Airport
21  located in Arlington, Virginia.
22  Q.   What was the ultimate destination of this trip?
23  A.   It would be 14516 General Washington Drive, Woodbridge,
24  Virginia.
25  Q.   Is that the defendant's address?
```

United States v. Zilevu

1   A.   It's not.

2   Q.   Where is that in relation to the defendant's home?

3   A.   That is directly next to the defendant's home.

4   Q.   We've heard a lot of testimony about the defendant's

5   address being at 14520.

6        How do you know that this is next door and not two

7   doors down?

8   A.   I researched it using Google Maps and could see clearly

9   it was the house directly beside his.

10       MR. WALKER:  I want to go back to Government's

11  Exhibit 401 now and look at the most frequent vendor that is

12  used.  Sort of in the middle of the page, Ms. Dashoff.

13       Amazon, Shell, Uber, and ExxonMobil.  Thank you.

14  BY MR. WALKER:

15  Q.   Do you see the transactions listed for Uber there?

16  A.   I do.

17  Q.   How many transactions occurred at Uber using the Matthew

18  Brown card ending in 2003?

19  A.   49.

20  Q.   And what was the total amount of those charges?

21  A.   $1,065.48.

22  Q.   If we could pull up Government's Exhibit 83.

23       Special Agent Soden, is Government's Exhibit 83

24  another Uber receipt that you obtained during the

25  investigation?

──────United States v. Zilevu──────

48

1    A.   Yes.

2    Q.   If we could focus on the destination and origin

3    information for a moment.

4         What is listed as the destination for this Uber

5    ride?

6    A.   The destination is 14520 General Washington Drive,

7    Woodbridge, Virginia, which is also Kwashie Zilevu's address.

8    Q.   All right.  Special Agent Soden, I want to go back to

9    Government's Exhibit 401 now.

10        Towards the bottom half of the page, there should be

11   a transaction for Sprint wireless.

12        Do you see the third transaction listed in the

13   enlarged section for Sprint wireless?

14   A.   Yes.

15   Q.   On what date did that transaction occur?

16   A.   September 9th of 2016.

17   Q.   And then what was the amount of the charge?

18   A.   $548.88.

19   Q.   Special Agent Soden, are you familiar with an individual

20   named Michelle Purvis?

21   A.   Yes.

22   Q.   Could you spell her last name for the benefit of the

23   court reporter.

24   A.   P-u-r-v-i-s.

25   Q.   How are you familiar with Ms. Purvis?

Direct - F. Soden

49

1   A.   Michelle Purvis is an Internal Revenue Service employee

2   and former coworker of Kwashie Zilevu.

3   Q.   Did you interview Ms. Purvis during the course of the

4   investigation?

5   A.   I did.

6   Q.   Did you request records from Sprint Wireless associated

7   with this $548.88 charge?

8   A.   I did.

9   Q.   If we could pull up Government's Exhibit 100.

10       Special Agent Soden, are we looking at records

11  associated with a Sprint phone number that you requested in

12  connection with this investigation?

13  A.   Yes.

14  Q.   For whose number are these records?

15  A.   For Michelle Purvis's telephone number.

16       MR. WALKER:  If we could go to the second page of

17  this exhibit and enlarge the bottom portion with the account

18  details, please.

19  BY MR. WALKER:

20  Q.   Special Agent Soden, do you see Ms. Purvis's name

21  reflected there?

22  A.   Yes.

23       MR. WALKER:  All right.  If we could go to page 7 of

24  the exhibit and enlarge the top half, please.

25  BY MR. WALKER:

─United States v. Zilevu─

50

1  Q.   Do you see where it says "request type"?

2  A.   Yes.

3  Q.   What is reflected as the request type?

4  A.   Payment.

5  Q.   And on what date did the payment occur?

6  A.   September 9th of 2016.

7  Q.   And is that consistent with the records you examined when

8  you prepared Government's Exhibit 401?

9  A.   It is.

10 Q.   What are the last four digits of the subject number used

11 to make this payment?

12 A.   2003.

13 Q.   You said a moment ago that Ms. Purvis was a coworker of

14 the defendant's.

15        Did you find any evidence to suggest that she had

16 access herself to this credit card?

17 A.   No, I did not.

18 Q.   All right.  In addition to the purchases we've discussed,

19 were there also purchases made at Best Buy using the Matthew

20 Brown card?

21 A.   There were.

22 Q.   Can you just generally describe the types of purchases

23 that were made at Best Buy using the Matthew Brown card.

24 A.   Mainly computer and electronics.  Specifically, an Apple

25 watch, and also there was a Western Digital external hard

─United States v. Zilevu─
Direct - F. Soden
51

1   drive.

2   Q.   Well, generally speaking, where were the Best Buys

3   located, where those purchases were made?

4   A.   In and around the Woodbridge and Springfield, Virginia,

5   area.

6   Q.   During your investigation, did law enforcement also

7   obtain records from Amazon associated with the Matthew Brown

8   Amex card?

9   A.   Yes.

10  Q.   Let's pull up Government's Exhibit 110.

11           Do you recognize these as records obtained from

12  Amazon regarding the Matthew Brown account?

13  A.   Yes.

14           MR. WALKER:   All right.   I want to focus on the

15  middle two columns.

16           If we could enlarge those for a moment, Ms. Dashoff.

17  Columns E and F.

18  BY MR. WALKER:

19  Q.   Do you see the column that says "customer name"?

20  A.   I do.

21  Q.   What is the customer name listed there?

22  A.   Johnny Zilevu.

23  Q.   During the investigation, did you learn who Johnny Zilevu

24  is?

25  A.   Yes.   Johnny Zilevu is Kwashie Zilevu's father.

United States v. Zilevu

Direct - F. Soden

52

1   Q.   To the left of that column, do you see a column labeled

2   "customer e-mail"?

3   A.   I do.

4   Q.   What is the e-mail address listed there?

5   A.   Skiddysmall@hotmail.com.

6   Q.   During your interview with the defendant, what, if

7   anything, did you ask him about this e-mail address?

8   A.   I asked him if that was an e-mail that he used, and he

9   advised that, yes, it is indeed an e-mail that he uses.

10  Q.   If we could go to page 4, to the column marked "shipping

11  name" and focus on that.

12          What's the shipping name reflected on these records?

13  A.   The shipping name is Matt Brown.

14  Q.   If we could go to, next to that, to the shipping address.

15          What's the shipping address?

16  A.   14520 General Washington Drive in Woodbridge, Virginia.

17  Q.   All right.  If we could go to page 5 of this exhibit,

18  please.

19          Looking at page 5, I want to start with the column

20  on the far left that says "shipping phone."

21          What number is listed in that column?

22  A.   That's Kwashie Zilevu's Google Voice telephone number.

23  Q.   And the billing name listed there?

24  A.   Matt Brown.

25  Q.   If we could go to the last four columns and enlarge those

Tonia M. Harris OCR-USDC/EDVA 703-646-1438

EASTERN DISTRICT OF VIRGINIA

1   please, Ms. Dashoff.

2          Do you see a billing phone number listed there?

3   A.   I do.

4   Q.   What is that billing phone number?

5   A.   That is also Kwashie Zilevu's Google Voice telephone

6   number.

7   Q.   And the column that says "CC type," what is reflected

8   there?

9   A.   American Express.

10  Q.   And the name on the credit card?

11  A.   Matthew Brown.

12  Q.   And the last four digits of the credit card number?

13  A.   2003.

14  Q.   Special Agent Soden, during the course of your

15  investigation, did you come to learn whether the Matthew Brown

16  American Express card was used to purchase flights for the

17  defendant and his associates?

18  A.   Yes.

19  Q.   Let's take a look at Government's Exhibit 50.

20          What is Government's Exhibit 50?

21  A.   These are transaction records from Delta Airlines

22  associated with the Matt Brown credit card ending in 2003.

23          MR. WALKER:  If we could enlarge in that first

24  block, the middle column.

25  BY MR. WALKER:

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

─────United States v. Zilevu─────
54

1    Q.    Do you see where it says "PAX name"?

2    A.    Yes.

3    Q.    What name is reflected there?

4    A.    Kwashie Senam Zilevu.

5    Q.    And do you see where it says "ticket DOC total"?

6    A.    Yes.

7    Q.    What is the amount listed there?

8    A.    $781.20.

9           MR. WALKER:  Let's focus for a moment on the

10   itinerary information box and focus on the origin and

11   destination sections of that, please, Ms. Dashoff.

12   BY MR. WALKER:

13   Q.   What is listed as the origin of this trip in the first

14   line?

15   A.    BWI.

16   Q.    What is BWI?

17   A.    Baltimore Washington International Airport.

18   Q.    And the destination?

19   A.    MSP.

20   Q.    What is MSP?

21   A.    Minneapolis-St. Paul airport.

22   Q.    And the second line that lists Minneapolis-St. Paul as

23   the origin, what's the destination code?

24   A.    SMF.

25   Q.    What is SMF?

─────────United States v. Zilevu─────────

1   A.   Sacramento airport.

2   Q.   If we could go to page 3 of this exhibit to the table

3   marked "geographic address information."

4           Whose name is listed there in the geographic address

5   information?

6   A.   Matthew Brown.

7   Q.   What's the address listed there as associated with

8   Matthew Brown?

9   A.   14520 General Washington Drive.

10  Q.   And if we could go to the next section, where it says

11  "electronic address information."

12          Whose e-mail address appears there?

13  A.   Kwashie Zilevu's Gmail address.

14  Q.   Looking down at the bottom column now to the phone

15  address information, whose phone number is reflected there?

16  A.   Kwashie Zilevu's Google Voice telephone number.

17  Q.   Were these purchases made using the Matthew Brown

18  American Express card?

19  A.   They were.

20  Q.   All right.  If we can take a look now at Government's

21  Exhibit 50A.

22          Is this an itinerary for the same trip that we just

23  walked through?

24  A.   Yes.

25          MR. WALKER:  If we could enlarge the first column --

EASTERN DISTRICT OF VIRGINIA

Direct - F. Soden
────United States v. Zilevu────
56

1   sorry, the second column in the first box.  Thank you.

2   BY MR. WALKER:

3   Q.   Do you see where it says "PAX name"?

4   A.   I do.

5   Q.   What's the name reflected there?

6   A.   Nefise Yenilmez.

7   Q.   During the investigation, did you learn who that is?

8   A.   Yes.

9   Q.   Who is it?

10  A.   That's an ex-girlfriend of Kwashie Zilevu.

11  Q.   Was the Matthew Brown American Express card ending in

12  2003 also used to purchase this flight?

13  A.   It was.

14  Q.   What's the total amount reflected at the ticket doc

15  total?

16  A.   $781.20.

17  Q.   Let's go to Government's Exhibit 51.

18         MR. WALKER:  If you can enlarge the top half,

19  please, Ms. Dashoff.

20  BY MR. WALKER:

21  Q.   What are we looking at in Government's Exhibit 51?

22  A.   Itinerary information for an American Airlines flight

23  that was booked using Matthew Brown's Amex -- or the Amex

24  credit card opened using Matthew Brown's identity.

25  Q.   What's the destination of this trip?

─────────United States v. Zilevu─────────
57

1   A.   Destination is Dallas Fort Worth, Texas.

2   Q.   And whose name appears at the top of this itinerary

3   information?

4   A.   Kwashie Senam Zilevu.

5   Q.   And looking down at the bottom under "receipt," where it

6   says "passenger," who is listed as the passenger?

7   A.   Kwashie Senam Zilevu.

8   Q.   What is the total of this ticket?

9   A.   $457.20.

10  Q.   Finally, let's look at Government Exhibit 52.

11       What is Government's Exhibit 52?

12  A.   This is an e-mail booking confirmation or receipt for a

13  South African Airways flight.

14  Q.   And to whose e-mail address was this sent?

15  A.   This was sent to Kwashie Zilevu's Gmail address.

16  Q.   How did law enforcement obtain a copy of this e-mail?

17  A.   This was also from the Google search warrant that was

18  executed on the kzilevu@gmail.com account.

19       MR. WALKER:  If we could highlight the middle

20  portion where the flight information is located, please.

21  BY MR. WALKER:

22  Q.   What is listed under "from/to"?

23       MR. WALKER:  You were fine where you were, Ms.

24  Dashoff.  Thank you.

25  BY MR. WALKER:

─────────────────────────────────────────

1    Q.    What is listed as "from/to" for this flight?

2    A.    Washington Dulles International Airport.

3    Q.    And where did the flight go?

4    A.    To Accra Kotoka.

5    Q.    Do you know where that's located?

6    A.    It's in Ghana.

7    Q.    For whom was this ticket purchased?

8    A.    For --

9    Q.    If we could enlarge the blue section, please.

10   A.    It would have been Eva Ahiable, Zilevu's mother.

11   Q.    If we could go to page 2 of this exhibit near the top,

12   there's a section that says "payment."  Sort of the third

13   block of text.

14         Looking at now on your screen, it's the second line

15   item listed there, what are the last four digits of the card

16   used to purchase these flights?

17   A.    2003.

18   Q.    And the total amount of the purchase?

19   A.    $955.56.

20   Q.    During the course of your investigation, did you discover

21   other purchases made for South African Airways using the

22   Matthew Brown account?

23   A.    Yes.

24         MR. WALKER:  If we could go back to Government's

25   Exhibit 401 one last time.  The sixth vendor listed there is

United States v. Zilevu

1    the one we want to focus on this time.

2    BY MR. WALKER:

3    Q.   Do you see South African Airlines listed in this

4    Government Exhibit 401?

5    A.   Yes.

6    Q.   What is total amount of purchases made at South African

7    Airlines?

8    A.   $2,294.72.

9         MR. WALKER:  All right.  If we could go now to the

10    bottom of page 3 of Government's Exhibit 401 and enlarge the

11    totals again.

12    BY MR. WALKER:

13    Q.   How many total transactions were associated with the

14    Matthew Brown card?

15    A.   349.

16    Q.   Special Agent Soden, I want to move on and talk about the

17    card opened in the name of Larry Fudger.

18         Have you reviewed the application associated with

19    that account?

20    A.   I have.

21    Q.   If we could pull up Government's Exhibit 140.

22         Do you recognize this as U.S. Bank credit card

23    application in the name of Larry Fudger?

24    A.   Yes.

25         MR. WALKER:  If we could go to page 3 of

1    Government's Exhibit 140 and enlarge the e-mail address.

2    BY MR. WALKER:

3    Q.   Special Agent Soden, what e-mail address is listed on

4    this application?

5    A.   Lfudger1952@gmail.com.

6    Q.   What, if any, information were you able to obtain from

7    Google associated with this account?

8    A.   Account subscriber information.

9    Q.   If we could pull up Government's Exhibit 141.

10             Special Agent Soden, what is Government Exhibit 141?

11   A.   This is a record of Google subscriber information

12   associated with that lfudger1952@gmail account, which also

13   reflects the logins to that account.

14   Q.   I want to direct your attention to the login, the second

15   one listed there, ending with .207.

16             Do you see that?

17   A.   I do.

18   Q.   Did law enforcement obtain records associated with that

19   IP address?

20   A.   Yes.

21   Q.   If we could pull up Government's Exhibit 2A.

22             With whose e-mail address is this IP address

23   associated?

24   A.   Kzilevu@gmail.com, Kwashie Zilevu's e-mail address.

25   Q.   And the evening telephone number, whose is that?

─────────United States v. Zilevu─────────
61

1   A.   That's Kwashie Zilevu's Google Voice telephone number.

2   Q.   And the account address, whose address is that?

3   A.   Kwashie Zilevu's address.

4   Q.   If we could go back to Government's Exhibit 2.

5        What is the IP address listed on this page?

6   A.   100.15.54.9.

7   Q.   And with what address is this IP address associated with?

8   A.   Kwashie Zilevu's address.

9   Q.   And looking back at Government's Exhibit 141, do you see

10  the IP address 100.15.54.9 reflected there?

11  A.   Yes.

12  Q.   If we could pull up Government's Exhibit 402.

13       Do you recognize Government's Exhibit 402 as a

14  summary chart you prepared for expenses associated with the

15  Larry Fudger account?

16  A.   Yes.

17  Q.   I would like to direct your attention to the line that

18  says Best Buy.

19       Do you see that?

20  A.   I do.

21  Q.   On what date was the transaction at Best Buy?

22  A.   September 7th of 2017.

23  Q.   For what amount?

24  A.   $794.98.

25  Q.   Let's pull up Government's Exhibit 150.

─────────United States v. Zilevu─────────
62

1          Special Agent Soden, what is Government Exhibit 150?

2  A.   This is an e-mail receipt from Best Buy.

3  Q.   To whom was this e-mail sent?

4          MR. WALKER:  If we could enlarge the header

5  information, Ms. Dashoff.

6  A.   Kzilevu@gmail.com.

7  Q.   How did you obtain this e-mail?

8  A.   This would have also -- this was also obtained through

9  the search warrant conducted on KZilevu@gmail.com.

10  Q.   If we could go to the bottom of the first page here.

11          What city and state are listed as this -- associated

12  with this Best Buy?

13  A.   Woodbridge, Virginia.

14          MR. WALKER:  And going to the next page of

15  Government's Exhibit 150.  If we could enlarge the

16  descriptions and the receipt, please.

17  BY MR. WALKER:

18  Q.   Special Agent Soden, what was purchased on this day from

19  Best Buy?

20  A.   An Amazon Echo Dot and a Samsung LED TV.

21  Q.   For what total amount?

22  A.   $794.98.

23  Q.   If we could zoom out and go to the information directly

24  below the description.

25          Whose name is reflected as associated with these

United States v. Zilevu

1   purchases?

2   A.   Larry Fudger.

3   Q.   If we could go back to Government's Exhibit 402.

4        Do you see a transaction fourth from the bottom for

5   Delta Air?

6   A.   I do.

7   Q.   On what date did the Delta Air transaction occur?

8   A.   On September 8th of 2017.

9   Q.   And for what amount?

10  A.   $942.60.

11  Q.   In the course of reviewing the results of the e-mail

12  search warrant you obtained, what, if any, communications did

13  you discover from Delta regarding this purchase?

14  A.   Could you repeat that.

15  Q.   Yes.

16       Did you discover any communications from Delta

17  regarding this purchase in the defendant's e-mail account?

18  A.   Yes.

19  Q.   If we could pull up Government's Exhibit 160.

20       Do you recognize this as an e-mail from Delta to the

21  defendant?

22  A.   Yes.

23  Q.   Was this e-mail obtained in the connection with the

24  search warrant you've been referencing?

25  A.   Yes.

─────United States v. Zilevu─────

64

1    Q.   On what date was this e-mail sent?

2    A.   September 8th of 2017.

3    Q.   All right.  In the e-mail, I want to focus on the

4    information directly below the Delta logo for a second.

5         Where it says "hello," whose name is reflected

6    there?

7    A.   Kwashie Senam.

8    Q.   In the section that says "depart," what was the departure

9    airport?

10   A.   Washington Dulles International Airport.

11   Q.   Where do these flights ultimately end up?

12   A.   In Montego Bay, Jamaica.

13   Q.   If we could go to page 2, to the middle of the page,

14   where it says "method of payment."

15        What are the last four digits of the card that was

16   used to pay for these flights?

17   A.   5062.

18   Q.   Do you recognize that card number?

19   A.   Yes.

20   Q.   How do you recognize it?

21   A.   That is the last four digits of the credit card that was

22   opened using Mr. Fudger's identity.

23   Q.   What was the total amount charged reflected in this

24   e-mail receipt?

25   A.   $942.60.

—United States v. Zilevu—

65

1          MR. WALKER:  Let's go to Government's Exhibit 402

2    one last time.  If we could enlarge the totals at the bottom

3    of the page.

4    BY MR. WALKER:

5    Q.   Special Agent Soden, how many total transactions were

6    charged to the Larry Fudger U.S. Bank credit card?

7    A.   24.

8    Q.   And in what total amount?

9    A.   $10,273.39.

10   Q.   At some point during the investigation, did you execute a

11   search warrant at the defendant's home?

12   A.   Yes.

13   Q.   On what date did that search warrant occur?

14   A.   On October 3rd of 2019.

15   Q.   During that search warrant, can you just generally

16   describe what was seized.

17   A.   Mainly computer and electronics equipment and storage

18   devices.

19   Q.   With that in mind, I want to shift gears and focus on

20   some of what was found during that search warrant.

21          Let's pull up Government's Exhibit 143.

22          Special Agent Soden, do you recognize Government's

23   Exhibit 143?

24   A.   I do.

25   Q.   What is it?

Direct - F. Soden ─────────United States v. Zilevu─────────

66

1  A.   This looks like a Citibank or this is a Citibank checking

2  account application for Larry Fudger.

3  Q.   How did you obtain this document?

4  A.   This was obtained when our digital forensics lab, they

5  scanned an external hard drive that was seized from Kwashie

6  Zilevu's residence.

7            MR. WALKER:  If we could highlight the header

8  information at the very top for a moment, please.

9  BY MR. WALKER:

10  Q.   On the second line there, there's a reference to MacBook

11  Pro.

12            Whose MacBook Pro does it say this document came

13  from?

14  A.   Kwashie's MacBook Pro.

15            MR. BROWN:  Objection.  Well, it's -- sorry,

16  withdrawn.

17            THE COURT:  Yes, sir.

18  BY MR. WALKER:

19  Q.   Were you finished with your answer, Special Agent Soden?

20  A.   I guess I can repeat it.  Kwashie's MacBook Pro.

21  Q.   Now, I want to focus on the substance of this document

22  for a minute.

23            MR. WALKER:  If we can enlarge the --

24            Thank you.

25  BY MR. WALKER:

─────United States v. Zilevu─────

67

1   Q.   Whose name is listed on this Citibank application?

2   A.   Larry Fudger.

3   Q.   And with what address is Larry Fudger purportedly

4   associated?

5   A.   5576 Roundtree Drive in Woodbridge, Virginia.

6   Q.   Going down to the third page now.

7        Do you see where it says "applicant signature"?

8   A.   I do.

9   Q.   On what date was the application purportedly signed?

10  A.   On February 6th of 2018.

11       MR. WALKER:  If we could go back to the second page

12  for a moment, Ms. Dashoff, and enlarge the information at the

13  top.

14  BY MR. WALKER:

15  Q.   Special Agent Soden, do the date of birth and Social

16  Security number fields on this document appear to be filled

17  out?

18  A.   They do.

19  Q.   During your investigation, what, if any, evidence did you

20  find to suggest that Larry Fudger applied for a City checking

21  account in 2018?

22  A.   None at all.

23  Q.   Let's pull up Government's Exhibit 144.

24       Special Agent Soden, how was this document obtained?

25  A.   This would have been the same instance.  This would have

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

─United States v. Zilevu─
68

1   been an image that was taken from an external hard drive taken

2   from Zilevu's residence during the search warrant.

3           MR. WALKER:  And if you could focus, Ms. Dashoff, on

4   the header information in the top section with the name.

5   BY MR. WALKER:

6   Q.   Whose name is reflected on this document?

7   A.   Larry Fudger.

8   Q.   Special Agent Soden, are you familiar with these types of

9   IRS documents?

10  A.   I am.

11  Q.   What is it?

12  A.   This is a notice informing Larry Fudger that an employer

13  identification number had been opened in his name.

14  Q.   What is the date of this notice?

15  A.   September 27th of 2017.

16  Q.   What, if any, evidence did you find during the

17  investigation to suggest that Larry Fudger actually applied

18  for an EIN in his own name?

19  A.   None at all.

20  Q.   Let's move now to talk about the credit card that was

21  opened in the name of Clifford Shingleton.

22           Have you reviewed the application associated with

23  that account?

24  A.   I have.

25           THE COURT:  Mr. Walker, let's go ahead and take a

United States v. Zilevu
69

1   comfort break right now for everybody as we're sort of

2   switching gears.

3          Ladies and gentlemen, we're going to go ahead and

4   take a ten-minute comfort break.  Please do not discuss the

5   case or any aspect of the case with anyone.

6          We will bring you back in at 12:25 promptly.

7          (Recess.)

8          (Court proceedings resumed at 12:33 p.m.)

9          THE COURT:  Mr. Walker, just for housekeeping, how

10  long do you think you're going to need with this witness?

11         It looks like you are to the last alleged victim.

12         MR. WALKER:  Yes, exactly, Your Honor.  So we're at

13  the end.

14         THE COURT:  Okay.  Mr. Brown, just, again, for

15  logistics, how long do you anticipate cross-examination to be?

16         Let's assume Mr. Walker is finished by 1:00.

17         MR. WALKER:  I will definitely be done by 1:00, Your

18  Honor.

19         MR. BROWN:  I will be done before 2:00, by 2:00.

20         THE COURT:  Then let me -- we're going to need some

21  time because you all are going to need to make some --

22         Is this your last witness, Mr. Walker?

23         MR. WALKER:  Yes, Your Honor.

24         THE COURT:  Okay.  You're going to need to make some

25  strategic decisions on your side.  What I would suggest that

Direct - F. Soden

─────United States v. Zilevu─────

70

 1    we do is assuming that we get through this witness by two

 2    o'clock, if you are in a position to speak with your client

 3    and make whatever strategic decisions you can make, then it

 4    might open us up to do some other things.

 5            So I'll give you as much time, obviously, as you

 6    need to do that.

 7            MR. BROWN:  We won't need much time, Your Honor.

 8    But as soon as he concludes, we'll be able to meet and make a

 9    decision.

10            THE COURT:  Very good.  Thank you very much

11    gentlemen.

12            A couple of little things.  I've gone through the

13    instructions.  It seems that there are disputes over two

14    instructions.  We're not talking instructions now, but I'm

15    just making sure I've got everything.

16            There's dispute over two.  One, the use of the alibi

17    instruction, number one.  And then number two, the "in

18    relation to."  I think the defense wants two words that you

19    don't think apply.

20            MR. WALKER:  I think that sounds right, Your Honor.

21    I think on the ID elements, Mr. Brodnax wants two words that

22    we don't want.  I think that's basically it.  It's not a whole

23    lot.

24            THE COURT:  And I just want to make sure, again,

25    because this is the way I work.  I have an instruction that

United States v. Zilevu

71

1    appears to be the same instruction and I want to make sure

2    that I'm not missing something.  I've read it a couple of

3    times and I think it's the same thing, but I want to make sure

4    that I'm not missing something here.

5              It's instruction number A and instruction number PP.

6              MR. WALKER:  Oh, I think it might have been a sort

7    of autopopulate issue when it was printed to PDF, I think.

8              Are you talking about the elements instruction?

9              THE COURT:  Yeah.  Essential elements to the offense

10   charged, aggravated identity theft.  Instruction letter A and

11   PP look to be the exact same thing.

12             MR. WALKER:  I'm not sure how Mr. Brodnax submitted

13   this last version.  I'm not sure how he numbered it, but --

14             MR. BRODNAX:  The very last one, where we changed

15   the --

16             MR. WALKER:  Yes.

17             MR. BRODNAX:  The very last one, is that PP?

18             MR. WALKER:  Yes.

19             MR. BRODNAX:  So that's the same as what you had

20   submitted?

21             MR. WALKER:  That's the same, yes.

22             MR. BRODNAX:  This is to take the place of what he

23   had submitted?

24             THE COURT:  Okay.  What I'm going to do is --

25             MR. WALKER:  Your Honor, the correct one should not,

United States v. Zilevu

1    for PP, should not have any reference to the word "possess."

2           So if you're looking at one that has reference to

3    the word "possess," that's not the right one.

4           THE COURT:  Okay.  What I'm going to do is, I'm

5    going to hand them down there to you all and let you take a

6    look at them and tell me where the difference is.

7           Just approach.

8           Why don't you, Mr. Brodnax, take a look at that.

9           MR. WALKER:  So there's a third version of this,

10   which Mr. Brodnax filed yesterday, and that is the version

11   that we agree to use.  With the exception of the distinction

12   about whether or not we had "each of" in it.

13          THE COURT:  We'll find it.

14          MR. BRODNAX:  Let me tell you the court document

15   number.

16          THE COURT:  We'll find it.  It's fine.  We'll figure

17   it out.  Again, I was just making sure I wasn't missing

18   something.

19          MR. WALKER:  Okay.

20          THE COURT:  And then two other little things.

21          One, there's instruction lettered M.  It depends on

22   if the defendant exercises his right to testify.  And

23   instruction lettered N affected the defendant's decision not

24   to testify.

25          So on that, we will give either one or the other,

───────United States v. Zilevu───────

73

1    correct?

2            MR. WALKER:  Correct.

3            MR. BRODNAX:  Correct, Your Honor.

4            THE COURT:  Okay.  So I'll set those aside.

5            And then the last one that I had a question about,

6    is the duty of the Court to admonish an attorney.  I didn't

7    admonish anybody, and I typically do not.  So I don't think we

8    need to do that one.

9            MR. WALKER:  I don't have an issue with that, Your

10   Honor, unless you admonish one of us in the next couple of

11   hours.

12           MR. BRODNAX:  We will try to be careful, Your Honor.

13           (Counsel confers.)

14           MR. BRODNAX:  Your Honor, instruction JJ, which is

15   the essential elements of access device fraud.  Element No. 3,

16   I believe should read that the defendant did so to receive

17   payment or any other thing of value aggravating $1,000 or more

18   during any one-year period.

19           THE COURT:  Okay.  Do you have that substitute?  Do

20   you have that substitute?

21           MR. BRODNAX:  Yes.  What we submitted to the Court

22   was wrong.  We left out the word "year."

23           THE COURT:  Marlan, just make sure we get that one.

24           MR. BRODNAX:  That's JJ, instruction JJ.

25           MR. WALKER:  It's the essential elements of access

Direct - F. Soden
────────────────United States v. Zilevu────────────────
74

1   device.

2            THE COURT:  Okay.  All right.  Got it.

3            We got a question from the jury.

4            One of the jurors has submitted this observation.

5   It's not really a question.

6            "Overheard two groups within the jury room

7   discussing how Google is always tracking you, such as

8   listening to your phone, microphone, when the phone is not in

9   use.

10           "Other group mentioned something about the

11  relationship between virtual private networks and IP

12  addresses.  I did not hear mention of any case specifics, but

13  these were heard in passing within the room."

14           MR. WALKER:  Your Honor, if the Court is

15  comfortable, I don't think I've heard anything that suggest --

16           THE COURT:  I consider this just general banter.

17           MR. WALKER:  If the Court wants to just remind the

18  jury not to discuss the case or anything related to it, I

19  guess that would be sufficient.

20           THE COURT:  I'm not going to rat out who sent me.

21           MR. WALKER:  Right.  That's exactly what Mr. Brodnax

22  and I were discussing about.

23           THE COURT:  I won't rat it out.  And I think this

24  is an appropriate thing to do.  This person is taking their

25  role seriously.  That's a good thing.

─────── United States v. Zilevu ───────

1          I'll make this a part of the record.  I'm not going

2    to answer it specifically.  I'll just bring them back and have

3    a general conversation with them.

4          MR. WALKER:  Sounds good, Your Honor.

5          (Jury present.)

6          THE COURT:  Let the record reflect the jury has been

7    seated.

8          Thank you, ladies and gentlemen.  I want to say

9    something to you because it is important.  When we say that

10   we're going to be back at 12:25 or 12:30, we usually take

11   advantage of that time while most of you are taking care of

12   your private or personal needs.  The rest of us are in here

13   working.  We're working pretty hard and sometimes that work

14   that we do is to your advantage.

15          Let me suggest to you that we're getting near the

16   last parts of the trial.  We're working our way through this.

17   And this is critical that you maintain your attention to

18   everything.

19          And also, sort of be careful about the things that

20   you're talking about until the case is submitted to you for

21   your deliberations.  I think I said at the beginning of the

22   trial the legitimate things to start talking about in your

23   banter, and it's a natural thing amongst jurors, they become

24   friends.  You've seen these people for the last three days.

25   You've gotten to know them.  You probably know each by first

United States v. Zilevu

76

1    name, and that's great.  That's the way juries work, and

2    that's the way a collective usually works.

3            But try to be careful about the things that you're

4    talking about when you're just sort of sitting around and

5    shooting the breeze.  The Nats will play tomorrow and they

6    will lose again.  So it's probably a good idea to talk about

7    that, to reserve your comments.

8            But again, thank you, ladies and gentlemen, for your

9    time and attention.

10            MR. WALKER:  May I proceed, Your Honor?

11            THE COURT:  You may.

12   BY MR. WALKER:

13   Q.   Special Agent Soden, we were about to talk about the

14   credit card that was opened in the name of Clifford

15   Shingleton.

16            Have you reviewed the application completed for that

17   credit card?

18   A.   Yes, I have.

19   Q.   If we could pull up Government's Exhibit 170.

20            Do you recognize Government's Exhibit 170 as the

21   application for the credit card in the name of Clifford

22   Shingleton?

23   A.   Yes.

24            MR. WALKER:  If we could go to page 6 of Government

25   Exhibit 170.

—United States v. Zilevu—

77

1          Highlight the e-mail address.

2    BY MR. WALKER:

3    Q.   What is the e-mail address listed on the Clifford

4    Shingleton application?

5    A.   Dok1933@gmail.com [sic].

6    Q.   What, if anything, did --

7          MR. BROWN:  I'm just going to object.  The document

8    speak for itself.  I believe that was a misspelling.

9          THE COURT:  Why don't you ask the question again,

10   Mr. Walker, and the gentleman can reanswer.

11   BY MR. WALKER:

12   Q.   Special Agent, can you just spell all of the letters.

13   A.   Yes.  It's d-o-k-a-y-1-9-3-3@gmail.com.

14   Q.   Did law enforcement obtain records associated with

15   dokay1933@gmail.com?

16   A.   Yes.

17   Q.   If we could pull up Government's Exhibit 171.

18          Do you recognize this as Google subscriber

19   information for this e-mail address?

20   A.   Yes, I do.

21   Q.   For the numbers 1933 that occur in the e-mail address, do

22   they also occur in another e-mail address that we've been

23   discussing?

24   A.   No.

25   Q.   Do they occur -- I want to direct your attention to --

─────United States v. Zilevu─────

1   we've previously been discussing the Matthew Brown.

2   A.   Oh, yeah.  Mbbrown1933.  Sorry.

3   Q.   No worries.

4        So looking down at the IP address information, do

5   you recognize the IP address that appears most frequently, the

6   1000.15.54.9?

7   A.   I do.

8   Q.   Is that an IP address that we've looked at in

9   Government's Exhibit 2 as associated with the defendant?

10  A.   It is.

11  Q.   If we could pull up Government Exhibit 403.

12       Do you recognize this as a summary chart you created

13  for purchases made on the Clifford Shingleton credit card

14  account?

15  A.   Yes.

16  Q.   Looking at the first vendor listed there, what do you

17  see?

18  A.   MacroTele.

19  Q.   What is MacroTele?

20  A.   That is a business Kwashie Zilevu advised that he owns.

21  Q.   Do you also see, about seven lines down, a purchase at

22  Iceland Air?

23  A.   I do.

24  Q.   On what date was that purchased?

25  A.   On December 30th of 2017.

Direct - F. Soden

1   Q.   For what amount?

2   A.   $701.92.

3   Q.   About two lines down or two lines above that, do you see

4   a purchase for PayPal with H-A-I-Y next to it?

5   A.   Yes.

6   Q.   What is the amount of that purchase?

7   A.   $1,000.

8   Q.   And then two lines below Iceland Air, do you see another

9   PayPal reference with a different moniker behind it?

10  A.   Yes.

11  Q.   What is the amount of that purchase?

12  A.   $500.

13  Q.   Did you find evidence related to these PayPal purchases

14  in the defendant's e-mail account?

15  A.   Yes.

16          MR. WALKER:  If we could pull up Government's

17  Exhibit 192.

18          Highlight the -- enlarge the header information at

19  the top, please, Ms. Dashoff.

20  BY MR. WALKER:

21  Q.   Who received this e-mail, Special Agent Soden?

22  A.   Kwashie Zilevu.

23  Q.   On what date?

24  A.   On February 2, 2018.

25  Q.   What is the subject of this e-mail?

Direct - F. Soden ─────United States v. Zilevu─────

80

1   A.   "You sent a payment."

2   Q.   If we could go down to the bottom information.

3        Who is listed as the purported sender of this money?

4   A.   Clifford Shingleton.

5   Q.   And what e-mail address is listed as associated with

6   Clifford Shingleton?

7   A.   Kwashie Zilevu's official IRS e-mail address.

8   Q.   What evidence did you find during the investigation to

9   suggest that that e-mail address, kwashie.s.zilevu@irs.gov,

10  was associated with the real Clifford Shingleton in any way?

11  A.   None.

12       MR. WALKER:  Let's pull back up Government's Exhibit

13  403.

14       If we could enlarge the total amount, the first set

15  of totals.

16  BY MR. WALKER:

17  Q.   Special Agent Soden, how many total transactions were

18  engaged in the Clifford Shingleton card?

19  A.   23.

20  Q.   And what was the amount that was spent?

21  A.   $9,686.69.

22  Q.   Now, below those totals there are other lines that say

23  "total transactions" and "total spent."

24       What are those columns representing in Government

25  Exhibit 403?

─────United States v. Zilevu─────
81

1   A.    Total transactions illustrates the total number of

2   transactions amongst all three credit cards combined, and then

3   the total spent is the total amount that was spent when you

4   combine all three credit cards.

5   Q.    In other words, are these two columns sums of what is --

6   or captured in Government's Exhibit 401, 402, and 403?

7   A.    That is correct.

8   Q.    All right.  You've testified about some of the things the

9   defendant told you when you were interviewing him.  I want to

10  ask about a few more.

11        At the time you interviewed him, what, if anything,

12  did he tell you about how frequently he goes to his parents'

13  house?

14  A.    He said he goes to his parents' house pretty often.  He

15  often teleworked from their house while working at the IRS.

16  Q.    You also testified that he admitted he owned a business

17  called MacroTele.

18        What, if anything, did he tell you about any other

19  businesses that he owned?

20  A.    He advised that he owned two other businesses.  One by

21  the name of FiveStarVPS, and the other by the name of

22  Thetasis.

23  Q.    Could you spell Thetasis.

24  A.    T-h-e-t-a-s-i-s.

25  Q.    What, if anything, did he tell you that those businesses

Direct - F. Soden
────United States v. Zilevu────

82

1  did?

2  A.   He advised that they allowed for or they were tailored to

3  storing and analyzing of data on a virtual private server and

4  also the hosting of websites on a virtual private server.

5  Q.   You also testified earlier that the defendant

6  acknowledged receiving and using a credit card in the name of

7  Matthew Brown.

8         What, if anything, did he admit about receiving the

9  Larry Fudger credit card?

10  A.   He stated that he did receive the Larry Fudger credit

11  card, and that he took it out of the envelope that he received

12  it in and it was mailed to his address.  He opened the

13  envelope and took it out.

14  Q.   What, if anything, did he admit about using the Larry

15  Fudger credit card?

16  A.   He stated that he did use the card to make purchases.

17  Q.   What, if anything, did he admit about receiving the

18  Clifford Shingleton credit card?

19  A.   He stated that he did receive the Clifford Shingleton

20  credit card and, again, took it out of an envelope that he

21  received in the mail.

22  Q.   What, if anything, did he admit about using the Clifford

23  Shingleton credit card?

24  A.   He stated that he did use the Clifford Shingleton credit

25  card.

Direct - F. Soden

1  Q.   Now, what, if any, explanation did he give you about

2  knowing who Clifford Shingleton was?

3  A.   He stated that he had met Clifford Shingleton at his

4  friend Kwaku Blay's wedding in Chantilly, Virginia.

5  Q.   How did he describe what Clifford Shingleton looked like?

6  A.   He stated that he was approximately -- a black male and

7  approximately in his 40s.

8  Q.   Have you seen Clifford Shingleton before?

9  A.   I have.

10  Q.   Is that description true?

11  A.   No.

12  Q.   What, if any, evidence did you ask him about regarding

13  why he started using the cards in the names of Clifford

14  Shingleton and Larry Fudger?

15  A.   He claimed that he could not remember why he started

16  using the cards that he received in their names.

17  Q.   What, if anything, did he tell you about taking

18  responsibility for what he did?

19  A.   He stated that he takes full responsibility for using all

20  three credit cards and making purchases with them.

21  Q.   Well, despite saying that he took full responsibility,

22  what, if anything, did he tell you about applying for the

23  credit cards?

24  A.   He advised that he did not apply for any of the credit

25  cards.

Cross - F. Soden

─United States v. Zilevu─

84

```
 1   Q.   Well, at the time that you interviewed the defendant, had
 2   you seized any electronic evidence from his home?
 3   A.   No.
 4   Q.   To the best of your knowledge, was the defendant aware of
 5   that fact when he claimed he did not submit the applications?
 6   A.   Yes.
 7   Q.   After the interview, did you share with the defendant
 8   what you had documented during the course of your interview?
 9   A.   Yes.
10   Q.   Did he object to the information that you wrote down in
11   any way?
12   A.   No.
13            MR. WALKER:  Nothing further, Your Honor.
14            THE COURT:  Thank you, sir.
15            Cross-examination.
16            MR. BROWN:  Thank you, Your Honor.
17                        CROSS-EXAMINATION
18   BY MR. BROWN:
19   Q.   Mr. Soden, how are you this afternoon?
20   A.   Doing well.  How about you?
21   Q.   Good.
22            I don't want to hold you up too long.
23            Your interview with Mr. Zilevu took place in
24   September of 2019?
25   A.   Correct.
```

Cross - F. Soden

─────────United States v. Zilevu─────────

85

1    Q.   At that point, Mr. Blay had already been interviewed by

2    authorities out of Maryland.

3              Were you aware of that at that time?

4    A.   I don't believe I was aware at that time.

5    Q.   Okay.  When did you become aware of that?

6    A.   It would have been after we arrested Kwashie.  It was

7    after that that we looked at it and saw that Blay had been

8    arrested previously and that an interview had been conducted.

9    Q.   Did you learn at that time that the police had

10   interviewed Mr. Blay in February of 2019, and had discovered

11   all of this, as the officer put it on the video, "all of this

12   fraud with Matthew Brown on Mr. Blay's phone"?

13   A.   That's when we -- yeah, we discovered that interview and

14   the information included in it.

15   Q.   What was found on Mr. Blay's phone?

16             What was all the fraud the officer was referring to?

17   A.   I can't say.  I never saw his phone.  I just can go off

18   of that video and what was mentioned in the video.

19   Q.   So when you learned that that, in fact, was the case and

20   that the law enforcement out there in Maryland had done a

21   search warrant on Mr. Blay's phone and discovered all of this

22   fraudulent in Matthew Brown, you didn't make any efforts to

23   try to review that evidence, did you?

24   A.   No, I did not.

25   Q.   When we talk about these IP addresses, you've heard the

Cross - F. Soden

──────United States v. Zilevu──────

86

1    testimony about the use of TeamViewer, correct?

2    A.    Correct.

3    Q.    And you heard Mr. Blay say he used TeamViewer.  He claims

4    he would use it with Mr. Zilevu.

5          You heard that?

6    A.    I did.

7    Q.    And, in fact, TeamViewer, when you use that and access

8    someone else's system and access the internet, isn't it true

9    that it will reflect your IP as the system you are going

10   through, not your own?

11   A.    From what I've been told, that apparently is the case.

12   Q.    The information you referred to that the government

13   seized from Mr. Zilevu's house, I just want to confirm some

14   representations I made to the jury to make sure I wasn't

15   trying to exaggerate.

16         It was, in fact, 57 terabytes of information,

17   correct?

18   A.    I believe the total amount of everything that was imaged

19   was 57 terabytes.

20   Q.    How much is 57 terabytes?

21   A.    That's a lot.  I mean, most computers now are probably

22   what 10 gigabytes.  That's a fair amount.  I think 1,000

23   gigabytes equal 1 terabyte.  It might be greater than that.

24   Q.    And pursuant to that investigation and the rules, et

25   cetera, my office was provided with about eight DVDs and a

Cross - F. Soden

—United States v. Zilevu—

87

1   2-terabyte external drive.

2           Does that sound about accurate?

3   A.   I believe that's accurate.

4   Q.   And we were provided with some information, some

5   documentation which reflected the results of the forensic

6   review of the items seized from my client's home, correct?

7   A.   Correct.

8   Q.   And two of those items were -- one was -- two of those

9   items were a MacBook Pro; am I right?

10  A.   Correct.

11  Q.   And isn't it true that one of those MacBooks was not

12  accessible for some reason by the forensic investigator?

13  A.   One of the MacBooks was not accessible because it had --

14  there was an encryption software on it that our forensic lab

15  was unable to break into.

16  Q.   The other MacBook, you were able to access the data on

17  that, correct?

18  A.   Correct.

19  Q.   And that is the MacBook I addressed when we discussed --

20  you may agree or not -- I discussed a MacBook with Mr. Blay.

21          Do you recall?

22  A.   I recall.

23  Q.   I discussed a number of items on what would have been his

24  MacBook, and he seemed to acknowledge some of those items,

25  including a fake ID of himself with the name Darnel Navel.

─────United States v. Zilevu─────

1          Do you recall?

2    A.   I recall.

3    Q.   And those, of course, would have been found on the

4    MacBook that your forensic investigator could access, not the

5    one he could not access because we wouldn't know what was on

6    it, right?

7    A.   Correct.

8    Q.   Therefore, we know that the things that were found on a

9    MacBook were all found on, presumably, the MacBook that

10   Mr. Blay says was his MacBook?

11   A.   Well, not all of the evidence was found on that MacBook.

12   Q.   Well, I'm sorry.

13        All the evidence was found on a MacBook.  We don't

14   have to be concerned on which MacBook it's from.  Let me say

15   that.

16   A.   I'm just saying there was more than just the evidence

17   that was pulled off the laptop that you're eluding to was

18   Blay's.  There was more evidence of identity theft on other

19   storage devices.

20   Q.   Okay.  There was a lot more?

21   A.   Yes.

22   Q.   But when it comes down to which MacBook something came

23   from, when it says it's from a MacBook, we know which MacBook

24   it was; am I right?

25   A.   It was identified.  I believe the registry identified it

Cross - F. Soden

─────United States v. Zilevu─────

89

1    as K. Boateng or something along those lines, which is maybe a

2    name that he goes by at --

3              Is that a nickname for him?

4    Q.   For whom?

5    A.   For Kwaku Blay.

6    Q.   Yes.

7              And, in fact, isn't that his middle name?

8    A.   I believe, yeah.  Boateng, I believe.

9    Q.   Just so things are clear, when something came from a

10   MacBook, we know it's from the Boa-whatever, Blay's MacBook?

11   A.   That was seized from Zilevu's home.

12   Q.   Thank you.  Yes, yes.  But, yes.

13             So the answer is "yes"?

14   A.   Yes.

15   Q.   Thank you.

16             Do you recall that there were -- that Mr. Blay had a

17   copy of his own ID on that MacBook?

18   A.   I saw his -- I guess his head was used on multiple

19   identities, from the information I was looking at.

20   Q.   Tell the ladies and gentlemen how many multiple

21   identities you saw Mr. Blay's head on.

22   A.   I couldn't tell you specifically.  I would say over five.

23   Q.   Did you see -- did he have, in fact, his wife's identity

24   on his MacBook?

25             Did you see that?

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────

EASTERN DISTRICT OF VIRGINIA

Cross - F. Soden ─────United States v. Zilevu─────

90

1   A.   I can't say 100 percent.  It sounds familiar, but I can't

2   tell you 100 percent.

3   Q.   Did he have Mr. Zilevu's ID on his MacBook?

4   A.   Not that I recall.

5   Q.   You don't recall seeing that?

6   A.   No.

7   Q.   Was there an individual that you -- was he able to

8   identify if there was an uncle of his?

9        Did you have any discussion with him about that,

10  about some IDs on his MacBook?

11  A.   With Kwaku Blay?

12  Q.   Yes.

13  A.   I don't believe that we -- that's a possibility.  I can't

14  recall if we did confirm that that was his uncle or not.

15  Q.   And so that there's no misunderstanding, so that we're

16  clear, there were, in fact, putting aside people that Mr. Blay

17  knew, there were dozens of pictures of people's IDs and credit

18  cards of people's various names?

19            MR. WALKER:  Your Honor, may we approach.

20            THE COURT:  Yes.

21            (Bench Conference.)

22            MR. WALKER:  Your Honor, I was understanding

23  cross-examination, which is part of the reason why we haven't

24  objected before to this point.  But at this point, it appears

25  that Mr. Brown is attempting to backdoor in the information

─United States v. Zilevu─

Cross - F. Soden

91

1    that the Court kept out.

2        When he was cross-examining Mr. Blay, with respect

3    to credit cards and identity, it is the stack of papers that

4    were provided to the Court earlier.  And so, given that the

5    Court has already ruled that extrinsic evidence is improper

6    and thus improper to be delving into it with Special Agent

7    Soden in an effort to backdoor it in, especially given the

8    fact we didn't discuss any of that information during the

9    course of his direct examination.

10        MR. BROWN:  I appreciate the anticipatory objection.

11    The evidence that the testimony already elicited from Mr. Blay

12    and allowed by the Court, the documents were not.  And I'm not

13    going to attempt to move the documents in, but I, in fact,

14    when I asked about the Blay numbers -- of people and the

15    credit cards on his laptop, and he said "Yes."

16        I listened to the same testimony to corroborate the

17    investigator.  I haven't gone yet to the next step.  If the

18    government wishes to object to, I haven't gone there and I

19    have not intended to.

20        THE COURT:  Okay.  My view is this, and I think that

21    your cross-examination, up to this point, is appropriate,

22    because it does suggest your theory of the case that this is

23    really Blay that's doing all of these things, as opposed to

24    your client.

25        However, I think you're probably at the edge of the

1  cliff as far as that is concerned.  So what I'm going to do is

2  I'm going to let you sum up the last little point that you

3  want to make, and then I'll look forward to moving to another

4  area of examination.

5        MR. BROWN:  Thank you, Your Honor.

6        MR. WALKER:  And, Your Honor, while we're here.

7  Again, I'm not anticipatory of his question, but I don't know

8  if Mr. Brown intends to get into any other statements that

9  Mr. Zilevu may have made to law enforcement, and if he is, I

10  thought it would be efficient by asking about that right now

11  and dealing with that at sidebar before we come back.

12        And so, I don't know if you want, when he brings it

13  up, to come back, so.

14        THE COURT:  Well, I think, because we've already

15  gotten into the things that Mr. Zilevu said that may be

16  incriminating, that he is entitled to some degree of

17  rehabilitation if Mr. Zilevu said things that are not

18  incriminating or less incriminating.  We'll see where he goes

19  with that.

20        MR. WALKER:  Your Honor, the only point I'm

21  making is -- I totally understand the Court's perspective on

22  that.  The only point I'm making is that we entering

23  (indiscernible) it's specific to pertinent points.  And so the

24  reason that we are able to elicit the hearsay from Special

25  Agent Soden is because Mr. Zilevu was a participant.  That

─────────United States v. Zilevu─────────
                                                              93

```
 1   rule doesn't go both ways.

 2            THE COURT:  Yeah, sure.  There's certain

 3   Constitutional implications that Mr. Zilevu enjoys that in the

 4   context of this particular litigation, Mr. Blay does not

 5   enjoy.  So, yeah, I think we're on the same page.

 6            (Open court.)

 7            MR. WALKER:  Thank you, Your Honor.

 8   BY MR. WALKER:

 9   Q.   Mr. Soden, let's talk about your interview with

10   Mr. Zilevu.

11            That interview, it was not recorded by video or

12   audio in any manner?

13   A.   It was recorded via notes.  We write down notes whenever

14   we conduct interviews.

15   Q.   I appreciate you wanting me --

16   A.   But, no, it was not recorded via video or audio.

17   Q.   There is no law against that, is there?

18   A.   There's no law against recording an interview with

19   video/audio?

20   Q.   That's correct.

21   A.   No, it's just --

22   Q.   I'm not asking -- there is no law against it, is there?

23   A.   Not that I'm aware of.

24   Q.   And when you take notes during these interviews, you're

25   talking them contemporaneously as you were interviewing him;
```

Cross - F. Soden
───────────United States v. Zilevu───────────
94

1   am I right?

2   A.   I have a secondary interviewee with me.  U.S. Postal

3   Inspector Jackie Palmer was there.  I was the primary

4   interviewer.  I was taking notes, but he was taking notes, as

5   well, next to me since I was asking most of the questions.

6   Q.   If that were true, I would have received two sets of

7   notes about the interview; is that right?

8   A.   And you did, I believe.

9   Q.   Okay.  I don't believe I did.

10          But anyway, at the end of the notes, you recall -- I

11  can pull them out -- but it says at the very end he admits to

12  using all three cards.

13          Do you recall that?

14  A.   Correct.

15  Q.   So you went through the Matthew Brown card for about how

16  long?

17  A.   It's been almost two years.  But if I were -- I would say

18  probably 15, 20 minutes.

19  Q.   And for how long did you go over the Larry Fudger cards?

20  A.   I couldn't -- honestly, I can't tell you accurately.  I

21  mean, the whole interview entirely was maybe an hour.  So,

22  yeah, I couldn't tell you specifically minutes-wise how long I

23  went over each victim.

24  Q.   Okay.  So if I were to ask you, again, my third question,

25  which is for the record, I'll do, for how long did you go over

Cross - F. Soden

95

1   the Clifford Shingleton card, your answer would be the same?

2   A.   Yeah, I couldn't tell you specifically how long we

3   focused on each victim.

4   Q.   And as you're asking the questions about these three

5   cards, you are contemporaneously, as is your co-interviewer,

6   taking notes on the answers; am I right?

7   A.   That's correct.

8   Q.   And it appears, for whatever reason, at the very end of

9   the interview, the question must have been, "And by the way,

10  did you mean to use all of these cards," and he said "Yes"?

11  A.   At some point during the course of the interview, yes.

12  Q.   And would the point in which it appears in the notes

13  reflect when in the interview the question was presented?

14  A.   Not entirely.  We do a recap at the end of the interview

15  and make sure that we got everything clear.

16  Q.   Okay.

17  A.   And then we will nail down the facts.  And if something

18  is stated, then we'll record it there.

19  Q.   So when you say, "We want to get everything clear," are

20  you suggesting to the jury that during the course of the

21  interview, in the 15 minutes you spent discussing Matt Brown

22  and the unknown amount of time you spent discussing Clifford

23  Shingleton, and the unknown amount of time you spent

24  discussing Larry Fudger, did my client admit to using the

25  cards, but that didn't make its way into the notes until you

Cross - F. Soden                ─United States v. Zilevu─
                                                              96

1   did a recap at the interview?

2   A.   I'm not telling you that's what happened.  No.  If it's

3   in the notes, I can't tell you specifically at what point

4   during the interview that that came out.

5   Q.   But what I'm trying to establish is, is you take the

6   notes contemporaneously as the interview is proceeding; am I

7   right?

8   A.   That's correct.

9   Q.   Meaning, if in the note it reflects that it's at the very

10  end of the notes, that suggests that the question came at the

11  end of the interview; am I right?

12  A.   That would suggest that.

13  Q.   Thank you.

14       You were asked about Exhibit 143, and that was the

15  Citibank checking account application, correct?

16  A.   Correct.

17  Q.   And a couple of things about that one.

18       You know, even Mr. Blay himself says, "I did all my

19  checking account fraud with my soccer friends, and then all my

20  credit card fraud with Mr. Zilevu."

21       Do you recall that?

22  A.   I recall that.

23  Q.   And this is, in fact, a Citibank checking account

24  application, this Exhibit 143?

25  A.   Correct.

United States v. Zilevu

97

1  Q.   And when you were asked by the government, you may

2  remember I stood up a little briefly there, as to, you know,

3  "Whose MacBook was this found on?"

4       And your answer was, "Kwashie's MacBook."

5       Why did you say that?

6  A.   Can you repeat that.

7  Q.   The question was:  "Whose MacBook was this document found

8  on?"

9       And your answer was, "Mr. Zilevu's MacBook."

10      Why did you say that?

11  A.   If I said that, then I misspoke because that information

12  was taken from an external hard drive from his home, from

13  Kwashie Zilevu's residence.

14      I don't believe I said "Kwashie Zilevu's MacBook" is

15  where that originated.

16  Q.   Well, it doesn't say "MacBook" in the path at the top of

17  the document that you're looking at?

18  A.   It does, but this is a backup.  So there was an original

19  MacBook and this data was backed up to an external hard drive,

20  and that's why it contains the registry with Kwashie Zilevu's

21  MacBook.

22  Q.   It was backed up from a MacBook Pro and found on a hard

23  drive.

24      Is that what you're saying?

25  A.   External hard drive, yes, sir.

1  Q.   Okay.  Okay.  You don't have any information as to whose

2  external hard drive that was, other than it was found --

3  A.   It was seized at Mr. Zilevu's.  That's all I have.

4  Q.   The e-mail, dokay -- d-o-k-a-y -- 1933, did you speak to

5  Mr. Blay about this e-mail address given his name?

6  A.   I don't believe I did, no.

7        You said the D-O --

8  Q.   Dokay1933.

9  A.   Correct.

10  Q.   You didn't speak to -- what is Mr. Blay's full name?

11  A.   I believe it's Kwaku Boateng Blay.

12  Q.   And did you ever discuss with him if he went by the

13  nickname K. Odakay (ph)?

14  A.   No.

15  Q.   No.

16        What is required to open an e-mail address?

17        What type of verification or proof of identity is

18  required to open up --

19  A.   Typically --

20  Q.   I'm going to withdraw that question, Your Honor.  I'm

21  sorry.

22        I want to ask this:  The government, you serve a

23  subpoena on Google, on Yahoo, on, I take it, you know, Venmo,

24  PayPal, the hotels, the airlines, et cetera?

25  A.   Most of it, yes.

─United States v. Zilevu─
99

1   Q.   And you received, let's just -- lots and lots of data

2   back; am I right?

3   A.   Correct.

4   Q.   There would have been perhaps thousands of e-mails, if

5   I'm not mistaken?

6   A.   In the kzilevu@gmail.com, yes, there were thousands of

7   e-mails.

8   Q.   And if I'm not mistaken, the 2-terabyte drive I received

9   is essentially all of the 2-terabytes of e-mails that were

10  received from Google and Yahoo?

11  A.   I believe so.

12  Q.   Okay.  And there were search terms used by the forensic

13  investigator, right?

14  A.   Correct.

15  Q.   Things like "Zilevu," or "Boateng," or "Blay"?

16  A.   Or "victim."

17  Q.   Or "Singleton," or "Fudger," and "Brown," et cetera?

18  A.   Exactly.

19  Q.   And there's a list of maybe 40 or 30 search terms, a lot

20  of search terms, right?

21  A.   Correct.

22  Q.   Do you have the two exhibit books in front of you?

23  A.   I've got exhibit book 202.

24  Q.   202.

25          Let me just say this.  I can deal with the other

1   part later.

2          You heard Mr. Blay say that he communicated

3   regularly with Mr. Zilevu; am I right?

4   A.   That's correct.

5   Q.   So I take it that -- well, I don't know if you looked at

6   those thousands of e-mails or not?

7   A.   I did.

8   Q.   The search terms were conducted and you reviewed the

9   results of those investigations, that search?

10  A.   Correct -- no.

11         Can I explain a little bit to you.

12  Q.   Well, just -- you know what the results of the search

13  warrant as far as things coming up as positive results?

14  A.   I'd just like to explain to clarify for you kind of what

15  the process was.

16  Q.   Sure.

17  A.   So the search of the all the electronics we received and

18  the computers that were taken from Mr. Zilevu's residence,

19  that goes over to our digital forensics lab.  And they'll

20  ask -- because of the voluminous nature of everything we

21  seized, and as you alluded to, 57 terabytes is a lot, they

22  asked for certain keywords.

23         So we'll send over stuff as we think of it.  And

24  what you see in that index is what was searched.

25  Q.   Thank you.  I appreciate that.

────────United States v. Zilevu────────

1           Did you -- during your interview of Mr. Blay, did

2   you ask him if he had introduced Mr. Zilevu to Clifford

3   Shingleton?

4   A.   No.

5   Q.   Why not?

6   A.   He didn't know Clifford Shingleton.  He stated he never

7   met anyone named Clifford Shingleton.

8   Q.   So you believed him?

9   A.   Yes.

10  Q.   And there's been -- one point, I don't want there to be

11  any confusion.

12          One of the -- when you referred to this company that

13  Mr. Zilevu had, MacroTele.  And we want to say MacroTele or

14  MacroTele, I'm not sure.

15          It gets spelled differently on certain occasions.

16          Did you notice that?

17  A.   I did notice that.

18  Q.   It's MarcroTele or MacroTele.

19          What is the explanation for that?

20  A.   I believe that's just a simple typo.

21  Q.   So I mean, is it a typo if it's on a credit card invoice,

22  if that's the company paid?

23          In other words, MarcroTele would be a different

24  company than MacroTele, correct?

25  A.   Well, when you submit your payment, I believe it's up to

Cross - F. Soden
─────────United States v. Zilevu─────────
102

1   the user in PayPal to enter that information correctly when

2   I'm paying somebody.  That's where you type in the entity that

3   you're paying.

4   Q.   Okay.  So that would mean -- that would suggest that the

5   person whose doing the paying is putting in the name, and

6   whether they put in MacroTele or MarcroTele, they are the ones

7   determining to whom that money is going to go, but the

8   eventual person who gets it, you think maybe it was just a

9   typo?

10  A.   Correct.  That's my assumption.  I could be wrong.

11              (Counsel confers.)

12              MR. BROWN:  No further questions, Mr. Soden.  Thank

13  you very much.

14              THE COURT:  Any redirect?

15              MR. WALKER:  Court's indulgence, Your Honor.

16              THE COURT:  Yes.

17              MR. WALKER:  Your Honor, we have no further

18  questions.

19  (Witness excused.)(Conclusion of Flannan Soden's testimony.)

20

21

22

23

24

25

─────Tonia M. Harris OCR-USDC/EDVA 703-646-1438─────
EASTERN DISTRICT OF VIRGINIA

1                    CERTIFICATE OF REPORTER

2

3          I, Tonia Harris, an Official Court Reporter for

4   the Eastern District of Virginia, do hereby certify that I

5   reported by machine shorthand, in my official capacity, the

6   proceedings had and testimony adduced upon the Jury Trial -

7   Excerpt in the case of the **UNITED STATES OF AMERICA versus**

8   **KWASHIE SENAM ZILEVU**, Criminal Action No.: 1:19-cr-356, in

9   said court on the 14th day of July, 2021.

10         I further certify that the foregoing 103 pages

11  constitute the official transcript of said proceedings, as

12  taken from my machine shorthand notes, my computer realtime

13  display, together with the backup tape recording of said

14  proceedings to the best of my ability.

15         In witness whereof, I have hereto subscribed my

16  name, this October 15, 2021.

17

18

19

20

21  _____

22  Tonia M. Harris, RPR
    Official Court Reporter

23

24

25

                                                    103